**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

UTICA MUTUAL INSURANCE COMPANY,

                         Plaintiff,                    6:12-cv-00196 (BKS/ATB)

v.

MUNICH REINSURANCE AMERICA, INC.,

                         Defendant.

_____

MUNICH REINSURANCE AMERICA, INC.,

                         Plaintiff,                    6:13-cv-00743 (BKS/ATB)

v.

UTICA MUTUAL INSURANCE COMPANY,

                         Defendant.

_____

**Appearances:**

Mary Beth Forshaw
Christopher G. Lee
Simpson, Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
For Utica Mutual Insurance Company

Syed S. Ahmad
Hunton & Williams LLP
2200 Pennsylvania Avenue NW
Washington, D.C. 20037
For Utica Mutual Insurance Company

Bruce M. Friedman
Crystal D. Monahan
Jason B. Eson
Rubin, Fiorella & Friedman LLP
630 Third Avenue, 3rd Floor
New York, NY 10017
For Munich Reinsurance America, Inc.

**Hon. Brenda K. Sannes, United States District Judge:**

<strong>MEMORANDUM-DECISION AND ORDER</strong>

## I.      INTRODUCTION

These related diversity breach of contract actions arise from Utica Mutual Insurance

Company's ("Utica") attempts to seek payment from Munich Reinsurance America, Inc.

("Munich") under the terms of the facultative reinsurance certificates[1] Munich issued to Utica in

1973 (12-cv-196) ("*Utica I*") and 1977 (13-cv-743) ("*Utica II*").[2]  Munich has paid Utica the $5

million and $1 million loss limits of the reinsurance certificates; at issue in this case is whether

Munich is required to pay defense expenses in addition to those loss limits.  In *Utica I*, Utica

claims that Munich violated the 1973 facultative reinsurance certificate ("1973 Certificate") by

failing to pay $2,760,533.96 in expenses.  In *Utica II*, Munich claims that Utica violated the

terms of the 1977 facultative reinsurance certificate ("1977 Certificate") by demanding payment

for an additional $789,813.47 in expenses after Munich had already paid the $1 million loss

limit.  In *Utica I*, Utica seeks to enforce the terms of the 1973 Certificate and judgment in the

---

[1]"Reinsurance 'is essentially insurance for insurance companies.'"  Barry R. Ostrager & Mary Kay Vyskocil, Modern Reinsurance Law and Practice § 1:01 (3d ed. 2014) (quoting *Emp'rs Reins. Corp. v. Mid-Continent Cas. Co.*, 358 F.3d 757, 761 (10th Cir. 2004)).  In a "facultative reinsurance" policy, the "ceding insurer purchases reinsurance for a part, or all, of a single insurance policy."  *Unigard Sec. Ins. Co., Inc. v. N. River Ins. Co.*, 4 F.3d 1049, 1054 (2d Cir. 1993).

[2] For convenience, unless otherwise specified, docket citations are to the filings in 12-cv-196.

amount of $2,760,533.96.[3]  In *Utica II*, Munich seeks a declaration that Utica violated the terms of the 1977 Certificate and judgment in the amount of $789,813.47.

Presently before the Court are: (1) Munich's motion for summary judgment as to defense costs with respect to the March 1, 1974 mid-term endorsement (Dkt. No. 300-3); (2) Munich's motion for summary judgment as to defense costs on the basis of collateral estoppel (Dkt. No. 300-4); (3) Munich's motions for summary judgment as to defense costs (Dkt. No. 300-5; *Utica II*, Dkt. No. 239-2); (4) Utica's motions for summary judgment as to allocation (Dkt. No. 302; *Utica II*, Dkt. No. 242); (5) Munich's motions to strike the statements contained in a number of declarations Utica submitted in support of its motion for summary judgment (Dkt. No. 314; *Utica II*, Dkt. No. 254); and (6) Utica's motion for summary judgment as to Munich's claim for reimbursement (*Utica II*, Dkt. No. 241).  For the following reasons, with the exception of Utica's motion for summary judgment with respect to Munich's quasi contract claims in *Utica II*, which is granted, the parties' motions are denied.

## II.    FACTUAL BACKGROUND

### A.    Overview

Utica issued primary general liability insurance policies ("primary policies") to Goulds Pumps Inc. ("Goulds") from at least 1955 through at least 1986.[4]  (Dkt. No. 300-1, ¶ 1; Dkt. No. 311, ¶ 1).  Each primary policy contained either a $300,000 or $500,000 per occurrence limit and while they obligated Utica to defend, once "the applicable limit of . . . liability has been exhausted by payments of judgment or settlements," Utica was no longer required to pay defense

---

[3] Utica originally sought $3,283,304.55 but has reduced the amount it seeks under the 1973 Certificate to $2,760,533.96.  (Dkt. No. 311, ¶ 20).

[4] The facts giving rise to the present actions have led to a number of other lawsuits between Utica and its reinsurers, including several in this district, and have been recounted extensively.  *See*, *e.g.*, *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, No. 13-cv-1178, 2016 WL 254770, 2016 U.S. Dist. LEXIS 6219 (N.D.N.Y. Jan. 20, 2016); *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*, 238 F. Supp. 3d 314 (N.D.N.Y. 2017).

costs.  (Dkt. No. 300-1, ¶¶ 23, 46).  Utica also issued a number of umbrella policies to Goulds for

various years during that time period.  (Dkt. No. 300-1, ¶ 2; Dkt. No. 311, ¶ 2).  The two that are

relevant to this action are: the 1973 policy ("1973 Umbrella"), which provided $25 million in

coverage to Goulds; and the 1977 policy ("1977 Umbrella"), which provided $3 million in

coverage.  Utica obtained reinsurance on both umbrella policies through Munich—a $5 million

facultative reinsurance certificate ("1973 Certificate") on the 1973 Umbrella and a $1 million

facultative reinsurance certificate ("1977 Certificate") on the 1977 Umbrella.  (Dkt. No. 301-3, at

2–3; Dkt. No. 301-33, at 2–4); (Dkt. No. 301-86, at 2–3; Dkt. No. 301-31, at 2–4); (Dkt.

No. 300-1, ¶¶ 17, 19; Dkt. No. 311, ¶¶ 17, 19).

Sometime prior to 2003, Goulds began to be named as a defendant in asbestos bodily

injury lawsuits.  (Dkt. No. 300-1, ¶ 5; Dkt. No. 311, ¶ 5).  At first, Utica handled Goulds' claims

under the primary policies, including the primary policies for calendar years 1973 and 1977,

which required Utica to defend and indemnify Goulds until indemnity payments exhausted the

liability limits.  (*Id*.).  At some point, Utica informed Goulds that all of the primary policies

contained aggregate limits for occurrences—i.e., that the $300,000 or $500,000 occurrence limit

did not reset for each new asbestos claim or occurrence but was the maximum available for each

policy year—and that it was paying the asbestos claims under the umbrella policies.[5]  (Dkt.

No. 300-1, ¶ 7; Dkt. No. 311, ¶ 7).

In February 2003, Goulds brought Utica into an existing coverage litigation against other

liability insurers in California state court—Goulds alleged, *inter alia*, that certain Utica primary

---

[5] All but one primary policy was claimed to have paid its alleged aggregate limit by January 30, 2003, and to have been exhausted.  (Dkt. No. 305-1, ¶ 72; Dkt. No. 320-1, ¶ 72).

policies did not contain aggregate limits, had not been exhausted,[6] and that Utica had therefore failed to fulfill its obligations under all the primary and umbrella policies it issued to Goulds. (Dkt. No. 300-1, ¶¶ 6–7; Dkt. No. 311, ¶¶ 6–7; Dkt. No. 302-2, ¶ 7).  Later that month, Utica advised Goulds that, although "certain of the primary liability insurance policies were exhausted by claim payments for asbestos losses in January 2003," it would provide defense cost coverage to Goulds under its umbrella policies, that the "sum of indemnity and expense payments are the 'ultimate net loss' for your umbrella policies from 1964 through 1976," and that the "policies from 1977-1987 had a defense provision in addition to policy limits."  (Dkt. No. 305-1, ¶ 71; Dkt. No. 320-1, ¶ 71).

In October 2003, Utica filed a lawsuit against Goulds in New York state court, seeking a declaration of duties under its insurance contracts with Goulds.  (Dkt. No. 302-2, ¶ 8).  At issue in both cases was whether California or New York law applied, the method of allocating the claims, whether Utica was entitled to continue to control the defense of the Goulds claims, and whether the primary policies Utica had issued to Goulds contained aggregate limits.[7]  (Dkt. No. 302-2, ¶ 9–11).  In the New York litigation, as in the California litigation, Goulds argued

---

[6] According to Utica, "[a] primary policy with a $100,000 occurrence limit and no aggregate limit could conceivably pay up to $100,000 for each asbestos bodily injury claim, with no cap on the number of such claims."  (Dkt. No. 302-1, at 9).

[7] In a February 21, 2007 email to Utica's Board of Directors, Utica's then president, J. Douglas Robinson, explained his understanding of the "aggregate limits" issue under California law as follows:

> Of all Goulds' allegations, the lack of aggregate limits of liability for asbestos claims presented the most significant downside to Utica. Under California law, an insured gets to select the policy year in which claims are processed (the "all sums" approach).

> If successful there, Goulds could select a policy year in which there was no aggregate limit of liability and have all asbestos claims handled in that year - without contribution from Goulds' other carriers. The policy would never exhaust and we would be required to apply a $500,000 limit to every asbestos claim in the primary layer. That would prevent claims from going into the umbrella layer and the reinsurance recovery that would follow. With over 140,000 asbestos claims presented, that would be catastrophic result for Utica.

(Dkt. No. 305-1, ¶ 153; Dkt. No. 320-1, ¶ 153).  In contrast, "[u]nder a pro rata allocation, each payment is spread evenly across the applicable years and goes up the 'tower' as lower-level policies exhaust."  (Dkt. No. 302-1, at 19 n.10 (citing *E.R. Squibb & Sons v. Lloyd's & Cos.*, 241 F.3d 154, 172 (2d Cir. 2001))).

that certain primary policies Utica issued to Goulds did not state an aggregate limit of liability for products liability losses—such as asbestos bodily injury claims—and therefore had not been exhausted.  (Dkt. No. 300-1, ¶ 80; Dkt. No. 311, ¶ 80).

By 2005, Utica had made more than $46 million in indemnity payments.  (Dkt. No. 300-1, ¶ 106; Dkt. No. 311, ¶ 106).  Utica, in furtherance of its contention that the primary policies contained aggregate limits, allocated $12.3 million to the primary policies, including approximately $9 million in defense costs, purportedly exhausting them, and allocated the remainder to the umbrella policies. (Dkt. No. 300-1, ¶¶ 106, 117; Dkt. No. 311, ¶¶ 106, 117).  By the end of 2006, Goulds had presented more than 140,000 claims to Utica seeking coverage in connection with the asbestos claims against it.  (*Id*.).

In February 2007, Utica and Goulds executed a $325 million settlement agreement, which was, in light of their agreement that the primary policies were exhausted (thus resolving the issue of aggregate limits in Utica's favor), to be paid entirely under the umbrella policies. (Dkt. No. 300-1, ¶ 14; Dkt. No. 311, ¶ 14; Dkt. No. 301-1).  The parties agreed, among other things, to dismiss the New York action and Goulds' claims against Utica in the California actions. (Dkt. No. 300-1, ¶ 14; Dkt. No. 311, ¶ 14; Dkt. No. 301-1).

The settlement agreement recognized that Utica had previously "paid Defense Costs and Indemnity Costs on behalf of Goulds under the Goulds Primary Policies and the Goulds Umbrella Policies" and, in doing so, had "exhausted the limits of liability applicable" to the asbestos claims under the primary policies and "impaired certain limits of liability of the Goulds

Umbrella Policies."[8]  (Dkt. No. 301-1, at 4).  Utica, therefore, was not required to make further

payment under the primary policies.  (Dkt. No. 313-108, at 44).

      The settlement agreement further recognized that Goulds and Utica had "asserted claims

against each other . . . regarding the payment of Defense Costs and Indemnity Costs . . . pursuant

to the terms and conditions of the Goulds Policies including, but not limited to, those claims

involving whether Utica Mutual's obligations to pay or reimburse Defense Costs or Indemnity

Costs under certain Goulds Policies are limited." (*Id*. at 5).  Goulds and Utica therefore agreed

that the "remaining limits of liability under the Goulds Umbrella Policies," which the settlement

agreement set at $325 million, "will be 'capped' for the payment of Goulds Claims."  (*Id*. at 5).

In this regard, the settlement agreement provides that Utica's payment "of Qualified Expenses

. . . will erode the Unimpaired Limits of each Goulds Umbrella Policy until such Unimpaired

Limits are exhausted,"[9] (Dkt. No. 301-1, at 19), and defines "Qualified Expenses" as

> the following amounts incurred by or on behalf of Goulds in
> connection with any Claim for which coverage is provided under
> one or more of the Goulds Umbrella Policies: (i) all Defense Costs;
> (ii) all Indemnity Costs; and (iii) all reasonable and necessary costs
> and expenses in the defense of Claims and in payment of
> judgments or settlements of Claims.

(Dkt. No. 301-1, at 10).  It further states that the $325 million "will be provided for the payment

or reimbursement of Qualified Expenses on and after the Effective Date" of the settlement

agreement, January 1, 2006.[10]  (*Id*. at 20, 9).  Thus, the settlement agreement required Utica to

---

[8] Utica claims attorney Kristen Martin testified that "[t]here was some erosion of the umbrella policies prior to when we entered into the settlement agreement," and Utica was "applying payments . . . and defense costs" to the umbrellas.  (Dkt. No. 313-108, at 12).

[9] Martin testified that, at the time of the Settlement Agreement, Utica believed the 1973 Umbrella was an "ultimate net loss policy," i.e., that it was a policy with limits eroded by both the payment of losses and expenses.  (Dkt. No. 313-108, at 14).

[10] Martin testified that even though Utica may have, through previous payments, eroded the umbrella policy limits before January 1, 2006, the effective date of the settlement agreement, (Dkt. No. 313-108, at 49), Utica refreshed the

pay Goulds a total of $325 million in combined umbrella policy limits and specified that the limits of liability of each of Utica's umbrella policies would be exhausted by the payment of both loss and expense.  (Dkt. No. 300-1, ¶¶ 14–16 ; Dkt. No. 311, ¶¶ 14–16).

The settlement agreement lists 17 umbrella policies and their "Aggregate Limits of Liability for Personal Injury and Property Damage," including $25 million for the 1973 Umbrella and $3 million for the 1997 Umbrella. (Dkt. No. 301-1, at 19)  Utica states that for tracking purposes, it treated the 1973 Umbrella as having a $25 million cap and the 1977 as having a $3 million cap.  (Dkt. No. 300-1, ¶ 17; Dkt. No. 311, ¶ 17).  Although the amounts allocated in the settlement agreement to the 1973 and 1977 Umbrellas reflect the loss limits contained in those policies, the amounts allocated to the 1978, 1979, and 1980 umbrellas, $48,333,332 each, exceed the $25 million loss limit specified in those policies. (Dkt. No. 301-1, at 19)  According to Utica, because the 1978, 1979, and 1980 umbrellas provided for expenses in addition to limits, it agreed to pay more under those policies. (Dkt. No. 301-1, at 19; Dkt. No. 313-108, at 48).

Utica subsequently billed, and Munich paid, $5 million under the 1973 Certificate, and $1 million under the 1977 Certificate.  (Dkt. No. 300-1, ¶ 19; Dkt. No. 311, ¶ 19).  In addition, Utica billed Munich for $2,760,533.96 in expenses under the 1973 Certificate and $789,813.47 in expenses under the 1977 Certificate.  (Dkt. No. 300-1, ¶¶ 133, 139; Dkt. No. 311, ¶¶ 133, 139).  At the heart of the present actions are Munich's claims that the expense billings are improper and that it has fulfilled its obligations under the terms of the 1973 and 1977 Certificates.

---

full umbrella policy limits as of January 1, 2006, (Dkt. No. 313-108, at 53).  Martin testified that Utica paid and assigned more than $40 million to the umbrella policies prior to January 1, 2006.  (Dkt. No. 313-108, at 51).

**B.**     **Procedural History**

In *Utica I*, which concerns the 1973 Certificate, Munich moved for summary judgment following a period of limited discovery.  (Dkt. No. 22).  It is undisputed that Munich has paid Utica $5 million, the 1973 Certificate's limit of liability; at issue in that motion was whether, under the terms of the 1973 Certificate, "Munich's expense payments are subject to the limit of [the $5 million] liability or whether Munich is obligated to pay for expenses in excess of that limit."  *Utica Mut. Ins. Co. v. Munich Reins. Am., Inc.*, 976 F. Supp. 2d 254, 259 (N.D.N.Y. 2013).  Additionally, the parties raised arguments concerning the authenticity of the 1973 Certificate and the choice of law.  *Id.* at 259–63.

In a Memorandum-Decision and Order entered on September 30, 2013, United States District Court Judge Lawrence E. Kahn[11] rejected Utica's arguments concerning the authenticity of and terms contained in the 1973 Certificate and found that New York law applied.  *Id.* Further, Judge Kahn found that the 1973 Certificate did not contain a "follow-the-form" clause and thus there was "no explicit presumption that the terms used in the Certificate must be given the same meaning as they are in the [1973] Umbrella," *id.* at 266, and, finally, that extrinsic evidence was inadmissible because the 1973 "Certificate's [$5 million] limit of liability unambiguously applies to expenses."  *Id.* at 268.  Having found that the 1973 Certificate contained a $5 million limit on loss and expense, and that Munich had already paid $5 million to Utica, Judge Kahn granted summary judgment to Munich and entered judgment in its favor.  *Id.* at 269; (Dkt. No. 67).  Utica appealed the judgment.  (Dkt. No. 68).

On appeal, the Second Circuit agreed that there was "no genuine dispute as to the [1973] Certificate's contents" and that New York law applied, but vacated the judgment, finding that the

---

[11] This matter was reassigned to the undersigned on January 21, 2015.  (Dkt. No. 73).

1973 "Certificate is ambiguous as to whether its limit of liability includes expenses"[12] and remanded for further development of the record and consideration of extrinsic evidence. *Utica Mut. Ins. Co. v. Munich Reins. Am., Inc.*, 594 F. App'x 700, 704 (2d Cir. 2014).

On remand, after the parties recommenced discovery, Munich withdrew its argument that the 1973 Certificate's $5 million limit of liability includes expenses. (Dkt. No. 180, at 6–7). Munich also withdrew any argument that the 1977 Certificate's $1 million limit of liability includes expenses. (Dkt. No. 180, at 6–7). Thus, while Munich continues to maintain that it is not liable for expenses in addition to the $5 million and $1 million it has already paid, it does so on the ground that, even if 1973 and 1977 Certificates allow for expenses in addition to limits, they do not, on their own, obligate it to pay expenses, and, indeed, do not require payment of expenses in addition to limits unless the 1973 and 1977 Umbrellas so provide, which, Munich contends, they do not.

### C.    The Umbrella Policies & Reinsurance Certificates

#### 1.    The 1973 Umbrella

The 1973 Umbrella, effective July 1, 1973 to July 4, 1974, was issued by Utica to Goulds and provided $25 million in coverage. (Dkt. Nos. 304-10, 301-28, 301-96). The body of the 1973 Umbrella initially defines "Ultimate Net Loss" as

> the total sum which the Insured, or any company as his insurer, becomes obligated to pay by reason of personal injury or property damage claims, either through adjudication or compromise, and all sums paid for expense, including premiums for attachment or appeal bonds, in respect to litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of employees and office expenses of the named Insured or of any

---

[12] The parties' arguments concerning the limit of liability in the 1973 Certificate centered on *Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 4 F.3d 1049, 1071 (2d Cir.1993); *Bellefonte Reins. Co. v. Aetna Cas. & Sur. Co.*, 903 F.2d 910, 914 (2d Cir. 1990); and *Excess Ins. Co. v. Factory Mut. Ins. Co.*, 3 N.Y.3d 577 (2004).

> underlying insurer or any other expenses which are recoverable
> through any other valid and collectible insurance.

(Dkt. No. 301-96, at 6). Though Utica contends this provision was superseded by a mid-term

endorsement, it does not dispute that, as written, it is an expense-within-limits provision.

According to Utica, in or about December 2007, Kristen Martin, a Utica claims attorney,

noted that there was an endorsement in the "coverage file material" that "changed the [1973

Umbrella] from an ultimate net loss to defense outside the limits." (*Utica II*, Dkt. No. 249-89, at

2). Much of the dispute in *Utica I* centers on this "Defense-Settlement" endorsement ("Defense

Endorsement"), which is dated March 1, 1974—in the middle of the July 1973 to July 1974

policy term. (Dkt. No. 304-10, at 22; Dkt. No. 301-28, at 22; Dkt. No. 301-96, at 18). It states:

> It is agreed that in consideration of the premium charged, it is
> understood and agreed that insuring agreement VI. is added as
> follows:
>
> VI.  Defense – Settlement
>
> With respect to any occurrence not covered by the underlying
> policy(ies) of insurance described in the schedule of
> underlying insurance or any other underlying insurance
> collectible by the insured, but covered by terms and conditions
> of this policy except for the amount of retained limit specified
> in Item 3 of the Declarations the company shall:
>
> (a) defend any suit against the insured alleging such injury,
> sickness, disease or destruction and seeking damages on
> account thereof, even if such suit is groundless, false or
> fraudulent; but the company may make such
> investigation[,] negotiation and settlement of any claim or
> suit as it deems expedient;
>
> *      *      *
>
> (c) pay all expenses incurred by the company, all costs taxed
> against the insured in any suit and all interest accruing
> after entry of judgment until the company has paid or
> tendered or deposited in court such part of such judgment
> as does not exceed the limit of the company's liability
> thereon;

> (d) reimburse the insured for all reasonable expenses, other
> than loss of earnings incurred at the company's request;
>
> and the amounts so incurred, except settlements of claims
> and suits, are payable by the company in addition to the
> applicable limit of liability of this policy.

(Dkt. No. 301-96, at 18–19). The Defense Endorsement also contains a different definition of

the term "Ultimate Net Loss," and states that it

> means the sum actually paid in cash in the settlement or
> satisfaction of losses for which the insured is liable either by an
> adjudication or compromise with the written consent of the
> Company, after making proper deduction for all recoveries and
> salvage collectible, but excludes all loss expenses and legal
> expenses (including attorneys' fees, court costs and interest on any
> judgment  or appeal) and all salaries of employees and office
> expense of the insured, the company or any underlying insurer so
> incurred.
>
> This policy shall not apply to defense, investigation, settlement or
> legal expenses covered by underlying policy(ies) of insurance.

(*Id*. at 19).

## 2.    1973 Certificate

Munich has produced a copy and transcription of the contents of the 1973 Certificate and

the parties appear to agree on the contents—though they disagree on how to interpret them.

(Dkt. No. 300-1, ¶ 42; Dkt. No. 311, ¶ 42).

> 1. The Reinsurer agrees to indemnify the Company against losses
> or damages which the Company is legally obligated to pay
> under the policy reinsured, resulting from occurrences taking
> place during the period this Certificate is in effect, subject to
> the reinsurance limits shown in the Declarations. The Company
> warrants the copy of the policy forwarded to the Reinsurer to
> be a true copy of the said policy and the whole thereof, and
> agrees to notify the Reinsurer promptly of any changes made
> therein.
>
> 2. The Company shall settle all claims under its policy in
> accordance with the terms and conditions thereof. If the

reinsurance hereunder is pro rata, the Reinsurer shall be liable for its pro rata proportion of settlements made by the Company. If the reinsurance hereunder is excess, the Reinsurer shall be liable for its excess proportion of settlements made by the Company after deduction of any recoveries from pro rata reinsurance inuring to the benefit of the Reinsurer.

3. The Reinsurer shall be liable for its proportion of allocated loss expenses incurred by the Company in the same ratio that the Reinsurer's share of the settlement or judgment bears to the total amount of such settlement or judgment under the policy reinsured. The term "allocated loss expense" means all expenses incurred in the investigation, adjustment and litigation of claims or suits, but excluding the office expenses of the Company and the salaries and expenses of all employees of the Company. It also includes court costs and interest on any judgment or award provided the Reinsurer's prior consent to trial court proceedings has been obtained.

4. The Company shall advise the Reinsurer promptly of any claim and any subsequent developments pertaining thereto which in the opinion of the Company may involve the reinsurance hereunder. The Company has the obligation to investigate and defend claims or suits affecting this reinsurance and to pursue such claims or suits to final determination.

(Dkt. No. 301-33, at 2).

### 3. The 1977 Umbrella

In the 1977 Umbrella Utica agreed, in relevant part:

I. COVERAGE - EXCESS LIABILITY

To pay on behalf of the insured all sums in excess of the retained limit which the insured shall become legally obligated to pay, or with the consent of the company, agrees to pay, direct or consequential because of:

(a) personal injury;
(b) property damage; or
(c) advertising offense

to which this policy applies and caused by an occurrence during the policy period anywhere in the world.

II. DEFENSE - DEFENSE COSTS - INVESTIGATION - ASSISTANCE AND COOPERATION

With respect to any occurrence not covered by the policies listed in the schedule of underlying insurance or any other insurance collectible by the insured, but covered by the terms and conditions of this policy (including damages wholly or partly within the amount of the retained limit), the company shall:

(a) defend any suit against the insured alleging personal injury, property damage, or advertising offense, even if such suit is groundless, false or fraudulent . . .;

\*               \*               \*

(d) reimburse the insured for all reasonable expenses, including loss of earnings not to exceed $50 a day incurred at the company's request; the amounts so incurred, except settlements of claims and suits, are payable by the company in addition to the applicable limit of liability of this policy;

(e) the insured agrees to arrange for the investigation, defense or settlement of any such claim or suit in any country where the company may be prevented by law from carrying out this agreement; the company will pay defense expenses incurred with its written consent in addition to its applicable limit of liability under this policy and will promptly reimburse the insured for its proper share, subject to its applicable limit of liability under this policy, of any settlement above the retained limit made with the company's written consent;

\*               \*               \*

(h) this policy does not apply to defense costs covered by policies of underlying insurance.

(*Utica II*, Dkt. No. 249-42, at 7). The 1977 Umbrella defines "Retained Limit" as follows:

Retained limit means as to each occurrence with respect to which insurance is afforded under this policy:

(1) if an underlying policy is also applicable or would be applicable but for breach of policy conditions; the relevant "each person," "each accident," "each occurrence" or similar limit of liability stated therein (less any reduction thereof by

reason of an overriding aggregate limit of liability) plus all amounts payable under other insurance, if any;

(2) if any underlying policy otherwise applicable is inapplicable by reason of exhaustion of an aggregate limit of liability; all amounts payable under other insurance, if any; or

(3) if neither paragraphs (1) or (2) above apply and

    (a) the insured has other insurance; all amounts payable under such other insurance, but in no event less than the amount stated in the declarations as the insured' s retention, or

    (b) the insured has no other insurance; the amount stated in the declarations as the insured's retention.

For the purpose of determining the retained limit, "other insurance" means any other valid and collectible insurance (except under an underlying policy) which is available to the insured, or would be available to the insured in the absence of this policy, it being the intention that this policy shall not apply under or contribute with such other insurance unless the company's agreement thereto is endorsed hereon.

(*Utica II*, Dkt. No. 249-42, at 8).

### 4.    The 1977 Certificate

Under "General Conditions," the 1977 Certificate provides:

1.    The Reinsurer agrees to indemnify the Company against losses or damages which the Company is legally obligated to pay with respect to which insurance is afforded during the term of this Certificate under the policy reinsured, subject to the reinsurance limits and coverage shown in the Declarations. The Reinsurer shall not indemnify the Company for liability beyond circumscribed policy provisions, including but not limited to punitive, exemplary, consequential or compensatory damages resulting from an action of an insured or assignee against the Company. The Company warrants the copy of the policy forwarded to the Reinsurer to be a true and complete copy of the said policy, and agrees to notify the Reinsurer promptly of any changes made therein, provided that such changes shall not be binding upon the Reinsurer until accepted thereby. Nothing contained herein shall in any manner create any obligations of the Reinsurer or establish any rights against the Reinsurer in

favor of the direct insured or any third parties or any persons not parties to this Certificate of reinsurance.

2.  The Company shall settle all claims under its policy in accordance with the terms and conditions thereof. If the reinsurance hereunder is pro rata, the Reinsurer shall be liable for its pro rata proportion of settlements made by the Company. If the reinsurance hereunder is excess, the Reinsurer shall be liable for its excess proportion of settlements made by the Company after deduction of any recoveries from pro rata reinsurance inuring to the benefit of the Reinsurer.

3.  The Reinsurer shall be liable for its proportion of allocated loss expenses incurred by the Company in the same ratio that the Reinsurer's share of the settlement or judgment bears to the total amount of each settlement of judgment under the policy reinsured.  The term "allocated loss expense" means all expenses incurred in the investigation and settlement of claims or suits, including the salaries and expenses of staff adjusters but excluding other company salaries and office expenses. It also includes court costs and interest on any judgment or award provided the Reinsurer's prior consent to trial court proceedings has been obtained. Allocated loss expenses shall not include expenses incurred by the Company in regard to any actual or alleged liability that is not within the circumscribed provisions of the policy reinsured.

4.  The Company shall advise the Reinsurer promptly of any claim and any subsequent developments pertaining thereto which, in the opinion of the Company, may involve the reinsurance hereunder. The Company has the obligation to investigate and defend claims or suits affecting this reinsurance and to pursue such claims or suits to final determination.

(*Utica II*, Dkt. No. 245-1, ¶ 41; Dkt. No. 260-1, ¶ 41).  The 1977 Certificate requires Munich to make payment promptly when the cedent has furnished "proof that payment of a loss and loss expense has actually been made."  (*Utica II*, Dkt. No. 245-1, ¶ 42; Dkt. No. 260-1, ¶ 42).

### D.  Utica's Reinsurance Billings

On or about March 19, 2004, Utica notified Munich of the Goulds Pumps claims (date of loss specified as July 1, 1973, thus implicating the 1973 Certificate), and Munich requested additional information.  (Dkt. No. 301-34, at 2).  In a letter dated September 28, 2004, Utica

16

provided information about the asbestos claims against Goulds as well as the primary and umbrella policies involved.  (*Utica II*, Dkt. No. 241-2, ¶ 7; Dkt. No. 245-1, ¶ 7).

In a letter to Munich dated July 26, 2005, Utica advised that it had recently identified additional primary policies and that it intended to "reallocate, where required, all asbestos bodily injury settlements that are impacted by the new policies" and issue credits "to affected reinsurers."  (*Utica II*, Dkt. No. 244-7, at 3).  Utica wrote to Munich again on October 25, 2006 and advised that the California and New York litigations were still pending, though the parties were engaged in settlement discussions.  (*Id*. at 2).

In a letter dated July 10, 2007, Utica informed Munich that it had reached a settlement with Goulds and indicated that it was enclosing a copy of the settlement agreement and planning to allocate and bill its reinsurers "consistent with the terms of the settlement agreement and the respective reinsurance agreements" once it "completed the appropriate allocation of [the] previously unallocated payments." (Dkt. No. 313-57, at 2).

On or about November 15, 2007, Utica sent Munich its initial reinsurance billings for the Goulds Pumps claims: Utica billed $5 million in loss and $1,847,975 in expense under the 1973 Certificate and $1 million in loss and $731,368.21 in expense under the 1977 Certificate.  (Dkt. No. 313-58, at 3–5; *Utica II*, Dkt. No. 244-44, at 5).  An internal Munich document dated November 29, 2007 indicated that Munich was reviewing the settlement agreement and planned to contact Utica regarding the billings if additional information was needed.  (*Utica II*, Dkt. No. 244-45, at 2).

On or about December 6, 2007, Munich employee Thomas Miller wrote in a "Memo to File":

> Called and spoke with Kristen Martin . . . claim-handler at Utica.
> We had several questions that we wanted clarified with respect to

> their settlement and the reinsurance billings. We discussed the
> treatment of expense under the agreement because it appeared that
> the settlement called for all policies to pay on an [ultimate net loss]
> basis, but that did not seem to be how they were allocating or
> billing. Kristen explained that as part of the settlement, the parties
> agreed to additional limits under the umbrella policies (this was
> another point that we needed clarification on since the settlement
> stated $325M in umbrella limits but the previously reported total
> was $255M) . . . . As to how the loss and expense payments are
> allocated under the Utica policies and how reinsurers are billed,
> there will be no effect. Utica will continue to allocate loss and
> expense to all triggered policies pursuant to the terms of their
> policies and will b[ill] reinsurers pursuant to the terms of their
> reinsurance contracts. In effect, the settlement agreement simply
> serves as a cap on Utica's supplemental expense obligation.

(Dkt. No. 300-1, ¶ 123; Dkt. No. 313-59, at 2); (*Utica II*, Dkt. No. 244-39, at 2). The document

further reflects that Munich requested "copies of the available policy documentation and a

spreadsheet showing the allocation across all years." (*Id.*). Martin responded via email the same

day and attached policy information. (Dkt. No. 313-103, at 2). This information, however, "did

not include several pages of endorsements of the specimen form *or the 1977 Umbrella*." (*Utica*

*II*, Dkt. No. 245-1, ¶ 48; Dkt. No. 260-1, ¶ 48) (emphasis added). Over the next few days, Utica

provided Munich with additional documents concerning reserve information "on the years that

impact" Munich, i.e., 1973 and 1977, as well as spreadsheets "with the claim data" and Utica's

"paid loss and expense on the primary and umbrella layer for all years." (*Utica II*, Dkt. No. 244-

48, at 2; Dkt. No. 244-50, at 2).

    In an email on December 14, 2007, Miller informed Utica that Munich was "in good

shape on the bill for the 1977 policy" and that he was "requesting management approval to pay

the claim. Hopefully I won't get any additional questions." (*Utica II*, Dkt. No. 241-2, ¶ 20; Dkt.

No. 245-1, ¶ 20). The same day, Miller's supervisor noted that Munich had confirmed the

necessary information and that loss and expense payment to Utica was "in order." (*Utica II*, Dkt.

No. 241-2, ¶ 22; Dkt. No. 245-1, ¶ 22). Munich paid Utica the sum of $1,789,819.47, ($1

million in loss and $789,819.47 in expense) the full amount Utica demanded under the 1977 Certificate.  (*Utica II*, Dkt. No. 241-2, ¶ 24; Dkt. No. 245-1, ¶ 24).[13]

Around the same time, Munich was assessing Utica's billings under the 1973 Certificate, and, on December 14, 2007, Miller requested that Martin provide "specimen copies of the umbrella coverage form that Utica would have been using at the time that the 1973 [Umbrella] policy was issued."  (Dkt. No. 300-1, ¶ 126; Dkt. No. 311, ¶ 126).  According to an internal Utica email dated December 17, 2007, Martin, who was collecting coverage material to send to Munich, found an endorsement modifying the 1973 Umbrella:

> When I went to pull the coverage file materials (that our counsel had prepared) to send to [Munich], I noted that there was an endorsement that changed the policy from an ultimate net loss to defense outside the limits.  While this makes our settlement with Goulds even better, do our reinsurance billings need to be modified? . . . . Can you let me know if our billing is changed by the recently discovered endorsement?

(*Utica II*, Dkt. No. 249-89, at 2).  According to an internal Munich note, Martin called Miller two days later to advise that the 1973 Umbrella was endorsed to provide expense in addition to limits:

> [Martin] indicated that their umbrella policies always included expense as part of loss until the forms were changed in 1976 or 1977, which is why the settlement was negotiated based on that assumption. However, when [Martin] went to the counsel files to review the folios that were created by coverage counsel for each policy, she discovered that the relevant language was actually endorsed off of the 1973 policy that we reinsured, meaning that the policy treats expense as supplemental. Bottom line is that [Martin] indicated they are going to be withdrawing the $1.6M bill[14] on the

---

[13] In or about June 2009, Utica submitted an additional $58,445.26 in expense billing, which Munich paid.  (*Utica II*, Dkt. No. 241-2, ¶ 27; Dkt. No. 245-1, ¶ 27).

[14] This internal note refers to "$1.6M" as the amount of expenses Utica billed Munich under the 1973 Certificate, but this number varies in the record.  (*See* Dkt. No. 313-58, at 3–5) (referring to expenses in the amount of $1,847,975); Dkt. No. 308, at 20 (referring to expenses in the amount of "about $1.7 million").  At present, Utica seeks $2,760,533.96.  (Dkt. No. 311, ¶ 20).

>1973 fac cert and we will be getting a revised billing statement to
>that effect.

(Dkt. No. 300-1, ¶ 127; Dkt. No. 311, ¶ 127); (*Utica II*, Dkt. No. 249-48, at 2).

In August 2008, Miller asked Utica for a copy of the Defense Endorsement. (Dkt. No. 300-1, ¶ 128; Dkt. No. 311, ¶ 128). There is no evidence indicating that Utica provided Munich with a copy, however, until August 18, 2011, when Richard Hill, who had taken over handling the claim from Miller, again requested it. (Dkt. No. 300-1, ¶¶ 127, 129; Dkt. No. 311,¶¶ 127, 129). After reviewing the Defense Endorsement, Munich informed Utica that it was "still not clear as to the treatment of defense cost," noting that it appeared Utica "has a duty to defend with respect to any occurrence not covered by the underlying policy(ies)," which "does not appear to be the case in this loss." (Dkt. No. 300-1, ¶ 131; Dkt. No. 311, ¶ 131).

On or about September 16, 2011, Utica responded stating that "the Goulds claims do involve a situation where the occurrence is not covered by the underlying policies. That is because the primary coverage has exhausted. By definition there is no coverage under a policy after it is exhausted." (Dkt. No. 300-1, ¶ 132; Dkt. No. 311, ¶ 132). On October 21, 2011, after receiving Munich's last payment in satisfaction of the $5 million loss limit under the 1973 Certificate, Utica demanded "payment of $3,283,304.55 for the expenses billed to [the 1973 Umbrella year]." (Dkt. No. 300-1, ¶ 133; Dkt. No. 311, ¶ 133). Utica continued to demand payment and, on January 27, 2012, commenced *Utica I* against Munich alleging breach of contract and demanding judgment in the sum of $3,283,304.55 in connection with the 1973 Certificate. (Dkt. No. 1). On January 10, 2013, Munich filed *Utica II* against Utica demanding repayment of $789,819.47, the expense billings it had paid under the 1977 Certificate. (*Utica II*, Dkt. No. 1).

III.    SUMMARY JUDGMENT

   A.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  Still, the

nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).  Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

### B.    Objections to Declarations – *Utica I & Utica II*

Under Fed. R. Civ. P. 56(c)(2), Munich objects to, and moves to strike, statements contained in a number of declarations Utica submitted in connection with the pending motions for summary judgment.  (Dkt. No. 314).  Utica opposes this motion.  (Dkt. No. 324).  Rule 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Further, Rule 56(c)(4) requires that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *See also Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016) ("It follows from the purpose of the summary-judgment device—to determine whether there exists a genuine issue of material fact for trial—that any evidence considered on summary judgment must be reducible to admissible form.").

1.       **Griffin, Schilling & Merrell Declarations**

a.       **Fed. R. Evid. 406**

Munich moves to strike statements in the declarations of Utica employees John Griffin, Marcia Schilling, and Ernest Merrell regarding Utica's alleged routine practice of notifying reinsurers when there were changes to underlying policies. Munich argues that such evidence does not qualify as "habit" or "routine practice" within the meaning of Federal Rule of Evidence 406 and is therefore inadmissible. (*Id*. at 18). John Griffin states in his declaration that he was employed by Utica from 1974 until 2015 and worked as an underwriter for approximately 28 years. (Dkt. No. 203-10, ¶ 1). As an underwriter, Griffin "was involved in purchasing reinsurance, including facultative reinsurance, and communicating with reinsurers." (Dkt. No. 203-10, ¶ 3). In his declaration, Griffin asserts that it was Utica's practice to notify reinsurers of policy endorsements, and as part of that practice "Utica would have sent the [Defense Endorsement] to its facultative reinsurers that reinsured the 1973-1974 policy."[15] (Dkt. No. 203-10, ¶ 11).

Marcia Schilling was employed by Utica from 1970 to 2015 in various departments and capacities, including the National Accounts Department, which was responsible for, among others, the Goulds account. (Dkt. No. 302-14). Schilling states in her declaration that she assisted with the issuance of certain policies to Goulds and assisted the underwriter in determining the premium for the policies. (Dkt. No. 302-14, ¶¶ 1-3). According to Schilling, "[a]s a matter of practice, Utica would have informed facultative reinsurers about changes to a policy that those reinsurers reinsured that occurred after the policy was issued." (Dkt. No. 302-

---

[15] Munich seeks to strike this assertion on the ground that Griffin was not employed by Utica until 1974 and thus "could not have personal knowledge about the issuance of the Defense Endorsement or Utica's then existing practices for issuing endorsements to umbrella policies." (Dkt. No. 314-1, at 14). As Utica notes, however, the practice during Griffin's employment may be relevant to the extent that it tends to show that a long-standing practice, in effect at the time he was hired, was in effect before his employment. (Dkt. No. 324, at 6).

14, ¶ 10).  Schilling further states that consistent with this practice, she believes "Utica would have sent the [Defense] Endorsement" to the reinsurers that reinsured the Goulds 1973 Umbrella. (*Id.* ¶ 10).

Ernest Merrell was a Utica employee from 1964 to 1999, and during his employment, worked in National Accounts and later as a Senior Account Underwriter.  (Dkt. No. 302-13, ¶¶ 1–3).  In his declaration, he states that "[d]uring [his] time as an underwriter, including in the National Accounts Department, [he] learned about Utica's practices for issuing endorsements and about Utica's practices for communicating with its facultative reinsurers."  (Dkt. No. 302-13, ¶ 4).  Merrell states that "consistent with its practice," Utica would have informed its facultative reinsurers of the Defense Endorsement "orally or in writing or both."  (Dkt. No. 302-12, ¶11).

Rule 406 provides:

> Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice. The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness.

Fed. R. Evid. 406.  "Evidence of an organization's routine practice is admissible provided the proponent of the evidence establishes that the organization acted with 'regularity over substantially all occasions or with substantially all other parties with whom the [organization] has had similar business transactions.'"  *S.E.C. v. Lyon*, 605 F. Supp. 2d 531, 543 (S.D.N.Y. 2009) (quoting *Mobil Exploration & Producing U.S., Inc. v. Cajun Constr. Servs., Inc.*, 45 F.3d 96, 100 (5th Cir. 1995)).

Munich argues that these declarations fail to show that Utica's alleged practice of informing facultative reinsurers about endorsements was sufficiently regular, sufficient, and semi-automatic to qualify for admissibility under Rule 406.  Munich further argues that the declarants' failure to set forth "a single instance of which [they] have personal knowledge of any

24

mid-term endorsement ever being delivered to any Utica insured" or reinsurer is fatal to admissibility. (Dkt. No. 314-1, at 19). As Utica has submitted affidavits by individuals with personal knowledge of its practices with respect to reinsurer notification during the relevant time period, i.e., 1973–1974, the Court finds that Utica has set out facts that would be admissible under Rule 406 to show Utica acted in accordance with its routine practice regarding reinsurer notification. *Podell v. Citicorp Diners Club, Inc.*, 914 F. Supp. 1025, 1032 (S.D.N.Y. 1996), *aff'd*, 112 F.3d 98 (2d Cir. 1997) ("Helm states in her affidavit that it is TRW's practice to send a consumer in plaintiff's position an updated credit report upon completion of the reinvestigation, together with a notice of his right to include his own statement concerning the disputed item in subsequent credit reports. Evidence of that routine practice is relevant to prove that TRW acted in conformity with it on this occasion."). Accordingly, Munich's motion to strike these statements is denied.

### b.    Inconsistent Statement

Munich seeks to strike all references John Griffin makes in his declaration to the "'not covered by' language in the Umbrella Policies." (Dkt. No. 314-1, at 8). In his declaration, Griffin states that he "understood" the Umbrella policies to require Utica "to pay expense in addition to the limits" "'with respect to any occurrence not-covered-by' the primary policies" by reason of exhaustion of the primary policy. (Dkt. No. 203-10, ¶ 12). Munich argues that Griffin's declaration is inconsistent with his testimony in the Utica/Goulds coverage litigation. (Dkt. No. 314-1, 8). It is well-settled that "'a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.'" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 482 (2d Cir. 2014) (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)).

Munich argues that Griffin testified in the Utica/Goulds litigation that he "had no familiarity" with the "occurrence not covered by" language in the policy, (Dkt. No. 314, at 8-9), but that is not entirely accurate. In fact, Griffin testified that he was "not exactly" familiar with "two types of coverage," excess and umbrella. (Dkt. No. 313-166, at 4-5). Munich also cites to Griffin's answer, when he was asked whether "there any defense obligation" under the umbrella policy "[f]or claims that are covered by the underlying primary insurance, and answered "I'm not sure." (Dkt. No. 313-166, at 5). While Griffin's testimony may provide grounds for cross-examination at trial, the Court denies Utica's motion to strike Griffin's declaration. Griffin's uncertainty regarding the defense obligation for claims *covered by* the underlying primary insurance is not inconsistent with his opinion that "not covered" includes exhaustion. Accordingly, Munich's motion to strike portions of the Griffin, Schilling, and Merrell declarations is denied.

### 2.    Bernard Turi Declaration

#### a.    Paragraph 10

Bernard Turi is a senior vice president at Utica. Additionally, Turi is general counsel, general auditor, and chief risk officer. (Dkt. No. 204). Turi has "had responsibility for handling asbestos-related bodily injury claims against Goulds" since 1990, when he was working as a staff attorney. (*Id*. at ¶ 3). Munich moves to strike paragraph 10 from Turi's declaration, which states:

> During the coverage litigation, Goulds argued that Utica would have an evidentiary problem establishing that certain primary policies were subject to aggregate limits. If Utica could not prove the existence of aggregate limits in certain primary policies, and depending on how other allocation issues were resolved, that result could potentially have created unlimited liability for Utica, regardless of reinsurance. As a result, Utica's view that the primary policies were subject to aggregate limits was a non-negotiable term of any settlement

> with Goulds. That term was non-negotiable under any circumstances. That non-negotiable term eventually was part of the settlement agreement with Goulds. *Irrespective of reinsurance, I would have settled with Goulds based on Utica's view that the primary policies were subject to aggregate limits*.

(Dkt. No. 204, ¶ 10 (emphasis added)).  Munich is concerned with the speculative nature of this paragraph generally and the last sentence in particular.  (Dkt. No. 314-1, at 17).  Munich argues, among other things, that Turi "fails to acknowledge . . . that Utica agreed to provide approximately [$]140 million in additional insurance limits to Goulds in order to persuade Goulds to impute aggregate limits into Utica's primary policies," and fails to explain "why the additional limited were not tacked on to those primary policies, rather than assigned to Utica's umbrella policies."  (*Id*.).  These arguments, however, go to the weight, rather than the admissibility of Turi's statements, and thus do not provide a basis for striking them from the declaration.

### b.    Paragraphs 12 & 13

Munich moves to preclude, under Fed. R. Civ. P. 37(c)(1), paragraphs 12 and 13 of Bernard Turi's declaration concerning Utica's interpretation of the "not covered by" language in its umbrella policies on the basis that Utica failed to provide the information contained in those paragraphs during discovery, in violation of its obligations under Rule 26(a) and (e).  A party's failure "to provide information or identify a witness as required by Rule 26(a) or (e)" may preclude the party from using "that information or witness . . . at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  The purpose of the rule is "to prevent the practice of 'sandbagging' an adversary with new evidence," *Johnson Elec. N. Am. v. Mabuchi Motor Am. Corp.*, 77 F. Supp. 2d 446, 458 (S.D.N.Y. 1999).

In "supplemental response number 22" to its discovery requests Munich requested:

> All documents and communications, including but not limited to
> any Utica internal presentations or memoranda, concerning Utica's
> treatment of defense costs under any umbrella policy in effect at
> any time between 1973 and 1978 that Utica issued to any pump
> manufacturers, including but not limited to Goulds and/or Buffalo
> Pumps a/k/a Buffalo Forge Company, that were created, drafted or
> prepared on or after January 1, 2000.

(Dkt. No. 85-5, at 13).  Utica responded:

> Utica objects to this request because it is overly broad and unduly
> burdensome.  Utica objects to this request because it seeks
> documents that are not relevant to the parties' claims or defenses
> or to the subject matter involved in this action. Utica objects to this
> request to the extent it seeks documents protected by the attorney-
> client privilege, attorney work product, or any other applicable
> privilege. Subject to those objections, Utica will produce or make
> available all non-privileged, responsive documents with respect to
> Goulds.

(Dkt. No. 85-5, at 13).  Unsatisfied with this response, as well as with Utica's response to several

other requests concerning the "not covered by" language, Munich filed a motion to compel.

(Dkt. No. 85).  United States Magistrate Judge Andrew T. Baxter granted the motion with

respect to supplemental request number 22, but otherwise denied Munich's motion in relevant

part:

> I conclude that first request number 14 and 8 supplemental request
> number 13 through 14 are unduly broad and not likely to produce
> information that will fairly test Utica's consistency in interpreting
> the not-covered-by language in its umbrella policies.  Oddly, these
> requests ask for documentation of instances in which Utica
> interpreted umbrella policies in a manner consistent with Utica's
> purported uniform practice as opposed to instances where it
> deviated that practice by denying to pay expenses.
>
> It seems a backward and unnecessarily broad approach to testing
> Utica's application of the not-covered-by language . . . . So, again,
> I'm going to require some supplemental responses with respect to
> supplemental response number 22, but not the other questions in
> this group or the other demands in this group.

(Dkt. No. 120, at 65–66). Following Magistrate Judge Baxter's order, Utica "confirm[ed]" that it "located no documents responsive to the Court's order on Munich Re's supplemental request 22." (Dkt. No. 259-2, at 2).

In his declaration, which Utica submitted in connection with the pending motions for summary judgment, Turi states:

> I understood that the umbrella policies issued to Goulds that contained a provision requiring Utica to defend "with respect to any occurrence not-covered-by" the primary policies obligated Utica to defend the claims against Goulds after the primary policies exhausted. I understood that those provisions obligated Utica to pay expense in addition to the limits in those policies. Consistent with that understanding, Utica was paying defense costs under the Goulds umbrella coverage that included the "not-covered-by" provision: (1) before any dispute with Goulds related to aggregate limits under certain primary policies; and (2) before the litigation between Utica and Goulds.
>
> I understood that Utica interpreted the "not-covered-by" language consistently across its policyholders and that has remained my understanding.

(Dkt. No. 204, ¶¶ 12–13). Munich moves to preclude Turi's statements concerning Utica's interpretation of the "not covered by" language in the umbrella policies, arguing, "Since Utica failed to produce documents to [Munich] about how Utica interpreted the 'not covered by' language with its other policyholders, it cannot proffer evidence regarding same in Mr. Turi's declaration." (Dkt. No. 319, at 5). As Utica notes, its position with respect to its interpretation of the "not covered by" language has been consistent throughout this litigation, thus, the statement in Turi's declaration is not new evidence. (Dkt. No. 324, at 12). Moreover, Munich does not contend, nor does Turi's declaration indicate, that there is documentary evidence Utica failed to disclose. There is, therefore, no basis on which to find Utica violated Rule 26(a) or (e). Accordingly, Munich's motion to strike paragraphs 12 and 13 from the Turi declaration is denied.

C.       **Notification of Defense Endorsement – *Utica I***

Munich argues that it is entitled to dismissal of Utica's breach of contract claim (*Utica I*)

because Utica, in violation of the principles of contract modification as well as the terms of the

1973 Certificate, never notified it that it had added the Defense Endorsement to the 1973

Umbrella.  (Dkt. No. 300-2, at 18–19).[16]  Utica opposes Munich's motion and asserts that

because the follow-the-fortunes doctrine prohibits Munich from second guessing "Utica's

reasonable determination that the endorsement was part" of the 1973 Umbrella, the Court need

not reach the issue of modification.  (Dkt. No. 308, at 5).  Utica further argues that, even

assuming the principles of contract modification apply, "notice . . . would not have been

required" because the issuance of the Defense Endorsement was an immaterial change and, in

any event, Munich suffered no prejudice.  (Dkt. No. 308, at 12–16).

1.       **Follow the Fortunes**

Utica asserts that it is of no consequence whether it notified Munich of the Defense

Endorsement, or modified the 1973 Certificate, because the follow-the-fortunes doctrine requires

Munich to accept its determination that the Defense Endorsement was part of the 1973 Umbrella.

(Dkt. No. 308, at 5).  As set forth below, there is no follow-the-fortunes clause in the reinsurance

certificate, and the Court has declined to imply this term into it.[17]  Accordingly, the Court turns

to the parties' arguments concerning contract modification in the context of the 1973 Certificate.

---

[16] Initially, Munich also argued that there is no evidence that Utica actually modified the 1973 Umbrella via issuance of the Defense Endorsement to Goulds, (Dkt. No. 300-3, at 18).  In its reply, however, Munich acknowledged that the issue of whether Utica actually modified the 1973 Umbrella with the Defense Endorsement "is not material to [its] motion" and stated that its reply would "focus on the fact that [Munich] did not receive or agree to it."  (Dkt. No. 315, at 6 n.1).  Accordingly, the Court does not address this issue.

[17] In any event, a follow-the-fortunes clause would not prohibit Munich from arguing that it never agreed to cover expenses in addition to limits because the policy it agreed to reinsure was an expense-within-limits policy and Utica failed to notify it that it had changed that policy. *See Glob. Reins. Corp. of Am. v. Argonaut Ins. Co.*, 634 F. Supp. 2d 342, 350 (S.D.N.Y. 2009) (noting that a "follow the fortunes" clause "does not make a reinsurer liable for risks beyond what was agreed upon in the reinsurance certificate.") (quotation omitted).

## 2.    Contract Modification

Munich contends it is entitled to summary judgment because Utica never notified it that the terms of the 1973 Umbrella had changed.  Utica argues that the evidence shows that it notified Munich of the Defense Endorsement, and that even if it failed to notify Munich, there was no breach because it was not required to notify Munich of a change to the underlying policy unless the change was material, which, Utica asserts, it was not.  (Dkt. No. 308, at 5–6). The 1973 Certificate provides: "The Company warrants the copy of the policy forwarded to the Reinsurer to be a true copy of the said policy and the whole thereof, and *agrees to notify the Reinsurer promptly of any changes made therein*."  (Dkt. No. 301-33, at 2 (emphasis added)).  It is this provision that Munich claims Utica breached by failing to notify it of the mid-term Defense Endorsement.  The 1973 Umbrella, effective July 1, 1973 to July 4, 1974, was issued by Utica to Goulds and provided $25 million in coverage.  (Dkt. Nos. 304-10, 301-28, 301-96).  The 1973 Umbrella, as originally written, provided for expenses within limits; it defined "Ultimate Net Loss" as "the total sum which the . . . insurer, becomes obligated to pay by reason or personal injury or property damage claims . . . *and all sums paid for expense*."  (Dkt. No. 301-96, at 6 (emphasis added)).  Utica claims that, on or about March 1, 1974, it issued a Defense Endorsement to the 1973 Umbrella, changing it to an expense-in-addition-to-limits policy.  (Dkt. No. 304-10, at 22; Dkt. No. 301-28, at 22; Dkt. No. 301-96, at 18).  The Defense Endorsement changed the "Ultimate Net Loss" provision to "exclude[] all loss expenses and legal expenses" and added a provision stating that "[w]ith respect to any occurrence not covered by the underlying policy(ies)" it would pay expenses "in addition to the applicable limit of liability of this policy."  (Dkt. No. 301-96, at 18–19).

It is well settled under New York law that "[r]einsurance contracts are governed by the same principles that govern contracts generally."  *Glob. Reins. Corp. of Am. v. Century Indem.*

*Co.*, No. 124, 2017 WL 6374281, at *6, 2017 N.Y. LEXIS 3723, at *11 (N.Y. Dec. 14, 2017).

Further, under New York law, "parties may modify a contract 'by another agreement, by course

of performance, or by conduct amounting to waiver or estoppel.'" *Dallas Aerospace*, 352 F.3d at

783 (quoting *CT Chems. (U.S.A.) Inc. v. Vinmar Impex, Inc.*, 81 N.Y.2d 174 (1993)). "Indeed,

'[f]undamental to the establishment of a contract modification is proof of each element requisite

to the formulation of a contract, including mutual assent to its terms.'" *Id.* (alteration in original)

(quoting *Beacon Terminal Corp. v. Chemprene, Inc.*, 75 A.D.2d 350, 354 (2d Dep't 1980)).

Further, though it has confined its observations to dicta, the Second Circuit has noted that "[t]he

relationship between a reinsurer and a reinsured is one of utmost good faith, requiring the

reinsured to disclose to the reinsurer all facts that materially affect the risk of which it is aware

and of which the reinsurer itself has no reason to be aware." *Christiania Gen. Ins. Corp. of N.Y.

v. Great Am. Ins. Co.*, 979 F.2d 268, 278 (2d Cir. 1992) (citing *Sumitomo Marine & Fire Ins.

Co., Ltd.-U.S. Branch v. Cologne Reins. Co. of Am.*, 75 N.Y.2d 295, 303 (1990)); *see also

Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 4 F.3d 1049, 1066 (2d Cir. 1993) (concluding that

"[t]he good faith and fair dealing implied in all contracts also required notice" and noting that, in

the context of reinsurance, "we have characterized this duty in dicta as one of 'utmost good

faith'" (quoting *Christiania*, 979 F.2d at 278)). The New York Court of Appeals has explained

that "[e]ncompassed within this duty is a basic obligation of a reinsured to disclose to potential

reinsurers all 'material facts' regarding the original risk of loss, and failure to do so renders a

reinsurance agreement voidable or rescindable." *Mich. Nat'l Bank–Oakland v. Am. Centennial

Ins. Co. (In re Liquidation of Union Indem. Ins. Co. of N.Y.)*, 89 N.Y.2d 94, 106 (1996) (quoting

*Sumitomo Mar. & Fire Ins. Co. v. Cologne Reins. Co.*, 75 N.Y.2d 295, 303 (1990)). "Material

facts are those likely to influence the decisions of underwriters; facts which, had they been

revealed by the reinsured, would have either prevented a reinsurer from issuing a policy or prompted a reinsurer to issue it at a higher premium."  *Id.*

Utica, relying on an expert witness, has presented evidence that the content of the Defense Endorsement would *not* have constituted a material change requiring notice to the reinsurer.  In his expert report, Paul Feldsher, who has "more than 43 years of underwriting experience," stated that "[s]ince each company used its own umbrella policy language, at the time Utica negotiated its reinsurance of the Goulds umbrella policy with [Munich], it is unlikely that [Munich's] underwriter knew how the umbrella policy treated defense costs or would have considered it material.  And, since closings traditionally did not include preprinted policy jackets, [Munich's] underwriter was unlikely to have known that even at the time he or she issued the reinsurance certificate."[18] (Dkt. No. 313-102, ¶ 10).  Munich, however, has adduced evidence that when there were changes to a reinsured policy, it would refer such changes to underwriters, who "would respond with an endorsement of the change to the certificate that reinsured that policy."  (Dkt. No. 300-1, ¶ 151; Dkt. No. 301-124, at 16).  For example, Munich asserts that, when Utica changed the premium for the 1977 Umbrella, Munich issued an amendment to the Certificate reflecting that change.  (Dkt. No. 300-1, ¶ 55).  From this evidence, a reasonable factfinder could infer that Munich would have referred Utica's addition of an endorsement changing the 1973 Umbrella to an expense-in-addition-to-limits policy to its underwriters for review.  Thus, there are triable issues of fact as to whether the addition of the Defense Endorsement was a material change to Munich.

As to whether the 1973 Certificate was modified with respect to the Defense Endorsement, Munich has come forward with evidence that, if credited, would show that Utica

---

[18] Although Munich argues that the expert opinions Utica has presented are too speculative to raise a triable issue of fact, (Dkt. No. 315, at 11), its argument is conclusory and it does not otherwise challenge the admissibility of Feldsher's opinion.

never notified it of, and thus Munich never assented to, the Defense Endorsement.  Munich notes that none of the documents among which the Defense Endorsement was found indicate that it was forwarded to Munich at or about the time it was issued.  (Dkt. No. 300-1, ¶ 36; Dkt. No. 311, ¶ 36).  Further, Munich claims that it maintained its underwriting file for the 1973 Certificate, (Dkt. No. 300-1, ¶ 38, 301-66, 301-101), but that the file "does not contain a copy of the Defense Endorsement or a record of communication from Utica advising of the existence of the Defense Endorsement," (Dkt. No. 300-1, ¶ 43).  This, Munich contends, is evidence that Utica never notified it of the Defense Endorsement.  Utica counters that Munich "has provided no evidence to support that it maintained its underwriting file," and adds that the file it possessed was incomplete, (Dkt. No. 311, ¶ 43), as evidenced by its acknowledgment that "[t]he specimen form for the 1973 Umbrella was not contained in [Munich's] underwriting files," (Dkt. No. 300-1, ¶ 28 n.6).  This suffices to raise a question of fact regarding the completeness of Munich's underwriting file and whether the absence of the Defense Endorsement from it constitutes evidence from which a factfinder could infer Utica notified it of the endorsement.

Finally, Utica contends that Munich has waived any objection to the Defense Endorsement because, when Munich first learned about it orally in December 2007, Munich accepted the change in Utica's billings under the 1973 Certificate—from approximately $1.7 million to $0—and it "did not complain about the endorsement or dispute Utica's revised billing based on the endorsement."  (Dkt. No. 308, at 20).  The waiver doctrine, however, "may not be invoked to extend coverage or to create coverage where none exists."  *United Fire & Cas. Co. v. Arkwright Mut. Ins. Co.*, 53 F. Supp. 2d 632, 643 (S.D.N.Y. 1999) (citing *Atl. Mut. Ins. Co. v. Balfour MacLaine Int'l Ltd.*, 85 F.3d 68 (2d Cir. 1996)).  Further, "[w]aiver is, of course, the intentional relinquishment of a known right."  *United Fire & Cas. Co.*, 53 F. Supp. 2d at 642.

Here, there is evidence that Munich, despite asking Utica for a copy of the Defense Endorsement in 2008, did not receive one until August 2011, at which point it challenged the expense billings under the Defense Endorsement, and disputed Utica's interpretation of the language "occurrence not covered by." (Dkt. No. 300-1, ¶¶ 127, 129; Dkt. No. 311, ¶¶ 127, 129). As there is a question of material fact whether Munich reinsured the Defense Endorsement in the first instance, waiver, as a defense, may not be available. Accordingly, Munich's motion for summary judgment as to the Defense Endorsement is denied.

### D.    Collateral Estoppel – *Utica I* & *Utica II*

Munich argues that it is entitled to summary judgment on the issue of defense expenses because the arbitration award rendered in favor of a different facultative reinsurer, R&Q Reinsurance Company, against Utica collaterally estops Utica from arguing that the 1973 and 1977 Umbrellas "cover defense costs where underlying coverage applied" but was exhausted. (Dkt. No. 300-4, at 15). Utica opposes Munich's motion. (Dkt. No. 309).

Relitigation of an issue of fact or law is precluded on the basis of collateral estoppel if "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 918 (2d Cir. 2010). "Under New York law as it has evolved, collateral estoppel may also be applied, assuming there has been a final determination on the merits, to an issue resolved in arbitration." *Postlewaite v. McGraw-Hill*, 333 F.3d 42, 48 (2d Cir. 2003). "Application of the estoppel following arbitration, however, may be problematic because arbitrators are not required to provide an explanation for their decision." *Id.*

On October 19, 2013, the Arbitration Panel issued a "Final Order," which states, in relevant part:

> (1) We find that the 1978-81 policies issued by Utica to Goulds had "aggregate limits" of $500,000 each.
>
> (2) We find that the facultative certificates reinsuring the 1978-1982 inclusive umbrella policies issued by Utica to Goulds do not cover defense costs, orphan shares, or declaratory judgment expenses.

(Dkt. No. 300-1, ¶ 189). According to Munich, the extensive briefing preceding the final order shows that the issue of whether the R&Q-reinsured umbrella policies provided coverage for defense costs for asbestos claims was decided in R&Q's favor. (Dkt. No. 300-4, at 16–17). During the arbitration, Utica equated, as it does here, the "not covered by" language with the exhaustion of underlying limits. (*Id.* at 17 n.19). Munich acknowledges that "the Final Order is directed at the coverage provided by the facultative certificates rather than the reinsured umbrella policies," but argues that "the clear import" of the panel's order "is that the umbrella policies do not cover defense costs." (Dkt. No. 300-4, at 27). As Utica notes, however, the Arbitration Panel's order does not indicate whether the dispute at issue in this case—the interpretation of the "not covered by" language in the 1973 and 1977 Umbrellas—"was material and essential to the panel's ruling." (Dkt. No. 309, at 8). Further, during the litigation before the arbitration panel, while R&Q argued that the umbrella policies did not cover defense expenses, it also argued that the *certificates* prohibited Utica from billing R&Q for expenses in addition to limits. (Dkt. No. 301-148, at 83–84). The Arbitration Panel found that the "facultative certificates . . . do not cover defense costs" but made no finding with respect to the underlying umbrella policies. (Dkt No. 301-1, ¶ 189). While a plausible explanation for its finding is that the Arbitration Panel determined that the facultative certificates did not cover defense costs because the umbrella

policies did not cover the defense costs at issue, it is equally plausible that the Panel determined, as it stated, that the certificates themselves did not cover defense costs. Accordingly, even if the Court were to set aside the other issues Utica identified as problematic in the application of collateral estoppel to the arbitration award, including, *inter alia*, the overall differences between the umbrella and reinsurance contracts in the R&Q arbitration and in these cases, as well as the application of different legal standards, the Court concludes that Munich has failed to "show[] with clarity and certainty what was determined by the prior judgment." *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117 F.3d 674, 677 (2d Cir.1997) (quoting *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1321 (9th Cir. 1992)). Accordingly, summary judgment on the ground of collateral estoppel is denied. *Id*. ("[T]he defendants must make a showing so strong that no fair-minded jury could fail to find that the arbitrator necessarily denied the claim for the reason they assert.").

### E.    Defense Costs & Allocation – *Utica I* & *Utica II*

Munich moves for summary judgment regarding defense costs in both actions. In *Utica I*, Munich argues that it has no duty under the 1973 Certificate to indemnify Utica for defense costs Utica paid in addition to the 1973 Umbrella's $25 million limits and that it is entitled to dismissal of Utica's breach of contract claim as a matter of law. (Dkt. No. 300-5). In *Utica II*, Munich argues that it has no duty to indemnify Utica for defense costs paid in addition to the 1977 Umbrella's $3 million limits and that it is entitled to summary judgment on its claim that Utica breached the 1977 Certificate by billing Munich for more than the 1977 Certificate's $1 million limit. (*Utica II*, Dkt. No. 239-2). Utica opposes the motions, (Dkt. No. 310; *Utica II*, Dkt. No. 251), and moves for summary judgment on the allocation of defense expenses "because Munich has no valid defense to payment as a matter of law." (Dkt. No. 302). As many of the arguments overlap, the Court finds it more efficient to address the motions together.

### 1.     The Certificates' Defense Expense Provisions

Munich argues that the Certificates only obligate Munich to indemnify Utica for costs covered by the underlying Umbrellas, that the 1973 and 1977 Umbrellas, by their terms, did not obligate Utica to pay defense costs once limits had been exhausted, and that Utica, therefore, is not entitled to reinsurance coverage for its "voluntary" payment of defense costs.  Utica argues that, because the 1973 and 1977 Certificates by their own terms—independent of the Umbrellas—obligate Munich to pay defense expenses, the determination of whether the Umbrellas covered defense expenses in addition to limits is unnecessary.  (Dkt. No. 310, at 8).

It is undisputed that Utica has paid over $130 million in defense expenses.  (Dkt. No. 300-1, ¶ 111; Dkt. No. 311, ¶ 111; Dkt. No. 301-113, at 4).  Utica seeks payment of $2,760,533.96 in defense expenses under the 1973 Certificate and billed Munich for $789,813.47 in defense expenses under the 1977 Certificate.  Utica contends that these amounts are Munich's proportionate share of the total defense expenses it paid under the 1973 and 1977 Umbrellas.[19] There is evidence, however, that these expense billings included declaratory judgment expenses Utica incurred in "the insurance coverage litigation involving Goulds" and "unallocated expenses."  (Dkt. No. 305-1, ¶ 47; Dkt. No. 302-11, ¶ 8).  The parties, however, have not specified the amount of declaratory judgment or unallocated loss expenses Utica has assigned to the 1973 and 1977 Umbrellas and Certificates.  (*See*, *e.g.*, Dkt. No. 301-113, at 4 (spreadsheet); Dkt. No. 221, ¶ 10 (O'Kane declaration discussing billing under the 1973 Certificate in the amount of "$249,967.43 for unallocated expense"); Dkt. No. 313-1, at 13–20 (spreadsheets).

---

[19] Daniel Hammond, a senior associate claims attorney for Utica, states in his declaration that "[t]he expense payments . . . were incurred in investigation, adjustment, litigation, and settlement of asbestos claims and suits against Goulds" and included, among other things, "payments to defense counsel to defend the asbestos suits against Goulds and payments to vendors for costs related to defending the asbestos suits against Goulds."  (Dkt. No. 302-11, ¶ 7).

As an initial matter, Utica appears to agree with Munich to the extent that it does not argue that the declaratory judgment expenses—the costs it incurred in the dispute with Goulds concerning coverage—were covered by the Umbrella policies.  This makes sense because there is no basis for concluding that Goulds realized any benefit from Utica's decision to challenge the claims Goulds was making under the Utica policies.  *See British Intern. Ins. Co. Ltd v. Seguros La Republica, S.A.*, 342 F.3d 78, 85 (2d Cir. 2003) (rejecting insurer's argument that declaratory judgment expenses "was within the coverage of the underlying policies," explaining that the "policy holders obtained no benefit from the mounting of coverage litigation against their own claims; such an initiative cannot be conceived as any part of the policyholders' coverage; on the whole, any policyholder would prefer that the insurer forgo the contest").  Instead, Utica contends that the Certificates require Munich to pay its share of declaratory judgment expenses regardless of the coverage provided in the underlying Umbrellas.  Thus, the Court must consider whether the Certificates provide coverage for such expenses.

Munich advances two arguments concerning declaratory judgment expenses.  First, Munich cites to paragraph 3 of the Certificates, which makes Munich "liable for its proportion of allocated loss expenses ["ALAE"] incurred by" Utica.  (Dkt. No. 301-31, at 2; Dkt. No. 301-33, at 2).  Munich argues that the Certificates "only cover ALAE," and  do not cover the declaratory judgment expenses at issue because in this case, as demonstrated by Utica's spreadsheets and billings, Utica has designated them as "ULAE" (unallocated loss expenses), which the Certificates do not cover.  (Dkt. No. 305, at 31 & n.24).  Second, Munich argues that Utica's assignment "of virtually all its [declaratory judgment] expenses to its umbrella policies" was "unreasonable" because the umbrella policies were not at issue in the coverage litigation, and

that Utica's "motive for this billing methodology" was the "maximization of reinsurance recoveries."  (Dkt. No. 305, at 31).

        The Court finds that questions of material fact preclude summary judgment for either side.  Paragraph 3 of the 1973 Certificate requires Munich to pay its share of "allocated loss expenses"—that is, "all expenses incurred in the investigation, adjustment and litigation of claims or suits."  (Dkt. No. 301-33, at 2).  Similarly, paragraph 3 of the 1977 Certificate requires Munich to pay its share of  "all expenses incurred in the investigation and settlement of claims or suits, including the salaries and expenses of staff adjusters but excluding other [Utica] salaries and office expenses."  (Dkt. No. 301-31, at 2).   Munich argues that these provisions cannot be read without reference to Paragraph 1, which specifies that Munich's obligation to indemnify Utica for "losses or damages" is for those "losses or damages" that Utica is "legally obligated to pay" under the reinsured policy; in other words, Munich argues that the expenses must have been those Utica was "legally obligated to pay" under the Umbrellas.  But the fact that "losses or damages" are explicitly subject to the requirement that Utica be legally obligated to pay them under the terms of the Umbrellas reasonably implies, as Utica argues, that "allocated loss expenses" which are not explicitly subject to the same requirement, are not tied to the Umbrellas. This implication is not strong enough in the context of the Certificates as a whole to show that such expenses are not tied to the underlying Umbrella policies; however, it is "sufficient to render the Certificate ambiguous."  *Utica Mut. Ins. Co. v. Munich Reins. Am., Inc.*, 594 F. App'x 700, 703 (2d Cir. 2014); *see also Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 25 N.Y.3d 675, 680 (2015) ("Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or where its terms are subject to more than one reasonable interpretation.").

Munich summarily asserts, without analysis or argument, that the notion that it could be liable for amounts Utica spent defending Goulds' regardless of whether Utica had any obligation under the Umbrellas to do so is "absurd." (Dkt. No. 305, at 30). The Court notes that Utica has cited a case where a district court, interpreting a Certificate that appears to be in all relevant respects identical to that of the 1977 Certificate, found that a reinsurer was obligated to pay expenses incurred in a declaratory judgment action. *See Employers Ins. Co. of Wausau v. Am. Reins. Co.* ("*Wausau*"), 256 F. Supp. 2d 923, 926-27 (W.D. Wisc. 2003).[20] Neither party, however, has briefed the ambiguity in the Certificates or attempted to separate the amount Utica spent defending on Goulds' behalf from the amount it spent challenging Goulds' claims. As the Certificates are ambiguous as to whether defense expenses must be covered by the underlying Umbrellas to qualify as allocated loss expenses, interpreting the Certificates will require consideration of extrinsic evidence. *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998). Neither party has briefed this issue or submitted extrinsic evidence concerning whether the Certificates, by their terms, without reference to the Umbrellas, are the source of the contractual authority for Utica's billing of defense costs. Accordingly, the Court declines to consider this issue further.

## 2. The Umbrellas' Defense Expense Provisions

Utica argues that, even assuming, as Munich does, that reinsurance is unavailable unless the Umbrellas themselves provide for defense costs in addition to limits, it is still entitled to summary judgment because: (1) the Umbrellas provide such coverage; and (2) even if that coverage is arguable, follow the fortunes would require Munich to pay its share. Munich responds that: (1) the Certificates do not contain a follow-the-fortunes provision; and (2) even if

---

[20] Utica argues that because American Reinsurance Co., the defendant in *Wausau*, is Munich Re's predecessor, Munich Re is barred by collateral estoppel from arguing that the Certificates do not cover declaratory judgment expenses. (Dkt. No. 302-1, at 29). The Court declines to consider Utica's cursory argument.

Case 6:13-cv-00743-BKS-ATB    Document 268    Filed 03/20/18    Page 42 of 61

they did, Utica would not be entitled to deference under follow the fortunes because its payment

of defense costs in addition to limits was clearly beyond the scope of the Umbrellas and not in

good faith.

The 1973 Defense Endorsement and 1977 Umbrella state that Utica will provide defense

expenses "in addition to the applicable limit of liability" for "any occurrence *not covered by* the

underlying policy(ies) of insurance . . . but covered by terms and conditions of this policy."[21]

(Dkt. No. 301-96, at 18–19; *Utica II,* Dkt. No. 249-42 at 7)  (emphasis added)).  Utica asserts

that an occurrence is not covered by a primary policy, and that it is obligated to pay defense costs

in addition to limits, when the primary policy is exhausted.  Munich disagrees with Utica's

interpretation and asserts that the meaning of "occurrence not covered by" the primary policies is

plain: the occurrence "under consideration" must not have been "a loss or risk insured against by

[the] underlying [primary] policies," and policy exhaustion does not render an occurrence not

covered.  (Dkt. No. 300-5, at 14).

### a.    Implying a Follow-the-Fortunes Clause Into the Certificates

The scrutiny given to Utica's interpretation of the policy depends on whether the follow-

the-fortunes doctrine applies.  If it applies, Munich cannot challenge Utica's decision to pay

defense expenses in addition to limits unless the payments "are clearly beyond the scope" of the

Umbrella.  *N. River Ins.*, 361 F.3d at 140; *see also Arkwright Mut. Ins. Co. v. Nat'l Union Fire

Ins. Co. of Pittsburgh, Pa.*, 90-cv-7811, 1995 WL 3006, at *4, 1995 U.S. Dist. LEXIS 11, at *11

---

[21] In *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, No. 13-cv-1178, 2016 WL 254770, at *7, 2016 U.S. Dist. LEXIS 6219, at *22 (N.D.N.Y. Jan. 20, 2016), the court found that the issue of whether "the exhaustion of Utica's primary policies satisfies the requirement that the policyholder be 'not covered' for umbrella coverage purposes is immaterial" because, under the follow the fortunes doctrine, Utica was only required to show that its payment was "arguably within the scope of the insurance coverage" and Clearwater presented no evidence to the contrary.  In this case,  the parties dispute whether follow the fortunes applies, but even assuming it does, Munich has presented evidence raising a question of fact as to whether Utica's payment of defense expenses was reckless and therefore in bad faith.

(S.D.N.Y. Jan. 4, 1995) ("Where the reinsurance certificate contains a 'follow the fortunes' clause, the reinsurer 'is . . . bound to reimburse [the reinsured] on [the insured's] behalf so long as the payments are arguably within the bounds of the policy.'" (quoting *Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 762 F. Supp. 566, 586 (S.D.N.Y. 1991)). "This standard is purposefully low and the decision making process of the ceding insurer is not subject to a de novo review. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Am. Re-Ins. Co.*, 351 F. Supp. 2d 201, 208 (S.D.N.Y. 2005).

The "follow the fortunes" doctrine

> "binds a reinsurer to accept the cedent's good faith decisions on all things concerning the underlying insurance terms and claims against the underlying insured: coverage, tactics, lawsuits, compromise, resistance or capitulation." This doctrine insulates a reinsured's liability determinations from challenge by a reinsurer unless they are fraudulent, in bad faith, or the payments are "clearly beyond the scope of the original policy" or "in excess of [the reinsurer's] agreed-to exposure." . . . It is well-established that a follow-the-fortunes doctrine applies to all outcomes, including settlements and judgments.

*N. River Ins. Co. v. Ace Am. Reins. Co.*, 361 F.3d 134, 139–40 (2d Cir. 2004) (alteration in original) (first quoting *British Int'l Ins. Co.*, 342 F.3d at 85; then quoting *Christiania*, 979 F.2d at 280). "'Follow the settlements doctrine . . . is the follow-the-fortunes doctrine in the settlement context." *Travelers Cas. & Sur. Co., v. Gerling Global Reins. Corp. of Am.*, 419 F.3d 181, 186 n.4 (2d Cir. 2005). "[T]he main rationale for the doctrine is to foster the 'goals of maximum coverage and settlement' and to prevent courts, through 'de novo review of [the cedent's] decision-making process,' from undermining 'the foundation of the cedent-reinsurer relationship.'" *Id.* at 140–41 (alteration in original) (quoting *N. River*, 52 F.3d at 1206). The doctrine applies to post-settlement allocation decisions as well. *Id.* at 141.

As stated, neither party contends that there is a follow-the-fortunes or follow-the-settlements provision in the Certificates. Utica argues that this is unimportant because the doctrine is implied in every facultative reinsurance certificate. Courts are divided on whether an obligation to follow the settlements may be implied in a reinsurance contract that lacks such a provision. *See N.H. Ins. Co. v. Clearwater Ins. Co.*, 129 A.D.3d 99, 112–13 (1st Dep't 2015) (citing 7 Business and Commercial Litigation in the Federal Courts § 80:16 (3d ed.)). This issue "has not yet been addressed by a New York state appellate court." *N.H. Ins. Co.*, 129 A.D.3d at 112. In *New Hampshire Insurance*, the New York Appellate Division noted, however, "that certain scholars in the field have argued that, in the absence of a contractual provision expressly incorporating it, the 'follow the settlements' doctrine should not be implied in a contract of reinsurance." *Id.* at 113 n.7.

Although "[r]einsurance contracts are governed by the same principles that govern contracts generally," *Global Reins. Corp. of Am. v. Century Indem. Co.*, 30 N.Y.3d 508, 518 (2017), neither party has addressed the question of when, under New York law, a term may be implied into a contract. *Cf. British Int'l Ins. Co. Ltd., v. Seguros La Republica,* 342 F.3d 78, 83 (2d Cir. 2003) (noting that the cedent did not address when custom and practice could supplement the terms in a reinsurance certificate but ruling that, in any event, the record evidence of custom and practice was "insufficient to raise the legal issue"). Utica has cited to extrinsic evidence—evidence of how Munich evaluated claims—without any explanation for why the Court should look outside the terms of the reinsurance certificate to determine the parties' intent. *See*, *e.g.*, *RMP Capital Corp. v. Victory Jett, LLC*, 139 A.D.3d 836, 838–39 (2d Dep't 2016) (noting that "matters extrinsic to the agreement may not be considered when the

44

intent of the parties can be gleaned from the face of the instrument.  A court should not imply a term which the parties themselves failed to include.").

In any event, while Utica has cited to evidence that Munich employees considered the follow the fortunes doctrine in its claims handling, Utica has not identified evidence that Munich considered itself bound to follow settlements involving disputed coverage.  Utica cites the testimony of Thomas O'Kane, Munich's Vice President of Claims, who has worked for Munich since 1992.  Kane testified that follow the fortunes is "a concept that's applied to facultative claim handling," and would be applied if there was a verdict or judgment, but does not apply to settlements.  (Dkt. No. 306, at 9).  With respect to settlements Kane explained that follow the settlements "means you can't second guess a settlement value of the claim if it's reasonable, in good faith, made at arm's length or not collusive with the - between the cedent and the policyholder or underlying plaintiff and is covered under the reinsured policy."  (*Id.*).  Kane testified that Munich could second-guess a ceding company's allocation decision if there were coverage issues.  (Dkt. No. 306, at 10); *see also* Dkt. No. 306, ¶ 4 ("MRAm acknowledges an obligation to follow the settlements entered into by its ceding companies for claims presented to MRAm under its facultative certificates so long as there is coverage for the losses and expenses that are the subject of settlement.")).  This does not evince Munich's intent to be bound to pay claims that were to pay  "*arguably within the scope of the insurance coverage that was reinsured.*"  *British Intern. Ins. Co. Ltd.*, 342 F.3d at 85 (emphasis in original).  Thus, even if the Court were to find a basis for considering this extrinsic evidence, it does not support Utica's claim that Munich considered itself bound to accept good faith settlements involving disputed coverage.

Utica has not argued that a follow-the-settlement clause should be implied based upon industry custom and practice.[22]  *Cf. Aetna Cas. & Sur. Co. v. Home Ins. Co.*, 882 F. Supp. 1328, 1350 (S.D.N.Y. 1995) (noting that "[t]he existence of an industry custom, such as the duty to follow loss settlements, is in the first instance a question of fact" and concluding that "[i]n view of the [expert witness] evidence" presented, it was "customary within the reinsurance industry for reinsurers to follow the claim settlement decisions of the ceding company even in the absence of an explicit loss settlements clause"); *see N. River Ins. Co. v. Emp'rs Reins. Corp.*, No. C2-00-1221, 2002 WL 35577077, at *7, 2002 U.S. Dist. LEXIS 11711, *23–24 (S.D. Ohio June 3, 2002) (finding that cedent "failed to show that it was the custom and practice for reinsurers to honor a reinsured's good faith settlement of claims involving *disputed coverage*") (emphasis added).

Munich argues that most courts have in other jurisdictions have refused to imply a follow the settlements or fortunes clause in reinsurance contracts that do not have such a clause.  *See, e.g., Am. Ins. Co. v. Am. Re-Ins. Co.*, No. 05-cv-1218, 2006 WL 3412079, at *5, 2006 U.S. Dist. LEXIS 95801, at *17 (N.D. Cal. Nov. 27, 2006) (finding "that the majority of courts addressing this issue, and the better reasoned opinions, have rejected the proposition that the 'follow the settlements' or 'follow the fortunes' doctrine may be read into every reinsurance policy as a matter of law.  In the absence of any authority from Pennsylvania on this issue, the Court will not impute the minority, less well-reasoned position to a Pennsylvania court.").  The Court notes that other reinsurance certificates do have such clauses, and that a reinsured may negotiate for the provision.  *See Emp'r Reins. Corp. v. Laurier Indem. Co.*, No. 8:03-cv-1650-T-17MSS, 2007 WL 1831775, at *15, 2007 U.S. Dist. LEXIS 45670, at *10–11 (M.D. Fla. June 25, 2007)

---

[22] Munich has cited an expert witness report stating that there is no support "as a matter of industry custom and practice" to imply a follow the fortunes/settlement term into the facultative reinsurance certificates.  (Dkt. No. 305-1, ¶ 189).

(declining to imply a follow the fortunes/follow the settlements clause into a reinsurance agreement, noting that if the clause is of particular importance to a potential reinsured, it is certainly capable of ensuring that such provision becomes a part of the contract); *Global Reins. Corp.*, 30 N.Y.3d at 518–19 (noting that when agreement is "negotiated between sophisticated, counseled business people negotiating at arm's length, . . . courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include") (citation omitted).  On this record, the Court declines to imply a follow-the- settlement clause into the reinsurance certificates.

        **b.**      **The Parties' Interpretations of "Occurrence Not Covered By"**

Munich moves for summary judgment on the ground neither the 1973 Defense Endorsement nor the 1977 Umbrella provide defense expenses for "occurrences" that were at any point covered by the underlying primary policies.  (Dkt. No. 300-5; *Utica II*, Dkt. No. 239-3).  Utica views the 1973 Defense Endorsement and 1977 Umbrella differently; it argues that they provide defense expenses for "occurrences" that were not covered by the underlying primary policies by reason of exhaustion.  (Dkt. No. 310).

"Under New York law . . . an insurer's obligation to indemnify an insured must be based on the insurance agreement." *Jakobson Shipyard Inc. v. Aetna Cas. & Sur. Co.*, 961 F.2d 387, 389 (2d Cir. 1992).  "An insurance agreement is subject to principles of contract interpretation." *Universal Am. Corp.*, 25 N.Y.3d at 680.  "As with the construction of contracts generally, unambiguous provisions of an insurance contract must be given their plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court." *Id.* (quoting *Vigilant Ins. Co. v Bear Stearns Cos., Inc.*, 10 N.Y.3d 170, 177 (2008)).  Regarding ambiguity the Court of Appeals of New York has instructed:

> Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or where its terms are subject to more than one reasonable interpretation. However, parties cannot create ambiguity from whole cloth where none exists, because provisions are not ambiguous merely because the parties interpret them differently. Rather, the test to determine whether an insurance contract is ambiguous focuses on the reasonable expectations of the average insured upon reading the policy and employing common speech.

*Universal Am. Corp.*, 25 N.Y.3d at 680 (internal quotation marks and citations omitted). "An ambiguity exists where the terms of an insurance contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (quoting *Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000)). "An insurance policy should be read in light of common speech and the reasonable expectations of a businessperson." *Id.* (quoting *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*, 13 A.D.3d 599, 600 (2d Dep't 2004)).

The 1973 Defense Endorsement states: "With respect to any occurrence[23] not covered by the underlying policy(ies) of insurance described in the schedule of underlying insurance or any other underlying insurance collectible by the insured, but covered by terms and conditions of this policy except for the amount of retained limit,"[24] Utica "shall," among other things, "defend any suit against the insured" and "pay all expenses incurred by the company." (Dkt. No. 301-28, at

---

[23] The 1973 Umbrella defines "occurrence" as "an accident during the policy period or . . . continuous or repeated exposure to conditions during or prior to the policy period, if the bodily injury or property damage occurs." (Dkt. No. 301-28, at 7).

[24] "Retained limit" is defined in the 1973 Umbrella as "the amount, stated as such in the declarations, of ultimate net loss resulting from any one occurrence if the insurance afforded by the underlying insurance is inapplicable to such occurrence." (*Id.*). Ultimate Net Loss is defined in the 1973 Defense Endorsement as "the sum actually paid in cash in the settlement or satisfaction of losses for which the insured is liable . . . but excludes all loss expenses and legal expenses (including attorneys' fees, court costs and interest on any judgment . . . ." (*Id.* at 23).

22).  It further states: "and the amounts so incurred, except settlements of claims and suits, are payable by the company in addition to the applicable limit of liability of this policy."  (*Id.*).

The provisions in the 1977 Umbrella are slightly different, but not so different as to require separate analysis.  Under the heading "II.  Defense—Defense Costs—Investigation—Assistance and Cooperation," the 1977 Umbrella states: "with respect to any occurrence[25] not covered by the policies listed in the schedule of underlying insurance or any other insurance collectible by the insured, but covered by the terms and conditions of this policy (including damages wholly or partly within the amount of the retained limit),"[26] Utica shall, *inter alia*, "defend against any suit against the insured," and "reimburse the insured for all reasonable expenses, including loss of earnings . . .; the amounts so incurred, except settlements of claims

---

[25] The 1977 Umbrella defines "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in personal injury, property damage or advertising offence which is neither expected nor intended from the standpoint of the insured."  (*Utica II*, Dkt. No. 249-42, at 8).

[26] The 1977 Umbrella defines "retained limit" as follows:

>   Retained limit means as to each occurrence with respect to which insurance is afforded under this policy:
>
>>   (1) if an underlying policy is also applicable or would be applicable but for breach of policy conditions; the relevant "each person," "each accident," "each occurrence" or similar limit of liability stated therein (less any reduction thereof by reason of an overriding aggregate limit of liability) plus all amounts payable under other insurance, if any;
>>
>>   (2) *if any underlying policy otherwise applicable is inapplicable by reason of exhaustion of an aggregate limit of liability; all amounts payable under other insurance, if any*; or
>>
>>   (3) if neither paragraphs (1) or (2) above apply and
>>
>>>   (a) the insured has other insurance; all amounts payable under such other insurance, but in no event less than the amount stated in the declarations as the insured's retention, or
>>>
>>>   (b) the insured has no other insurance; the amount stated in the declarations as the insured's retention.
>
>   For the purpose of determining the retained limit, "other insurance" means any other valid and collectible insurance (except under an underlying policy) which is available to the insured, or would be available to the insured in the absence of this policy, it being the intention that this policy shall not apply under or contribute with such other insurance unless the company's agreement thereto is endorsed hereon.

(*Utica II*, Dkt. No. 249-42, at 8) (emphasis added).

49

and suits, are payable by the company in addition to the applicable limit of liability of this policy." (*Utica II*, Dkt. No. 249-42, at 7).

Munich reads the "occurrence not covered by" language in the first sentence under the Defense heading to mean an occurrence that is "not within the scope of coverage provided by underlying policies of insurance." (Dkt. No. 300-5, at 8). Utica reads the "occurrence not covered by" language more broadly, and as including occurrences that are "not covered" by the underlying policies because those policies have been exhausted. (Dkt. No. 310, at 11). Both readings are plausible—though Munich appears to have the stronger argument.[27] While "occurrence not covered by" seems to imply that Utica would not be required to provide defense expenses for an occurrence that falls within the terms and conditions of an underlying policy—regardless of whether the amount of coverage had been exhausted—this implication is not so strong as to render the provision unambiguous. The phrase "covered by" is used twice in once sentence, the first time it refers to an occurrence not covered by the underlying "policy(ies)," the second time it refers to an occurrence "covered by the terms and conditions of this policy." The

---

[27] *See Am. Special Risk Ins. Co. v. A-Best Products, Inc.*, 975 F. Supp. 1019, 1026 (N.D. Ohio 1997) ("[T]he phrase 'not covered' in the Defense Coverage Endorsement refers to situations of horizontal coverage where [the umbrella insurer] acts as a primary carrier, and not to situations of vertical coverage where [the umbrella insurer] provides excess insurance after the exhaustion of the underlying primary insurance."); *Am. Safety Indem. Co. v. 612 Realty LLC*, 901 N.Y.S.2d 897, 897 (S.Ct. N.Y. Cty. 2009) ("In this context, the term 'covers,' as related to the primary policy, should be construed as referring to whether the primary policy provides coverage and not to whether it is collectible."); *Pergament Distribs., Inc. v. Old Republic Ins. Co.*, 128 A.D.2d 760, 761 (2d Dep't 1987) ("When used in this context, the terms 'covered' and 'not covered' refer to whether the policy insures against a certain risk not whether the insured can collect on an underlying policy.").

Utica has cited to the decision in *Utica Mutual Insurance Co. v. Clearwater Ins. Co.*, No. 6:13-cv-1178, 2016 WL 254770, at 7, 2016 U.S. Dist. LEXIS 6219, at *22 (N.D.N.Y. Jan. 20, 2016), but that case involved a different factual record and the district court applied the follow-the-settlements doctrine, and thus addressed a different issue, i.e. whether defense costs were "at least arguably within the scope of the insurance coverage." *Id.* Noting, *inter alia* that the reinsurer there "solely" relied on the terms of the umbrella policies and "fail[ed] to present any other evidence that defense costs are 'clearly beyond the scope of the original policy,'" the district court ruled that Utica was entitled to summary judgment on its claim for defense costs. *Id.*

phrase "covered by" accompanied by the phrase "terms and conditions of this policy" seems to signify a narrowing of occurrences "covered," and may support Utica's interpretation of not covered by the underlying "policy(ies)" as encompassing a broader category of occurrences, including claims not covered by reason of exhaustion. Thus, consideration of extrinsic evidence is required. *See Alexander & Alexander Servs.*, 136 F.3d at 86 ("If the court finds that the terms, or the inferences readily drawn from the terms, are ambiguous, then the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.").

Here, Munich has presented evidence suggesting that Utica intended the defense provisions "to provide first dollar defense coverage," meaning that "the 'first dollar' spent for defense with respect to an occurrence is paid by the umbrella insurer."[28] (Dkt. No. 300-1, ¶¶ 58–61; *Utica II*, Dkt. No. 239-3, at 29–30). Such evidence may support Munich's interpretation of the "not covered by" language because, in this case, Utica had already provided defense coverage under the primary policies, thus its continued provision of defense coverage under the

---

[28] An internal Utica document dated November 6, 1973, states: "Attached is a prototype endorsement form to be used with commercial umbrella policies . . . to provide first dollar defense coverage." (Dkt. No. 300-1, ¶ 58; Dkt. No. 311, ¶ 58; Dkt. No. 301-10, at 2). The attachment is a copy of the Defense Endorsement. (Dkt. No. 301-10, at 3). On or about November 29, 1973, Utica sent a letter to the Insurance Services Office in New York, stating, "Enclosed is a copy of our Defense Coverage Endorsement . . . The endorsement is for attachment to our Commercial Umbrella Policy when first dollar defense is desired." (Dkt. No. 300-1, ¶ 59; Dkt. No. 311, ¶ 59; Dkt. No. 301-11, at 2). The letter further states, "We would like to use this endorsement effective January 1, 1974," and requests "approval at your earliest opportunity." (*Id*. at 2). On or about October 24, 1974, Utica sent a letter to the New York State Insurance Department stating:

> Enclosed are manuscript copies of our revised Commercial Umbrella Policy and Commercial Umbrella Declarations Page. These will replace our previously approved forms.
>
> The major changes in the policy are:
>
> * * *
>
> 2. First Dollar Defense Coverage is now included in the policy. The previously approved Defense Coverage Endorsement Program is therefore concurrently withdrawn.

(Dkt. No. 300-1, ¶ 61; Dkt. No. 311, ¶ 61).

Umbrellas obviously would not have been "first dollar defense coverage."[29]  Utica, however, has

presented evidence from a former Utica underwriter and general counsel, who were involved in

the issuance of the Goulds umbrella policies during the relevant time period, and who averred

that they understood the Utica umbrella policies to cover expense after exhaustion of the primary

policies.  Thus, there are disputed issues of fact on the issue of the "not covered by" language.

### F.    Reimbursement – *Utica II*

Utica asserts that it is entitled to summary judgment on Munich's request for

reimbursement of expenses, which Utica billed and Munich paid in December 2007 under the

1977 Certificate, because reimbursement is not a valid remedy.  (*Utica II*, Dkt. No. 241).  Utica

argues: (1) the 1977 Certificate contains no right to reimbursement; (2) Munich did not reserve

its rights when it paid the billings, (3) Munich is bound by an "account stated"; (4) Munich

waived its breach of contract claims; (5) the voluntary payment doctrine applies; (6) estoppel

bars Munich's claims; (7) Munich assumed the risk by paying the billings; and (8) Munich's

quasi-contract claims fail because the parties' dispute is governed by a written contract.  (*Utica

II*, Dkt. No. 241-1).  The Court finds that issues of fact preclude summary judgment.

### 1.    Contractual Right to Reimbursement

Munich's first and second claims for relief allege breach of contract based on the 1977

Certificate.  (*Utica II*, Dkt. No. 1, at 6–7).  It is undisputed, however, that the 1977 Certificate

does not contain a provision allowing for reimbursement of paid reinsurance claims.  Although

Munich argues that a reinsurance contract need not contain a reimbursement provision "in order

---

[29] Additionally, Utica appears to have changed positions with respect to whether the 1977 Umbrella provided expenses in addition to limits.  In the settlement agreement, Utica increased the aggregate limits on the 1978, 1979, and 1980 umbrellas on the basis that they provided for expenses in addition to limits. (Dkt. No. 301-1, at 19; Dkt. No. 313-108, at 48).  It did not increase the aggregate limits on the 1977 Umbrella.  (*Id.*).

for [it] to be entitled to reimbursement from Utica for amounts that Utica had no obligation to pay," it provides no legal authority for this proposition.  (*Utica II*, Dkt. No. 245, at 17).

### 2.    Reservation of Rights

Utica argues that it is entitled to summary judgment because Munich, at the time it paid Utica's billings, did not do so with a reservation of rights. (*Utica II*, Dkt. No. 241-1, at 10–11). The cases it cites, however, concern the reservation of rights in the context of an insurer seeking reimbursement after providing defense coverage.  *See Century Sur. Co. v. Franchise Contractors, LLC*, No. 14-cv-277, 2016 WL 1030134, at *5, 2016 U.S. Dist. LEXIS 31271, at *13 (S.D.N.Y. Mar. 10, 2016) ("New York law permits insurers to provide their insureds with a defense subject to 'a reservation of rights to, among other things, later recoup their defense costs upon a determination of non-coverage.'" (quoting *Maxum Indem. Co. v. A One Testing Labs., Inc.*, 150 F. Supp. 3d 278, 283 (S.D.N.Y. 2015))); *BX Third Ave. Partners, LLC v. Fid. Nat. Title Ins. Co.*, 112 A.D.3d 430 (1st Dep't 2013) (considering whether insurer was "estopped from disclaiming title insurance coverage after providing a full defense for plaintiff in the underlying foreclosure action").  Utica has made no attempt to explain how such cases apply in the context of the payment of reinsurance billings.  Moreover, assuming the principles contained in those cases apply in the reinsurance context, there may be circumstances in which the delay in giving notice of a reservation of rights may be excused.  *See Federated Dep't Stores, Inc. v. Twin City Fire Ins. Co.*, 28 A.D.3d 32, 36 (1st Dep't 2006) ("[A]n insurer should not be charged with the obligation to reserve its rights against unknown policy defenses [and a] delay in giving notice of reservation of rights will be excused where it is traceable to the insurer's lack of actual or constructive knowledge of the available defense, especially where, in addition to such lack of knowledge, the insurer is misled by misrepresentations into defending the suit." (quoting Couch on Insurance § 202:60 (3d ed. 2005))).  Here, viewed in the light most favorable to Munich, there

is evidence that Utica, despite Munich's request, did not, at the time of the billings, provide the 1977 Umbrella.  (*Utica II*, Dkt. No. 245-1, ¶ 48; Dkt. No. 260-1, ¶ 48).  Thus, the Court concludes that the absence of a reservation of rights does not entitled Utica to summary judgment.

### 3.    Waiver, Voluntary Payment & Account Stated

Utica argues that because Munich knowingly and voluntarily paid Utica's reinsurance billings, the doctrines of waiver, voluntary payment and account stated bar Munich's claim for reimbursement.  (*Utica II*, Dkt. No. 241-1, at 11-12).   Specifically, Utica argues that Munich's lack of diligence in seeking a copy of the 1977 Umbrella and payment of the billings without requiring a copy demonstrate that Munich waived any defense that the billings were for expenses not covered by the 1977 Umbrella, and show that Munich's payment was voluntary and knowing.  (*Utica II*, Dkt. No. 241-1, at 12–15).

"Ordinarily, the insurer is not deemed to have waived its rights unless it is shown that it has acted with the full knowledge of the facts." *Zeldman v. Mut. Life Ins. Co. of N.Y.*, 269 A.D. 53, 56 (1st Dep't 1945).  To establish an account stated under New York law, a party must show that: "(1) an account was presented; (2) it was accepted as correct; and (3) [the] debtor promised to pay the amount stated." *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009) (quoting *Haskell Co. v. Radiant Energy Corp.*, No. 05-cv-4403, 2007 WL 2746903, at *12, 2007 U.S. Dist. LEXIS 69425, at *34–35 (E.D.N.Y. Sept. 19, 2007)). "Under the doctrine of account stated, a party receiving an account is obligated to inspect it, and if that party 'admits it to be correct, it becomes a stated account and is binding on both parties.'" *In re Rockefeller Ctr. Properties*, 46 F. App'x 40, 43 (2d Cir. 2002) (quoting *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff*, 638 F. Supp. 714, 719 (S.D.N.Y. 1986)).  Once there is an account stated, it may not be reopened "unless fraud, mistake, or other equitable considerations

are shown." *Kramer, Levin, Nessen, Kamin & Frankel*, 638 F. Supp. at 719.  Here the account

stated became an account settled by Munich's payment in full.  1 N.Y. Jur. 2d Accounts and

Accounting § 23 (2018).  "[A]ccounts settled between parties will not be opened except for

duress, fraud or mistake."  *Barlow v. Platt*, 133 A.D. 364, 366 (2d Dep't 1909).  "[T]he practice

of opening such accounts is not to be encouraged, and . . . after the lapse of considerable time the

evidence must be strong and conclusive."  *Id.* at 366–67.

     "The voluntary payment doctrine precludes a plaintiff from recovering payments 'made

with full knowledge of the facts' and with a 'lack of diligence in determining his contractual

rights and obligations.'"  *Spagnola v. Chubb Corp.*, 574 F.3d 64, 72 (2d Cir. 2009); *see, e.g.*,

*Eighty Eight Bleecker Co., LLC v. 88 Bleecker St. Owners, Inc.*, 34 A.D.3d 244, 246-47 (2006)

(ruling that sophisticated entity who overpaid rent for approximately twenty years without

protest or inquiry into the lease terms was "not laboring under any material mistake of fact" and

its "'marked lack of diligence in determining what its contractual rights were' demonstrates that

the payments were voluntary and not made under mistake of law"); *Gimbel Bros., Inc. v. Brook*

*Shopping Centers, Inc.*, 118 A.D.2d 532, 535 (2d Dep't 1986) (ruling that lessee who paid

weekly "Sunday charges" for almost half a year, "without having made any effort to learn what

its legal obligations were," was not operating under a mistake of law; it "displayed a marked lack

of diligence in determining . . . its contractual rights," and therefore was not entitled to recover

the monies paid).

     Here, it is undisputed that Munich paid Utica's reinsurance billings under the 1977

Certificate in December 2007—approximately five years before commencing the present action

for reimbursement.  Munich argues that the doctrines of account stated and voluntary payment

do not apply because it was misled by Utica – that Utica provided "false and incomplete

information." (*Utica II*, Dkt. No. 245, at 19 (citation omitted)).  In support of its argument,

Munich cites evidence indicating that, despite its request for the 1977 Umbrella at the time of the

billings, in paying the billings, Utica failed to include several pages of endorsements or the

specimen form for the 1977 Umbrella, and Munich  relied on Utica's representation "on multiple

occasions that the 1977 Umbrella policy covered defense costs in addition to limits."[30]  (*Utica II*,

Dkt. No. 245-1, ¶¶ 48, 50).  Munich has presented evidence that it did not receive a copy of the

1977 Umbrella until late 2012, and that, upon receiving it, Munich demanded a refund of the

defense expenses it paid in 2007.  (*Utica II*, Dkt. No. 249-45 ).  Munich argues that it was

Utica's obligation to disclose "all material facts," citing to *Allendale Mut. Ins. Co. v. Excess Ins.*

*Col. Ltd.*, 992 F. Supp. 278, 282 (S.D.N.Y. 1998); *cf. Sumitomo Mar. & Fire Ins. Co., Ltd. v.*

*Cologne Reins. Co. of Am.*, 75 N.Y.2d 295, 303 (1990) (noting that while a reinsured must

disclose all material facts, "the reinsured ordinarily has no obligation to disclose the terms upon

which insurance has been granted where those terms are generally to be found in policies of that

nature, for the reinsurer ought to be aware of such standard terms').

　　　　Here, there is evidence from which a factfinder, viewing the facts in the light most

favorable to Munich, could conclude that Munich was misled by Utica; that Munich relied on

Utica's representations regarding the coverage provided by the 1977 Umbrella; and that Munich

did not have the knowledge necessary to reject the billings until it received a copy of the 1977

Umbrella in 2012, despite its 2007 requests.  The Court therefore finds that there are material

---

[30] In his declaration, Miller avers that at the time "he generated th[e] log note" dated December 6, 2007, he "was relying upon representations made to [him] by Kristen Martin of Utica" and that he "accepted as true Ms. Martin's representations to me that the 1977 umbrella policy provided coverage for expenses in addition to limits."  (*Utica II*, Dkt. No. 248, ¶ 4).  Utica argues that because his averment is contradicted by his deposition testimony, it must be disregarded.  (*Utica II*, Dkt. No. 260, at 8 n.7).  During his deposition, Miller stated that "at this point in time" he was not sure what the basis was for his understanding that the 1977 Umbrella paid expense on a supplemental basis. (Dkt. No. 240-115, at 31).  That Miller lacks an independent recollection of events in 2007 does not necessarily contradict his declaration, which refers to the content of his internal log note.  Further, Miller also testified that he "recall some representation that post '76 or '77 the Utica policies applied on a supplemental basis."  (*Id.*).

issue of fact that preclude summary judgment under the doctrines of waiver, voluntary payment or account stated.

### 4.    Equitable Estoppel

Utica contends that the doctrine of equitable estoppel bars Munich's reimbursement claim because Utica justifiably relied on Munich's payment of the reinsurance billings under the 1977 Certificate and that it would be prejudiced should it be required to repay those billings. (*Utica I*, Dkt. No. 241-1, at 14–15). "Equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 400 (2d Cir. 2011). "[A] party may be estopped from pursuing a claim or defense where: 1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely on it; 2) and the other party reasonably relies upon it; 3) to [its] detriment." *SRecovery, Inc. v. One Groupe Int'l, Inc.*, 462 F.3d 87, 94 n.3 (2d Cir. 2006).

Utica claims that Munich's "approval and payment of the full amount of Utica's billings was a misrepresentation that its investigation of the billings was complete." (*Utica II*, Dkt. No. 241-1, at 14). Munich responds that because its agreement was the result of Utica's misrepresentations about the coverage provisions of the 1977 Umbrella, Utica's reliance on Munich's payment of the billings was unreasonable—particularly because Utica was in possession of the documents that contained the relevant provisions and failed to provide them to Munich. (*Utica II*, Dkt. No. 245, at 14–15). For the reasons discussed above, because there are issues of fact concerning Munich's knowledge and Utica's representations concerning the terms of the 1977 Umbrella at the time Munich paid the reinsurance billings, summary judgment is not warranted.

### 5.     Assumption of Risk

Citing *Estate of Hatch ex rel. Ruzow v. NYCO Minerals Inc.*, 270 A.D.2d 590, 591 (3d

Dep't 2000), Utica seeks summary judgment on the ground that Munich assumed the risk of

forgoing potential defenses to Utica's billings "by paying Utica in full without requesting

additional information."  (*Utica II*, Dkt. No. 241-1, at 15).  Munich, citing cases concerning a

reinsurer's duty of inquiry and the relationship of "utmost good faith,"[31] responds that

"assumption of risk is inapplicable to reinsurance claims."  (*Utica II*, Dkt. No. 245, at 21).  In

*Estate of Hatch*, the court affirmed dismissal of the defendant's counterclaim for a return of

royalties it had previously paid, finding that the defendant "deliberately assumed the risk that it

might be mistaken in its understanding of its contractual obligations."  270 A.D.2d at 591.  The

court explained that "one who is aware that his or her understanding of a legal obligation may be

erroneous can hardly be characterized as truly mistaken when he or she intentionally proceeds

without further investigation of his or her rights.  Under these circumstances, there is in reality

no mistake but rather 'conscious ignorance.'"  *Id.*  Assuming, without deciding, that such a

doctrine is applicable in the context of reinsurance, the Court concludes that questions of fact

concerning Munich's knowledge of the contents of the 1977 Umbrella, and Utica's

representations concerning those contents, preclude summary judgment.

### 6.     Quasi-Contract Claims

Utica argues that, in view of the written reinsurance certificate, it is entitled to summary

judgment dismissing Munich's quasi-contract claims ("Unjust Enrichment, Restitution, and

Money Had and Received," (*Utica II*, Dkt. No. 1, at 8–9)).  (Dkt. No. 241-1, at 15–16).

Restitution "is a form of equitable relief."  *Judge Rotenberg Educ. Ctr. Inc. v. Blass*, 882 F.

---

[31] *See, e.g.*, *Gerling Global Reins. Co. v. Ace Prop. & Cas. Ins. Co.*, 42 Fed. App'x 522, 524 (2d Cir. 2002) ("The relationship between a reinsurer and a reinsured is one of utmost good faith. . . ." (quoting *Christiania*, 979 F.2d at 278)).

Supp. 2d 371, 376 (E.D.N.Y. 2012). "There are various rubrics under which one can recover restitution for benefits it voluntarily conferred, including quasi-contract, unjust enrichment, and quantum meruit. These rubrics are not necessary mutually exclusive and often blend together." *Id*. A claim of money had and received also "sounds in quasi contract." *Rocks & Jeans, Inc. v. Lakeview Auto Sales & Serv., Inc.*, 184 A.D.2d 502, 502 (1st Dep't 1992). Such claims "[a]re not separate causes of action under New York law, but are instead conceptualized as different facets of a single quasi contract cause of action and should be treated as such." *DeSilva v. North Shore–Long Island Jewish Health Sys., Inc.*, No. 10 Civ. 1341, 2012 WL 748760, at *9 n.12, 2012 U.S. Dist. LEXIS 30597, at *34 n.12 (E.D.N.Y. Mar. 7, 2012).

To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quoting *Dolmetta v. Uintah Nat'l Corp.*, 712 F.2d 15, 20 (2d Cir. 1983)). "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'" *Id.* (quoting *City of Syracuse v. R.A.C. Holding, Inc.*, 258 A.D.2d 905, 906 (4th Dep't 1999)). Unjust enrichment is "an obligation the law creates *in the absence of any agreement*." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (quoting *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005)). As the New York Court of Appeals has explained, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark–Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 388 (1987). Munich contends that, based on Utica's argument that the 1977 Certificate "does not have any provision providing for reimbursement," there is a basis for finding that the 1977 Certificate does

not encompass the events at issue, and that the Court should therefore allow Munich's unjust

enrichment and other quasi-contract claims to proceed.  (*Utica II*, Dkt. No. 245 at 22).  The

claims at issue, including Munich's obligations to pay defense expenses, however, are governed

by the terms of the 1977 Certificate, thus Utica is entitled to summary judgment dismissing

Munich's quasi contract claims.  *See Mariah Re Ltd. v. Am. Family Mut. Ins. Co.*, 52 F. Supp. 3d

601, 620 (S.D.N.Y. 2014) ("[B]ecause the Reinsurance Agreement governs whether and under

what circumstances American Family is entitled to payment, it appears rather obvious that the

Reinsurance Agreement governs the subject matter of this unjust enrichment claim.").

### 7.    Laches

Utica seeks summary judgment dismissing Munich's claims concerning the 1977

Certificate on the ground that they are barred by laches.  (*Utica II*, Dkt. No. 260, at 11).  "The

essence of the equitable defense of laches is prejudicial delay in the assertion of rights."

*Deutsche Bank Nat. Tr. Co. v. Joseph*, 117 A.D.3d 982, 983 (2d Dep't 2014) (quoting *Stein v.*

*Doukas*, 98 A.D.3d 1026, 1028 (2d Dep't 2012)).  "Laches is an equitable defense that cannot be

asserted to bar a claim for damages-a legal claim governed by New York's six-year statute of

limitations for breach of contract actions."  *Guardian Music Corp. v. James W. Guercio Enters.,*

*Inc.*, 459 F. Supp. 2d 216, 226 (S.D.N.Y. 2006), *aff'd*, 271 F. App'x 119 (2d Cir. 2008).  Having

dismissed Munich's equitable claims, the defense of laches is unavailable.  Accordingly, Utica's

motion for summary judgment on the ground of laches is denied.

## IV.    CONCLUSION

For these reasons, it is

**ORDERED** that the parties' motions for summary judgment in *Utica I* (12-cv-196: Dkt.

Nos. 300 and 302) are **DENIED**; and it is further

**ORDERED** that Munich's motion to strike in *Utica I* (12-cv-196: Dkt. No. 314) is **DENIED**; and it is further

**ORDERED** that Utica's motion for summary judgment on Munich's reimbursement claims in *Utica II* (13-cv-743: Dkt. No. 241) is **GRANTED** as to Munich's quasi contract claims; and it is further

**ORDERED** that Munich's quasi contract claims in *Utica II* (13-cv-743: Dkt. No. 1 (Third Claim for Relief)) are **DISMISSED with prejudice**; and it is further

**ORDERED** that  Utica's motion for summary judgment on Munich's reimbursement claims in *Utica II* (13-cv-743: Dkt. No. 241) is otherwise **DENIED** in its entirety; and it is further

**ORDERED** that the parties' motions for summary judgment in *Utica II* (13-cv-743: Dkt. Nos. 239, 242) are **DENIED**; and it is further

**ORDERED** that Munich's motion to strike in *Utica II* (13-cv-743: Dkt. No. 254) is **DENIED**.

**IT IS SO ORDERED.**

Dated:  March 20, 2018
        Syracuse, New York

Brenda K. Sannes
U.S. District Judge