**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

UTICA MUTUAL INSURANCE COMPANY,

                            Plaintiff,                6:12-cv-00196 (BKS/ATB)

v.

MUNICH REINSURANCE AMERICA, INC.,

                            Defendant.

---

MUNICH REINSURANCE AMERICA, INC.,

                            Plaintiff,                6:13-cv-00743(BKS/ATB)

v.

UTICA MUTUAL INSURANCE COMPANY,

                            Defendant.

---

**Appearances:**

*For Utica Mutual Insurance Company:*
Syed S. Ahmad
Patrick M. McDermott
Latosha M. Ellis
Hunton & Williams LLP
2200 Pennsylvania Avenue NW
Washington, DC 20037

Mary Beth Forshaw
Christopher G. Lee
Simpson, Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017

*For Munich Reinsurance America, Inc.:*
Bruce M. Friedman
Crystal D. Monahan
Jason B. Eson
Rubin, Fiorella & Friedman LLP
630 Third Avenue, 3rd Floor
New York, NY 10017

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.  INTRODUCTION

These related diversity breach-of-contract actions arise from Utica Mutual Insurance Company's ("Utica") billings to Munich Reinsurance America, Inc.[1] ("Munich") under the terms of the facultative reinsurance certificates Munich issued to Utica in 1973 (6:12-cv-196) ("*Utica I*") and 1977 (6:13-cv-743) ("*Utica II*").[2] In *Utica I*, Utica claims that Munich violated the 1973 facultative reinsurance certificate ("1973 Certificate") by failing to pay $2,760,533.96 in expenses. In *Utica II*, Munich claims that Utica violated the terms of the 1977 facultative reinsurance certificate ("1977 Certificate") by billing it for $789,813.47 in expenses; Munich paid that expense billing and now seeks reimbursement.[3]

Munich has paid the $5 million and $1 million liability limits on the Certificates. At issue here is Munich's liability for additional loss expenses—that is, whether Munich is obligated to pay loss expenses incurred in investigating, adjusting, and litigating claims supplemental to the liability limits. The resolution of this issue hinges on the interpretation of certificates issued and umbrella policies reinsured in the 1970s, when neither party likely anticipated the kind of catastrophic asbestos claims faced by Utica in this case.[4]

---

[1] Munich was formerly known as American Re-Insurance Company. (Dkt. No. 360, Section IV.A.2).

[2] For convenience, unless otherwise specified, docket citations are to the filings in 6:12-cv-196.

[3] Utica originally sought $3,283,304.55 but has reduced the amount it seeks under the 1973 Certificate to $2,760,533.96. (Dkt. No. 311, ¶ 20).

[4] The facts giving rise to the present actions have led to a number of other actions in this Circuit between Utica and its reinsurers. *See, e.g.*, *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12 (2d Cir. 2018); *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*, 287 F. Supp. 3d 163 (N.D.N.Y. 2018), *appeal docketed*, No. 18-828 (2d Cir. Mar. 27, 2018); *R & Q Reins. Co. v. Utica Mut. Ins. Co.*, 18 F. Supp. 3d 389 (S.D.N.Y. 2014).

In July 2018, the Court held a ten-day bench trial in Syracuse, New York, at which ten fact witnesses and five expert witnesses testified. Both parties have submitted proposed findings of fact and conclusions of law. (Dkt. Nos. 429, 430, 431, 431-1, 440–442, 447, 449, 449-1, 450, 450-1). The Court has carefully considered the trial record, the credibility of the witnesses at trial, and the submissions of the parties. In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

For the reasons set forth below, the Court finds that, with respect to the 1973 Certificate, Munich is not liable for any additional monies to Utica. Even assuming that Munich's liability under the 1977 Certificate is limited to the $1 million policy limit, the Court finds that the voluntary payment doctrine bars Munich from recovering the loss and declaratory judgment expenses it has already paid Utica. The Court therefore finds that Munich is entitled to judgment in *Utica I*, and that Utica is entitled to judgment in *Utica II*.[5]

## II.     FINDINGS OF FACT[6]

### A.     The Primary Policies, Umbrella Policies, and Facultative Reinsurance Certificates

Utica, an insurance company, issued primary general liability insurance policies (the "primary policies") to Goulds Pumps, Inc. from 1955 through 1986. (Dkt. No. 360, Section IV.B.4). Utica also issued umbrella policies to Goulds from 1964 to 1975 and 1977 to 1982. (Dkt. No. 360, Section IV.B.7).[7] The primary policies, combined, provided $12,300,000 in liability limits and were expense-supplemental, allowing for expenses in addition to limits. (Ex.

---

[5] In light of the Court's rulings interpreting the reinsurance contracts, the Court has not considered the myriad other arguments raised by the parties.

[6] While the Court has endeavored to include all findings of fact in this section, there are additional findings of fact in the Conclusions of Law. (*See infra* Section III).

[7] The Court cites to the consecutively paginated trial transcripts, (Dkt. Nos. 408–426), as "T.," Utica's trial exhibits as "Ex. P-_," and Munich's trial exhibits as "Ex. D-_." When citing to exhibits admitted into evidence at trial, the Court cites to the Bates numbering assigned to each document where possible.

D-346-A, at R-0062463). The umbrella policies, combined, provided $255,000,000 in liability limits.[8] (Ex. D-346-A, at R-0062463). Utica purchased facultative reinsurance certificates[9] from Munich on several of its umbrella policies.

At issue in this action are the 1973 Umbrella Policy ("1973 Umbrella"), which provided $25 million in liability limits, the 1977 Umbrella Policy ("1977 Umbrella"), which provided $3 million in liability limits, and the facultative reinsurance certificates (the 1973 and 1977 Certificates) that Utica purchased from Munich on those policies. (Dkt. No. 360, Sections IV.A.3, C.10 and 13).[10] The dispute centers on whether the 1973 Umbrella, as allegedly modified by a midterm defense endorsement ("1973 defense endorsement"), and the 1977 Umbrella required Utica to pay Goulds' defense expenses supplemental to losses. The 1973 defense endorsement, which Utica asserts changed the 1973 Umbrella from expense-inclusive to expense-supplemental, was the subject of contention: the parties dispute whether Utica delivered the endorsement, upon issuance, to Munich; key Utica participants were unaware of the endorsement during its dealings with Goulds; and Utica, accordingly, took inconsistent positions,

---

[8] As the Second Circuit has explained:

> Primary and excess insurers provide liability coverage. Primary insurance provides the first layer of coverage of an insured's liability or loss. *Ali v. Fed. Ins. Co.*, 719 F.3d 83, 90 (2d Cir. 2013); 1 Steven Plitt et al., Couch on Insurance § 1:4, at 12 (3d ed. 2009). Excess insurance provides the additional layer of coverage for an insured's losses exceeding the primary insurance policy's limits. *Ali*, 719 F.3d at 90. Umbrella policies blend primary and excess coverage by providing last-resort excess coverage as well as gap-filling primary coverage on claims not otherwise insured by primary policies. *See, e.g.*, *BASF AG v. Great Am. Assurance Co.*, 522 F.3d 813, 815 (7th Cir. 2008); Francis M. Gregory Jr. & Nicholas T. Christakos, Primary, Excess and Reinsurance Problems in Large Loss Cases, 59 Def. Counsel J. 540, 542 (1992).

*Clearwater Ins. Co.*, 906 F.3d at 15.

[9] Generally speaking, reinsurance is insurance for insurance companies. (Dkt. No. 360, Section IV.A.3). In that relationship, Utica is known as the reinsured or the cedent, and Munich is known as the reinsurer. (Dkt. No. 360, Section IV.A.3).

[10] Munich was one of several reinsurers of Utica's umbrella policies with Goulds. (Ex. D-292, T. 1565–67). Munich assumed $5 million excess of the $5 million umbrella layer in the 1973 Certificate and $1 million excess of the $2 million umbrella layer in the 1977 Certificate. (Exs. D-4, D-90).

before and after its settlement with Goulds, on whether Munich's liability under the 1973 Certificate is expense-supplemental or expense-inclusive.

Alternatively, Utica asserts that, even if the Court disagrees with its interpretation of the Umbrella Policies, the 1973 and 1977 Certificates obligate Munich to reimburse Utica for defense expenses, including declaratory judgment expenses, on an expense-supplemental basis.

### B.     Asbestos Claims Against Goulds

In the early 1990s, Goulds became the subject of claims by individuals alleging bodily injury as a result of exposure to asbestos in a Goulds product. (T. 1156; Dkt. No. 450-1, ¶ 4). Utica was defending and settling those claims under the primary policies. (T. 1158–60). Because the cost was minimal, Utica was not "really tracking [the claims] to the policies" but would "load them all in one [policy] year" for "administrative purposes." (T. 1160–61). It likewise posted "a nominal reserve for loss and a nominal reserve for expense." (T. 1160).

In the late 1990s, however, because the number of asbestos claims had increased, (T. 1164–65), and "breached the aggregate limit of the [single] policy" to which Utica had been allocating claims, Utica began allocating the loss "to the appropriate policy year." (T. 1161–62). For example, if a claimant alleged asbestos exposure from 1975 to 1985, and Utica paid $1,000 for the claimant's loss, Utica would "allocate $100 to the ten policy year files." (T. 1162). This enabled Utica to "accurately spread[] the loss to the periods that were impacted." (T. 1162–63). Utica "allocate[d] expense evenly across the years in the same method." (Ex. P-8, at A-0003509). Utica set up separate policy year files for each primary and each umbrella policy so that, if the amounts Utica set aside in reserve for each claim "went over the primaries," Utica would then set reserves for "the umbrella for the corresponding year." (T. 1170).

In June 2002, Utica deemed the 1975, 1976, and 1978 primary policies exhausted. (Dkt. No. 450-1, ¶ 6; Ex. P-336). In October 2002, Utica advised Goulds[11] that these policies had exhausted and that there was no evidence of an umbrella policy above the primary policy for the July 2, 1976 to December 31, 1976 time period and requested reimbursement for the indemnity and expenses it had paid on Goulds' behalf for that time period. (Ex. P-336, at R-0029305; Ex. P-8, at A-0003510).[12]

Utica determined that Goulds also lacked umbrella coverage over its 1959 to 1963 primary policies and began "to allocate monies" it had paid into these "orphan share periods"— policy years "above the primaries where Goulds did not have an umbrella policy."[13] (T. 1175). In February 2003, Utica notified Goulds that "[t]here was no umbrella coverage purchased from Utica prior to 1964" and that it would "be billing Goulds" for the orphan share periods. (Ex. P-8, at A-0003509–10). Utica further advised that: (i) the 1964 to 1976 umbrella policies contained "ultimate net loss provisions" ("UNL" provisions), meaning that they "included the cost of expense within the available limit of umbrella coverage" (expense-inclusive) and that "future payments made for expense associated with defending these claims will erode the policy limits for these policies"; and (ii) the 1977 to 1987 umbrella policies "had a defense provision in addition to policy limits" (expense-supplemental), meaning that "[t]he proportionate allocation of the defense costs allocated to those policies would not erode." (Ex. P-8, at A-0003510).

---

[11] At this point, ITT Industries had purchased Goulds. (T. 1166–67). The Court continues to use Goulds for convenience.

[12] The 1973 Primary Policy ("1973 Primary"), according to Utica's records, was exhausted on December 27, 2002. (T. 409–10). At that point, Utica started allocating payments to the 1973 Umbrella. (T. 409–410; Ex. P-288-39, at R-0080514).

[13] Munich contends orphan shares also include other amounts Utica paid that were "the responsibility of Goulds or its other insurers." (Dkt. No. 450-1, ¶ 7 (Response); T. 78).

## C. California and New York Declaratory Judgment Actions

In March 2003, Utica learned that Goulds had filed a lawsuit in California seeking, among other things, declaratory judgment against a number of its insurers, including Utica. (Ex. P-57, at F-0307918; T. 1192–93; Ex. P-237). The issues included choice of law (New York or California), the orphan share allocation, and whether Utica was entitled to control the defense.[14] (T. 1194; Dkt. No. 450-1, ¶ 16). By April 2003, Utica was aware that Goulds was also claiming that certain primary policies (those issued in 1978, 1979, 1980, and 1982) contained a limit of liability for each occurrence but no aggregate limit. (Ex. D-279, at D-0014772). Utica believed the absence of aggregates from the 1978–82 policies was a "mere 'scrivener's error'"—"a simple oversight in policy processing" that neither it nor Goulds "intended." (Ex. D-76, at R-0040027). It recognized, however, that if the court were to find that California law applied[15] and that one or more of the primary policies had no aggregate limit, under the "all sums approach" Goulds could select a primary policy without an aggregate limit to apply to all asbestos claims. (Ex. D-76, at R-0040027). Utica further recognized that this would "effectively create an unlimited supply of coverage" under the primary policies, which would never exhaust or trigger the umbrella layer of coverage,[16] and "eliminate reinsurance recovery for all of these claims." (Ex. D-76, at R-

---

[14] Control of defense in connection with the Goulds claims was important to Utica. (T. 1174–75). Having control of the defense enabled Utica to make decisions concerning litigation strategy, settlement, and motion practice. (T. 1173).

[15] The choice-of-law issue complicated the aggregate-limit issue. New York courts follow a "pro rata" approach that allows the insurer to spread the loss (and orphan shares) across the applicable policies. (Ex. D-76, at R-0040027; T. 405). In California, by contrast, courts follow "the all sums approach," which does not allow allocation of orphan shares and gives the insured the ability to select which policy applies to the claims in question. (Ex. D-76, at R-0040027).

[16] At that time, Utica had deemed most, if not all, primary policies exhausted and was "in the umbrella layers" and "defending some or all of the claims in the umbrella." (T. 1195).

0040027). With over 80,000 asbestos claims at that point, such a result would be devastating for Utica. (T. 403; Ex. D-598, at D-0014157–58).[17]

In October 2003, Utica filed a declaratory judgment action against Goulds in New York because it believed New York was "the more appropriate jurisdiction" "for a lawsuit between a New York insurer, [and] New York based insured, Goulds Pumps," involving contracts that "were issued in New York." (T. 1194). Utica sought a declaration that: (i) it had "exhausted its obligations under the Primary Utica Policies;" and (ii) it had no duty to pay defense costs or indemnity attributable to periods of time for which Goulds had no insurance (the orphan share issue), Goulds was responsible for such amounts, and Goulds must reimburse Utica for amounts it paid "due to Gould Pumps' failure to obtain or pursue insurance."[18] (Ex. P-238, at R-0075798–99).

### D.    Utica's Negotiations and Settlement with Goulds

As part of the litigation effort, Utica attempted to identify all policy documents it had for the Goulds policies. (T. 425). Utica pieced the policies together from microfiche documents, archived documents, documents Goulds had kept, and documents from the brokers that placed the coverage for Goulds with Utica. (T. 425–27). In January 2004, Utica sent Goulds more than 2,500 pages of underwriting material regarding the primary and umbrella policies. (Exs. D-281; D-584). Among these documents was the 1973 defense endorsement purporting to modify the 1973 Umbrella mid-policy term from an expense-inclusive policy to an expense-supplemental policy. (Ex. D-584, at UMU 00133–34).

---

[17] These claims involved exposure to asbestos over a number of different years. (T. 405). Utica was "paying for a hundred percent of the defense" of those claims and paying "a hundred percent of the settlement" of those claims. (T. 403–04). Utica was "the biggest insurer of Goulds." (T. 405).

[18] Utica also sought a declaration that it "was only obligated to pay for injuries that were 'caused by accident.'" (Ex. P-238, at R-0075799). This argument is not at issue in this case.

On February 9, 2004, Goulds' coverage counsel, Michael Horton, wrote a letter to Utica's coverage counsel, Ron Robinson, concerning coverage issues. (Ex. D-61, at R-0029475). Horton wrote that one of the "more pertinent issues" concerning Goulds' approach to defense and indemnity costs was the "supplemental duty to defend under some or all of the umbrella policies by way of endorsement." (Ex. D-61, at R-0029475). Horton noted that Utica had "acknowledged" that its 1977 to 1985 umbrella policies "contain a supplemental duty to defend," but that Goulds believed "that additional Umbrella Policies, issued prior to January 1, 1977, may also contain a supplemental defense obligation." (Ex. D-61, at R-0029478). In a February 20, 2004 letter to Horton, Robinson requested "these endorsements and policies and any other documentation that supports your positions." (Ex. D-263, at D-0025871).

Robinson wrote Kristen Martin, a Utica staff attorney, on April 4, 2004, advising her that he had spoken with Horton about the "alleged [pre-1977] Utica policy endorsement" that Goulds claimed turned Utica's "ultimate net loss (wasting limit) umbrella policies into supplementary defense policies," but that Horton "appeared to be willing to waive this argument after he consults with his client." (Ex. D-14, at R-0028405, -08). There is no evidence that Goulds sent the defense endorsement to Utica; the virtual policy folio that Utica's coverage counsel assembled in 2005 for the 1973 Umbrella, however, contains a copy. (Dkt. No. 449-1, ¶ 7.b; Ex. P-100, at R-0000164–65).

As noted above, Utica believed it was obligated under the umbrella policies to defend the Goulds claims and was paying for "a hundred percent of the defense." (T. 403). Utica had determined that the umbrella policies issued prior to 1977 were expense-inclusive. (Dkt. No. 449-1, ¶ 4). The 1973 Umbrella, for example, defined the "Ultimate Net Loss" for which Utica was liable as:

the *total sum* which the Insured, or any company as his insurer, becomes obligated to pay by reason of personal injury or property damage claims, either through adjudication or compromise, *and all sums paid for expense*, including premiums for attachment or appeal bonds, in respect to litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of employees and office expenses of the named Insured or of any underlying insurer or any other expenses which are recoverable through any other valid and collectible insurance.

(Ex. P-100, R-0000152) (emphasis added). In contrast, Utica had determined that it was obligated to provide a defense and pay defense costs supplemental under the umbrella policies issued in 1977 and after, based on its interpretation of the "occurrence not covered by language" in the supplemental defense provisions of those policies.[19] (Dkt. No. 449-1, ¶ 4 (Response); T. 441). This is the same language at issue in the 1973 defense endorsement.[20]

At trial, Martin explained that, when Utica "looked at the 'not covered by' language, policy exhaustion to us equaled not covered by, so we believed those policies owed the defense." (T. 441). Bernard Turi, a Utica staff attorney and vice president who was involved in the Goulds claims, testified that he also understood, based on his training at Utica, that Utica's umbrella policies provided a defense following exhaustion of the primary policy, and that Utica always

---

[19] The provision in the 1977 Umbrella states:

DEFENSE - DEFENSE COSTS - INVESTIGATION - ASSISTANCE AND COOPERATION

With respect to any occurrence not covered by the policies listed in the schedule of underlying insurance or any other insurance collectible by the insured, but covered by the terms and conditions of this policy (including damages wholly or partly within the amount of the retained limit), the company shall:

(a) defend any suit against the insured alleging personal injury, property damage, or advertising offense . . . .

(Ex. P-92, at R-0007676).

[20] The parties agree that the language of the 1973 and 1977 Umbrellas is sufficiently similar for purposes of interpretation. (Dkt. No. 430, at 10–16; Dkt. No. 431, at 21–27). The 1973 defense endorsement also eliminated the defense-inclusive ultimate net loss provision, and replaced it with a defense-supplemental ultimate loss provision. (Ex. P-100, R-0000165).

"handled" its umbrella policies in this manner and viewed them as owing a defense. (T. 1187–88). John Griffin, who worked at Utica as an underwriter and manager from 1974 to 2015, (Dkt. No. 350-12, at 4), testified that he understood from his training as an underwriter and experience with umbrella policies that the umbrella policies Utica issued to Goulds obligated Utica to defend after the primary policies exhausted. (Dkt. No. 350-12, at 161–62). Griffin further stated that he understood throughout his career that Utica's umbrella policies obligated it to provide a defense. (Dkt. No. 350-12, at 164–65). In addition, Utica believed that, if it disclaimed the defense obligation under the umbrella policies, the insured (Goulds) would control the defense. (T. 1189–90).

Utica conducted no research in making this determination and twice declined offers from coverage counsel to research its obligation to provide a defense under the "occurrence not covered by language." (T. 1540 (William Robinson, former Utica coverage counsel, discussed the "occurrence not covered by" provision with Utica in 2003 but was "told that the decision had been made and there was no need . . . to research or analyze it."); T.1651–52 (William Savino, former Utica coverage counsel, testified that in December 2005 he noted the "not covered by language" in the umbrella policies issued after 1977 and raised it with Utica as a potential issue, but "learned that" Utica had already "analyzed the language and had concluded that their provision of the defense to their policyholder was appropriate.")). Turi explained that Utica would not "instruct counsel to do research on something we had already decided and understood." (T. 1541).

None of the Utica employees who opined on the meaning of "occurrence not covered by" provided any further explanation of their interpretation of "occurrence not covered by" within the context of the umbrella policies, including the provisions concerning retained limits. The

Court notes that one of Utica's experts, Paul Feldsher, who testified in support Utica's interpretation of "occurrence not covered by," did address the retained limit provision. Feldsher testified that, under his reading of the policy, to access indemnity under the 1973 Umbrella (and supplemental defense expense coverage), Goulds had to pay a $10,000 self-insured retention for each claim. (T. 868, 930, 945-947, 961, 1028). There is no evidence that Utica asked Goulds to pay, or believed Goulds was required to pay, a self-insured retention on any claim under the 1973 Umbrella. (T. 1535–36).

In December 2005, Utica and Goulds engaged in mediation. (Dkt. No. 450-1, ¶ 23). By then, Utica had paid approximately $12 million in indemnity and $8.8 million in expense under the primary policies, all of which it had deemed exhausted (a point Goulds disputed based on its aggregate-limits argument) and $21.7 million in indemnity and $14.4 million in expense under the umbrella policies.[21] (T. 416; Ex. D-346-A, at R-0062463). It had allocated $25,241,110.80 as the orphan share. (Ex. D-344, at F-0120699). In total, by the end of December 2005, Utica had paid more than $80 million on Goulds' behalf. (T. 416; Ex. D-344, at F-020699). On December 14, 2005, the parties reached a tentative agreement and executed a term sheet specifying that: there was $325 million in "[a]vailable remaining insurance from Utica"; "defense and indemnity will erode 'available insurance'"; "[p]ast expenditures/claims against" Goulds, i.e., orphan shares, were "waived"; and, with one exception as to a third party, "all primary coverage is deemed exhausted and all such policies shave [sic] aggregate limits." (Ex. D-272, at R-0065724).

---

[21] More specifically, Utica had, as of December 2005, allocated $300,000 in indemnity and $209,411.68 in expense to the 1973 primary and $1,329,537.37 in indemnity and $873,529.83 in expense to the 1973 Umbrella. (Ex. D-346-A, at R-0062463; T. 417). It had allocated $500,000 in indemnity and $327,166.75 in expenses to the 1977 primary policy ("1977 Primary") and $1,216,781.98 in indemnity and $755,774.77 in expenses to the 1977 Umbrella. (Ex. D-346-A, at R-0062463; T. 417). These amounts do not reflect orphan shares. (T. 417).

After executing the term sheet, the parties worked toward a final settlement and began circulating a settlement agreement. (*See* Exs. D-34, D-81). In correspondence, Goulds indicated that it "would be willing to set aside" its claims that, among other things, Utica "[i]ssued . . . primary policies that have no aggregate limits" and "seven umbrella policies that provide for an unlimited supplemental defense"[22] and that "[a]ll of these agreements and concessions were made by [Goulds] in exchange for the simplicity of Utica making $325,000,000 in limits available." (Ex. D-81, at R-0013557–58). According to a draft of the settlement agreement, Goulds proposed the following provision: "The parties stipulate and agree that as of the Effective Date, the limits of liability of the Goulds Primary Policies have been exhausted for Product Liability Claims including (without limitation) the Goulds asbestos suits." (Ex. D-34, at R-0037160). Next to that provision, Turi wrote "i.e. the policies all have agg," meaning aggregates. (D-34, at R-0037160; T. 1245). Turi "wanted to make it very clear that the policies weren't just exhausted but that they had aggregate limits." (T. 1245). Turi also circled the word "stipulate" and wrote "–delete." (Ex. D-34, at R-0037160). Turi proposed deleting "stipulate" because he was concerned it would imply that Utica had "bargained for" the exhaustion of the primary policies and aggregate limits, and he "didn't want that" because Utica "had aggregate limits" and Goulds "agree[d] that we did and always had, and there was documentation to support, so [he] felt like stipulation was almost cheapening the issue." (T. 1245–46). Although the settlement agreement indicates that the "primary policies have . . . an aggregate limit of liability," (Ex. 60, at F-0058717), the Court does not find credible Turi's testimony that the aggregate limits were not "bargained for" as part of the settlement. Not only was his testimony inconsistent on this

---

[22] Martin explained that there were six umbrella policies—1977 to 1982—that were supplemental and that Goulds claimed that "there was an endorsement on the pre-1977 policies" that changed them from UNL to supplemental. (T. 451).

point, (T. 1417 (Turi testifying that Goulds' agreement to aggregate limits had value to Utica)), but other evidence in the record demonstrates that a finding that any of the primary policies lacked aggregate limits would have been devastating for Utica, (Ex. D-598, at D-0014157–58).[23]

On February 22, 2007, Goulds and Utica entered a Defense and Indemnity Agreement in settlement of their claims. (Ex. D-2). The settlement agreement states that Utica had paid defense and indemnity costs on Goulds' behalf under the primary and umbrella policies, "and in doing so has: (i) exhausted the limits of liability . . . of the Goulds Primary Policies; [and] (ii) impaired certain limits of liability of the Goulds Umbrella Policies." (Ex. D-2, at F-0080485). The settlement was structured so that Utica would pay Goulds on a claim-by-claim basis, rather than a "lump sum." (T. 479 (Martin explaining that "the claims still needed to come in, they needed to be defended, they needed to be reviewed, we had to make sure it was an asbestos product and

---

[23] Utica required board approval for the settlement. (T. 1254). In a memo to Utica's Board dated February 21, 2007, Turi advised that Utica had reached an agreement in principle with Goulds and recommended that the settlement be consummated. (Ex. D-598). In support of this recommendation, under "Benefit of the Settlement," Turi wrote that the settlement "ends the uncertainty" over the California and New York litigation over the number of policies that applied, the remaining limits available, and Goulds' claim that "four primary policies lacked aggregate limits of liability." (Ex. D-598, at D-0014157). Turi further wrote:

> Of all of Goulds' allegations, the lack of aggregate limits of liability . . . presented the most significant downside to Utica. Under California law, an insured gets to select the policy year in which claims are processed (the "all sums" approach).

> If successful there, Goulds could select a policy year in which there was no aggregate limit of liability and have all asbestos claims handled in that year . . . . The policy would never exhaust and we would be required to apply a $500,000 limit to every asbestos claim in the primary layer. That would prevent claims from going into the umbrella layer and the reinsurance recovery that would follow. With over 140,000 asbestos claims presented, that would be a catastrophic result for Utica.

(Ex. D-598, at D-0014157–58). In a PowerPoint presentation prepared to secure board approval for the settlement, (T. 1346), Turi wrote:

> In addition to the never exhausting nature of that result, the claims (unless and to the extent each exceeded $500,000) would not reach the umbrella layer, depriving the company of reinsurance recoveries in those layers.

> Benefit of the Agreement—The Defense and Indemnity Agreement acknowledges that each of the primary policies contain aggregate limits of liability and are exhausted. Thus, the umbrella policies are triggered and we are able to obtain reinsurance recoveries.

(Ex. D-457, at D-0026093).

[Utica] would pay that money out over a long period of time")). The settlement agreement

contains a chart showing the "umbrella policies of insurance issued by Utica Mutual with the

following combined Aggregate Limits of Liability for Personal Injury and Property Damage":

| Policy Period | Personal Injury/Property Damage (combined) Aggregate Limits | Policy Number | Retained Limit |
|---|---|---|---|
| 7-1-64/65 | $2,000,000 | 1010 GLU | $25,000 |
| 7-1-65-5/31/66 | $5,000,000 | 1113 GLU | $25,000 |
| 7-1-66/67 | $10,000,000 | 1297 GLU | $25,000 |
| 7-1-67/68 | $10,000,000 | 1495 GLU | $25,000 |
| 7-1-68/69 | $10,000,000 | 1690 GLU | $25,000 |
| 7-1-69/70 | $10,000,000 | 1930 GLU | $25,000 |
| 7-1-70/71 | $10,000,000 | 2074 GLU | $25,000 |
| 7-1/71/72 | $10,000,000 | 2252 GLU | $25,000 |
| 7-1-72/73 | $10,000,000 | 2252 GLU | $25,000 |
| 7-1-73/74 | $25,000,000 | 2252 GLU | $25,000 |
| 7-1-74/-8-31-75 | $25,000,000 | 2252 GLU | $25,000 |
| 1-1-77/78 | $3,000,000 | LU 4799 | $25,000 |
| 1-1-78/79 | $48,333,332 | LU 4799 | $25,000 |
| 1-1-79/80 | $48,333,332 | LU 4799 | $25,000 |
| 1-1-80/81 | $48,333,332 | LU 4799 | $25,000 |
| 1-1-81/82 | $25,000,000 | LU 4799 | $25,000 |
| 1-1-82/83 | $25,000,000 | LU 4799 | $25,000 |

(Ex. D-2, at F-0080500). Though Utica had deemed the primary policies exhausted and was

allocating indemnity and expense to the umbrella policies prior to settlement, (T. 416; Ex. D-

346-A, at R-0062463), for Goulds, Utica reset the umbrella policies' available limits to zero as of

the effective date of the settlement, January 1, 2006, (Ex. D-2, at F-0080490, F-0080501

(providing that the "Available Limits" of liability "afforded under the Goulds Umbrella Policies"

is $325 million and that these limits were available as of the "Effective Date" of the settlement

agreement, January 1, 2006); T. 716). Goulds did not reimburse Utica for the approximately $25

million in orphan share payments made before January 1, 2006 but reimbursed Utica

approximately $7.2 million for orphan shares following the settlement. (T. 590–91). Utica assigned none of the claims it paid under the $325 million settlement amount to its primary policies, (T. 705), because "[t]he primary policies had been exhausted by asbestos payments" and Utica was not "going to pay twice," (T. 1264).

E.    **Utica's Notification to Munich**

By June 2001, Utica had begun corresponding with Munich about the asbestos claims being filed against Goulds. (Ex. P-116, at MRAG 0149 (June 27, 2001 letter from Utica claims attorney to Munich advising that, "[a]s previously reported, reinsurance for the Gould's [sic] Pumps's umbrella policies was procured through your company for certain years" from 1960 to 1987, and that Utica had decided "to distribute asbestos losses evenly across all available years of confirmed coverage for" Goulds)). At that time, Utica also sent Munich declarations pages from the 1974 and 1977 Certificates. (Ex. P-116, at MRAG 0150–52). A Utica staff attorney sent Munich another update in a letter dated February 6, 2002 and advised that Utica was "in the process of allocating asbestos payments to those claims." (Ex. P-112, at MRAG 0140). The Utica staff attorney attached a list of Gould's umbrella policies, policy years, and each policy's liability limit, the same reinsurance declaration pages it had sent previously, and a copy of a page from the 1975 Certificate. (Ex. P-112, at MRAG 0142–44).

Thomas Miller, a claims handler in Munich's environmental mass tort claims unit, (T. 1732), first received notice regarding "asbestos" claims involving Utica and Goulds in 2004, (T. 1734). Miller exchanged correspondence with Utica in an effort to obtain "an explanation of the potential exposure." (T. 1736). In a letter to Miller dated September 28, 2004, a Utica staff attorney, Alicia Atik, provided "an update as to the status of asbestos-related liabilities" for Goulds. (Ex. D-138, at MRAG 0313). Although Atik was aware that Goulds was claiming that certain primary policies lacked aggregate limits and were therefore not exhausted, (T. 526), she

wrote to Munich that Goulds' primary policy limits ($11.1 million) had "been exhausted by claim payments," (Ex. D-138, at MRAG 0313). Atik advised that Goulds had "umbrella coverage with Utica" and that the "umbrella policies from 1964 to 1976 were written on an ultimate net loss basis such that loss and expense erode the limits." (Ex. D-138, at MRAG 0313). Atik also informed Munich that in March 2003 Goulds had "joined [Utica] in a Declaratory Judgment action" "against 31 insurers and reinsurers" in California, that the action had been stayed, and that there were ongoing "negotiations on a Coverage Agreement." (Ex. D-138, at MRAG 0313–14). The letter does not mention Goulds' contention about the absence of aggregate limits. (Ex. D-138).

In a letter dated July 26, 2005, Kristen Martin, then a Utica associate claims attorney, advised Miller that Utica had identified four additional Goulds primary policies ($1.2 million) and that it would reallocate "where required." (Ex. D-143, at MRA77 123). Martin referenced the "coverage litigation regarding" Goulds Pumps, informed Miller that there was a "parallel litigation" in New York, and stated that the issue in both actions concerned "how asbestos bodily injury settlements and defense costs will be allocated to periods in which Goulds failed to procure umbrella coverage and the underlying Utica primary policy has been exhausted." (Ex. D-142, at MRA77 124). Miller did not try to find out more about the coverage litigation but relied on the information Martin provided. (T. 1802–03). Martin acknowledged that she "did not go into all the specifics as to what was at issue in the lawsuit" in her July letter to Miller but believed that, if Munich had been interested in information about the coverage action, it should have asked for more information. (T. 541). Further, Martin viewed the aggregate issue "as something that Goulds was raising and that it was a dispute, but Utica was confident that they would resolve the issue with aggregate limits on their policies." (T. 530). She felt that, because

the orphan share issue could have "material impact on billings," it was important to let Munich know about that issue. (T. 541).

In an October 25, 2006 letter update to Munich, Martin wrote that the "coverage action[s]" were still pending, that Utica had "asked that the court declare various Utica policies exhausted," and that the parties were engaged in settlement negotiations. (Ex. D-149, at R-0039201). Martin advised that Utica had allocated approximately $19 million in indemnity payments and $15 million in loss adjustment expenses to Goulds and that, though it had not yet billed those amounts to its reinsurers, depending on the litigation outcome, Utica "may" allocate those amounts "to years of available/unexhausted Utica coverage and thus will impact the potential future liabilities of our reinsurers." (Ex. D-149, at R-0039201).

In a July 10, 2007 letter, Martin notified Munich that Utica and Goulds had reached a settlement, "in which both parties compromised their respective claims." (Ex. D-153, at MRA77 021). Martin enclosed a copy of the settlement agreement and indicated that Utica was "in a position to allocate the remaining unallocated indemnity and [loss adjustment expense] payments in relation to the Goulds' asbestos claims" and that Utica would allocate and bill these amounts to its "reinsurers consistent with the terms of the settlement agreement and the respective reinsurance agreements." (Ex. D-153, at MRA77 021).

### F.     Utica's Reinsurance Billings to Munich

In November 2007, Munich received its first bills from Utica under the 1973 and 1977 Certificates. (Ex. D-154, at MRA73 03447). In a letter, Utica notified Munich that it had "completed the allocation of the indemnity and [loss adjustment expense] payments consistent with the settlement and order" and that Utica "planned on billing those amounts to our reinsurers consistent with the terms of the respective reinsurance agreements, the settlement agreement and court order." (Ex. D-154, at MRA73 03448). The bill under the 1973 Certificate indicated that

Utica had paid, under the 1973 Umbrella, $4,007,347.69 in direct loss and $2,656,812.64 in direct expense, which, calculated on an expense-inclusive basis, totaled: $6,664,160.33, passing the $5 million mark that triggered the 1973 Certificate. (Ex. D-154, at MRA73 03449). The bill indicated the "Total Reinsurance Due" from Munich was $1,664,160.33. (Ex. D-154, at MRA73 03449). The bill under the 1977 Certificate indicated that Utica had paid, under the 1977 Umbrella, calculated on an expense-supplemental basis, $3 million in direct loss and $2,194,104.63 in direct expense. (Ex. D-154, at MRA73 03450). According to the bill, the "Total Reinsurance Due" under the 1977 Certificate was $1,731,368.21 ($1,000,000 in loss and $731,368.21 in expense).[24] (Ex. D-154, at MRA73 03450).

Miller, who had previously established a loss-and-expense reserve in connection with the 1977 Certificate, (T. 1743–45; Ex. D-152, at MRA77 263), was under the "impression" that the 1977 Umbrella covered defense costs in addition to limits based on information from Utica indicating that "pre–'77 . . . certificates had expense as part of loss, and . . . that post–'77 . . . policies had expense in addition" to limits. (T. 1744–45). Miller, however, had not seen any policy documentation confirming his impression. (T. 1745).

### 1. Munich's Requests for Policy Documentation and Payment of Billings Under the 1977 Certificate

Miller spoke with Martin on December 6, 2007 to obtain clarification on the reinsurance billings. (Ex. D-157, at MRA73 00065). They discussed "the treatment of expense under the [settlement] agreement" because the settlement chart, (Ex. D-2, at F-0080500), called for all umbrella policies to pay on an UNL (expense-inclusive) basis, and it appeared Utica was billing Munich differently. (Ex. D-157, at MRA73 00065). Martin explained that "as part of the

---

[24] Since Munich reinsured $1 million out of the $3 million 1977 Umbrella, or 1/3, Munich was, according to Utica, responsible for 1/3 of $2,194,104.63 expense, or $731,368.21. Utica subsequently billed Munich for $58,445.26 in declaratory judgment expenses. (Dkt. No. 450-1, ¶ 138).

settlement, the parties agreed to additional limits under the umbrella policies,"—the available loss limits under the umbrellas totaled $255 million and the settlement stated there were $325 million "in umbrella limits"—and "[i]n return for the additional limits," the umbrella policies would be treated as UNL. (Ex. D-157, at MRA73 00065). Martin further explained that the settlement agreement, however, had "no effect" on "how reinsurers are billed" and that "Utica will continue to allocate loss and expense to all triggered policies pursuant to the terms of their policies and will be [sic] reinsurers pursuant to the terms of their reinsurance contracts." (Ex. D-157, at MRA73 00065). Miller requested "available policy documentation," "a spreadsheet showing the allocation across all years," and the "most current claim statistics so that [Munich could] update [its] reserve analysis for the additional fac certs." (Ex. D-157, at MRA73 00065). Miller believed that, when he asked for "available policy documentation," Utica would send him everything that was still available regarding the policies. (T. 1752–53).

Martin was aware that Utica had reconstructed policy files for both the 1973 and 1977 Umbrellas. (T. 560). These files contained the pertinent language concerning defense expenses. (T. 560; Exs. P-92, P-100).[25] However, rather than going "to the policy folders that the attorney and other people at Utica had recreated to fully represent the year," (T. 560), which were in a "unit where" she "no longer worked," Martin "grabbed" what she had "on [her] hard drive" and sent it to Miller via email on December 7, 2007, (T. 560; Ex. D-488). The documents included what appear to be excerpts from the 1973 Umbrella, (Ex. D-488, at MRA73 03455–58), and miscellaneous documents concerning 1974, 1975, 1977, and 1978 umbrella policies, (Ex. D-488,

---

[25] They also contained the 1973 defense endorsement that purportedly changed the 1973 Umbrella from expense-inclusive to expense-supplemental. (Ex. P-100, at R-0000164–65).

at MRA73 03459–66). None of the documents Martin sent to Miller, however, contained the pertinent policy language. (*See generally* D-488).[26]

On December 10, 2007, Miller requested a spreadsheet showing the "paid loss and expense for all of the Utica primary and umbrella policies over all the years." (Ex. D-160, at MRA73 03469). Miller explained that he needed the spreadsheet in order "to document our file that the allocation across all the years is . . . based on the terms of the settlement agreement" and "to make reserve projections." (Ex. D-160, at MRA73 03469). Martin forwarded the spreadsheet on December 11, 2007. (Ex. D-160, at MRA73 03469).

On December 12, 2007, Miller notified Munich's accounting department that he anticipated approving a claim to Utica "by the end o [sic] week in the approximate amount of $1,750,000." (Ex. D-161, at MRA73 03472).

On December 14, 2007, Miller notified Martin via email that Munich was "in good shape on the bill for the 1977 policy" and that he had requested management approval to pay the claim. (Ex. P-162, at R-0074003). The same day, Miller requested authority to pay Utica "a loss of 1,000,000.00 and pay an expense of 731,368.21" as the "payment of facultative share of asbestos products loss and expense," which exhausted the $1 million 1977 Certificate limit. (Ex. D-118). Miller's supervisor, Thomas O'Kane, approved payment, noting, "We have confirmed paid claims have properly exhausted the entire 3M umbrella policy limit and our loss and exp payment is in order." (Ex. D-118). Though he did not have the specimen terms and conditions for the 1977 Umbrella[27] and knew Martin's explanation of coverage was "inconsistent with the

---

[26] The Court credits Martin's testimony and does not find any intentional misrepresentation or deliberate concealment.

[27] Miller had not received the terms and conditions of the 1973 Umbrella or endorsement or the 1977 Umbrella. (T. 1767).

settlement agreement" but "consistent with what [Martin] had explained" to him about "the intent of the settlement agreement," Miller accepted Martin's explanations. (T. 1766–67). Miller and Munich management felt comfortable paying the 1977 Umbrella. (T. 1771). Munich paid Utica $1,731,368.21 in connection with the 1977 Certificate.

### 2. Utica's Rediscovery of the 1973 Defense Endorsement and Withdrawal of the Billings Under the 1973 Certificate

In his December 14, 2007 email, Miller sought more information from Martin about "the treatment of expense under the policies and the settlement agreement." (Ex. P-162, at R-0074003; T. 1761). Miller informed Martin that he was checking to "make sure we have received all available documentation from our underwriting files" but that Munich had "requested a full search when [they] first received these claims" and he doubted they would find additional support. (Ex. P-162, at R-0074003). Miller asked Martin to send "specimen copies of the umbrella coverage form that Utica would have been using at the time the 1973 was issued," as well as an "explanation of how it was determined that the 1973 policy treated expense as part of loss." (Ex. P-162, at R-0074003).

This time, in response to Miller's request, Martin "pull[ed] the coverage file materials" for the 1973 Umbrella that had been recreated by coverage counsel. (Ex. D-352, at R-0074340). In the file, she found the 1973 defense endorsement, which she believed "changed the policy from an ultimate net loss to defense outside the limits." (Ex. D-352, at R-0074340). In Martin's opinion, this made Utica's settlement with Goulds "even better" because, if Utica or Goulds had "realized" that there was another umbrella policy that provided "defense outside the limits," Goulds could have asked for "a higher cap" during settlement. (Ex. D-352, at R-0074340; T. 564).

In a telephone call on December 19, 2007, Martin told Miller "that [Utica's] umbrella policies always included expense as part of loss until the forms were changed in 1976 or 1977, which is why the settlement was negotiated based on that assumption." (Ex. D-119, at MRA73 00077). Martin also told Miller that, when she reviewed "the folios that were created by coverage counsel for each policy, she discovered that the relevant language was actualy [sic] endorsed off of the 1973 policy that [Munich] reinsure[d], meaning that the policy treats expense as supplemental." (Ex. D-119, at MRA73 00077). Martin advised Miller that Utica would be withdrawing the current bill on the 1973 Certificate and sending a revised billing statement reflecting treatment of expense as supplemental. (Ex. D-119, at MRA73 00077). Miller asked Martin to send a copy of that endorsement and expected that she would send it based on her representation that it "changed the way the policy responded." (T. 1762). There is no evidence that Martin sent the endorsement. On December 20, 2007, Miller received a revised billing from Utica on the 1973 Certificate indicating that current amount due was zero—reflecting that Utica was billing on an expense-in-addition-to-limits basis.[28] (T. 1763).

In August 2008, Miller emailed Martin to request updates on claim statistics, loss, and expense for "all the files" and again requested a copy of the 1973 defense endorsement. (Ex. P-163, at R-0074036). There is no evidence that Martin sent the 1973 defense endorsement; Martin testified it was no longer her job at that point—she was "filling in for someone"—and "just forgot to do it." (T. 570). The Court credits Martin's testimony and does not find any intentional misrepresentation or deliberate concealment. Miller did not receive the 1973 defense endorsement and left the claims department in October 2008. (T. 1765).

---

[28] Utica had previously included expenses in the loss calculation ($4,007,347.69 in loss + $2,656,812.64 in expense), which totaled $6,664,160.33 and therefore passed the $5 million layer that triggered the 1973 Certificate. (Ex. D-154, at MRA73 03449). By removing expenses from the calculation, the loss under the 1973 Umbrella was not yet sufficient to trigger the 1973 Certificate.

### 3. Utica's New Billings Under the 1973 Certificate and Commencement of *Utica I*

On June 15, 2011, Utica sent Munich a bill under the 1973 Certificate reflecting reinsurance due in the amount of $8,310,331.71 ($5,000,000 in loss and $3,310,331.71 in expense). (Ex. P-280-11, at MRA73 02180). In an August 17, 2011 email from Richard Hill, a Munich employee, to Michael Evolo, a Utica employee, Hill noted that Utica was treating expenses as supplemental under the 1973 Umbrella and requested "documentation in support." (Ex. D-121, at R0072141). Evolo emailed back on August 18, 2011 and attached the 1973 defense endorsement. (Ex. D-121, at R0072143–44). There is no evidence Munich had received this endorsement before August 18, 2011. (T. 220). The endorsement was not in Munich's underwriting file; Munich believed that Utica had never provided it. (T. 220; Ex. P-460 (underwriting file)).

On September 7, 2011, Hill emailed Evolo: "Since you were able to email me the documentation to suggest that expenses are supplemental, I will have to reallocate the payments to reflect expenses as supplemental in our system." (Ex. P-207, at R-0072175).

Hill notified Leah Spivey, head of Munich's environmental mass tort group, that there was a billing "on the Goulds matter" and that Utica was billing beyond Munich's $5 million "share of the policy amount." (T. 218–19). When Spivey read the 1973 defense endorsement, her opinion was that it "would provide defense coverage only in the case where the underlying policy did not provide coverage for specific . . . losses that would not be covered under [a] typical primary policy." (T. 221). Spivey further believed that the 1973 defense endorsement changed the "ultimate net loss clause in the policy to . . . indicate that no expenses should be paid under the policy." (T. 222). Munich also flagged Utica's billing for "unallocated expenses," which Spivey knew "were often declaratory judgment expenses"; Munich wanted to confirm the

nature of those expenses because its "facultative certificates do not respond to declaratory judgment expenses." (T. 224).

In a September 15, 2011 email, Hill alerted Evolo that Munich had reviewed the 1973 defense endorsement and found it was "not clear as to the treatment of defense cost." (Ex. D-17, at MRA73 02391). He explained that it "appeared that Utica Mutual has a duty to defend with respect to any <u>occurrence not covered by the underlying policy(ies),</u>" which did "not appear to be the case in this loss," and that Munich would need a complete copy of the 1973 Umbrella and "any coverage opinion that address [sic] the treatment of defense." (*Id.*). In addition, Hill provided a copy of the 1973 Certificate in an effort to obtain an explanation from Utica "as to the nature of the 'unallocated expenses'" reflected in the reinsurance billings. (Ex. D-17, at MRA73 02391).

On September 16, 2011, Daniel Hammond, an associate claims attorney at Utica, responded to Hill, quoting language from the reinsurance certificate, including the provision that states that the "Reinsurer shall be liable for its proportion of allocated loss expenses incurred by the Company in the same ratio that the Reinsurer's share of the settlement or judgment bears to the total amount of such settlement or judgment under the policy reinsured." (Ex. D-357, at MRA73 02403–04). Hammond wrote that the certificate "make[s] clear that Munich Re is responsible for the Goulds . . . expenses." (Ex. D-357, at MRA73 02404). Hammond stated that those expenses "are coverage litigation and expenses for outside counsel" and also "relate to a declaratory judgment action pending in" California. (Ex. D-357, at MRA73 02404). With respect to defense costs under the 1973 Umbrella, Hammond asserted that Utica had a duty to defend under the "occurrence not covered by" provision in the 1973 defense endorsement because "after exhaustion of the primary coverage, the occurrence is 'not covered by the underlying

policy(ies).'" (Ex. D-357, at MRA73 02405). Hammond cited *Zurich Insurance Co. v. Raymark Industries, Inc.*, 118 Ill.2d 23, 55–56 (1987), concerning the obligations of a primary insurer following the exhaustion of primary coverage.[29] (Ex. D-357, at MRA73 02405).

Spivey sent a September 30, 2011 email to Utica indicating that Munich may want to conduct "an onsite audit of the claim" and repeating Munich's request for a coverage opinion. (Ex D-97, at R-0072283). On October 5, 2011, Hammond responded to Spivey's email with a specimen copy of the 1973 Umbrella and asked for clarification regarding "what issue of coverage and time period of [coverage] opinion you are requesting." (Ex. D-99, at R-0071911). Spivey replied that Munich was requesting "all of the coverage in chronological order," but that the "area of concern" was Utica's "interpretation and reason for citing the *Zurich v. Raymark* case." (Ex. D-99, at R0071911). On October 10, 2011, Turi responded to Spivey's email and asserted that Munich's request for "every coverage opinion" was "unreasonable" and a delay tactic but that Munich was "welcome to audit the file on site." (Ex. P-58, at MRA73 02738). Turi explained that Utica had cited *Zurich Insurance Co.* for the "proposition that an insurer does not have an obligation to defend under a policy after the policy has exhausted" and, since the primary policy was exhausted, it "no longer covered the outstanding claims" and required the 1973 Umbrella to respond. (Ex. P-58, at MRA73 02738).

In an October 21, 2011 email to Turi, Spivey noted that Munich had consistently responded to Utica's "cessions on the 1973–1974 policy under its facultative certificate in accordance with how the original policy was written, treating expenses as part of ultimate net loss." (Ex. D-106, at R-0072330). Spivey informed Turi that Munich had "searched and has not

---

[29] Spivey credibly testified that she did not "understand why they were referring to" *Zurich Insurance Co.* because her "understanding of that case was the fact that, it was referring to just a primary policy, and . . . indicated that when a primary policy exhausted its loss limits, it no longer had a defense obligation," and she "didn't see what that had to do with the case that we were dealing with here." (T. 234).

found any notice of the endorsement, which you recently provided, that changes the expense treatment," and requested documentation showing that Munich "had been notified of this major change in coverage." (Ex. D-106, at R-0072330). Spivey reiterated that Munich did not interpret the endorsement "as changing the policy from UNL to supplemental in this instance," and again requested the "coverage opinion upon which [Utica] relied in order to change [its] handling of expense." (Ex. D-106, at R-0072330). Spivey also requested information on "how the expenses were allocated to the various layers of coverage in the 1973–1974 policy year" and "a breakdown of expenses paid under the 1973–1974 policy, when they were paid compared to the loss dollars paid, to which reinsurance layer they were allocated, and why." (Ex. D-106, at R-0072330).

In an email to Spivey on December 29, 2011, Turi wrote to again dispute Munich's reasons for not paying the billings under the 1973 Certificate and also asserted that Munich's obligations "are governed by Munich Re's certificate," which "provides that Munich Re will pay 'its proportion of allocated loss expenses incurred by Utica.'" (Ex. P-111, at R-00724391–92). This, however, did not "make any sense" to Spivey "because the facultative certificate only provides the coverage that the policy provides . . . . [I]t doesn't provide any independent or broader coverage than is provided by the policy itself." (T. 241). On January 27, 2012, Utica filed this action. (Dkt. No. 1). Utica seeks judgment in the amount of $2,760,533.96 and entry of declaratory judgment. (Dkt. No. 1).

### 4. Munich's Commencement of *Utica II*

Subsequently, Munich's attorneys "were granted access to Utica Mutual's underwriting files for various primary and umbrella policies issued to Goulds," including the 1977 Umbrella. (Ex. D-110, at MRA77 1308). There is no evidence that Munich had seen the 1977 Umbrella policy terms until then. Upon learning that the 1977 Umbrella contained the same "occurrence

not covered by" language as the 1973 defense endorsement, Spivey, in a letter to Turi dated November 27, 2012, requested a refund of $789,813.47—the expenses Munich paid in addition to the $1 million liability limit under the 1977 Certificate. (Ex. D-110, at MRA77 1308). Spivey wrote:

> Since the asbestos bodily injury claims asserted against Goulds were covered by Utica Mutual's January 1, 1977 primary policy issued to Goulds—and in fact Utica Mutual has represented that its primary policy limits were exhausted by payments made for those claims—the defense coverage provision of the 1977 umbrella policy is inapplicable. Moreover, Utica Mutual has no legal liability to pay defense costs to or for the benefit of Goulds in excess of its January 1, 1977 umbrella policy limit. Nor, to Munich Re's knowledge, does Utica Mutual's Settlement Agreement with Goulds obligate Utica to pay defense expenses in addition to the loss limit of its January 1, 1977 umbrella policy.

(Ex. D-110, at MRA77 1308–09). On January 10, 2013, Munich filed *Utica II*, alleging breach of contract[30] based on Utica's alleged billing Munich "for more than the [1977] Certificate's $1 million limit" and refusal to refund to Munich the amount of its alleged overpayment—$789,813.47. (*Utica II*, 6:13-cv-743, Dkt. No. 1). Munich seeks declaratory judgment and damages in the amount of $789,813.47. (*Utica II*, 6:13-cv-743, Dkt. No. 1).

### G.     General Conditions in the 1973 Certificate[31]

In the 1973 Certificate, Munich agreed to reinsure $5 million excess of $5 million on Utica's 1973 Umbrella, "subject to" certain general conditions. (Ex. P-4, at MRA 10181). These included the following:

> 1.  The Reinsurer agrees to indemnify the Company against losses or damages which the Company is legally obligated to pay under the policy reinsured, resulting from occurrences taking place

---

[30] In *Utica II*, Munich also advanced several quasi-contract claims; the Court dismissed those claims at the summary judgment stage. (*Utica II*, Dkt. No. 268, at 61).

[31] The Court only considers the provisions of the 1973 Umbrella, 1973 defense endorsement, and 1973 Certificate because, as described *infra* Section III.E., Munich is not entitled to reimbursement of its payment under the 1977 Certificate.

during the period this Certificate is in effect, subject to the reinsurance limits shown in the Declarations. The Company warrants the copy of the policy forwarded to the Reinsurer to be a true copy of the said policy and the whole thereof, and agrees to notify the Reinsurer promptly of any changes made therein.

2. The Company shall settle all claims under its policy in accordance with the terms and conditions thereof. If the reinsurance hereunder is pro rata, the Reinsurer shall be liable for its pro rata proportion of settlements made by the Company. If the reinsurance hereunder is excess, the Reinsurer shall be liable for its excess proportion of settlements made by the Company after deduction of any recoveries from pro rata reinsurance inuring to the benefit of the Reinsurer.

3. The Reinsurer shall be liable for its proportion of allocated loss expenses incurred by the Company in the same ratio that the Reinsurer's share of the settlement or judgment bears to the total amount of such settlement or judgment under the policy reinsured. The term "allocated loss expense" means all expenses incurred in the investigation, adjustment and litigation of claims or suits, but excluding the office expenses of the Company and the salaries and expenses of all employees of the Company. It also includes court costs and interest on any judgment or award provided the Reinsurer's prior consent to trial court proceedings has been obtained.

4. The Company shall advise the Reinsurer promptly of any claim and any subsequent developments pertaining thereto which in the opinion of the Company may involve the reinsurance hereunder. The Company has the obligation to investigate and defend claims or suits affecting this reinsurance and to pursue such claims or suits to final determination. The Company, when so requested, will afford the Reinsurer an opportunity to be associated with the Company at the expense of the Reinsurer in the defense or control of any claim, suit or proceeding involving this reinsurance and the Company and the Reinsurer shall cooperate in every respect in the defense and control of such claim, suit or proceeding.

. . . .

6. The Company shall furnish proof that payment of a loss and loss expense has actually been made by the Company and payment by the Reinsurer of its proportion thereof shall be made promptly
. . . .

(Ex. P-125).

## III.  CONCLUSIONS OF LAW

### A.  Breach of Contract

New York law applies to this diversity action. *Utica Mut. Ins. Co. v. Munich Reins. Am., Inc.*, 594 F. App'x 700, 704 (2d Cir. 2014). To establish breach of contract under New York law, the plaintiff must show: "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).

### B.  Following Provisions

The 1973 Certificate does not contain a follow-the-settlements or a follow-the-fortunes provision. In its summary judgment ruling, the Court rejected Utica's argument that the doctrines should be implied, as a matter of law, into the reinsurance certificates. *Utica Mut. Ins. Co. v. Munich Reins. Am., Inc.*, No. 6:12-cv-00196, 2018 WL 1737623, at *21–22, 2018 U.S. Dist. LEXIS 107997, at *63–70 (N.D.N.Y. Mar. 20, 2018).[32] The Court noted that Utica had not sought to imply the term based upon industry custom and practice, and addressed that issue in a motion in limine ruling. (Dkt. No. 391). In view of caselaw indicating that a provision may be implied into a contract in extremely limited circumstances, the Court allowed Utica "to present evidence at trial as to whether the doctrines of follow the fortunes or follow the settlements were,

---

[32] The Second Circuit subsequently ruled that a follow-the-settlements obligation should not be implied into reinsurance certificates that do not include a follow-the-settlements clause. *Utica Mutual Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 17, 25 (2d Cir. 2018) ("We see no reason to read such a term into the contract by implication. Instead we follow the New York Court of Appeals' instruction: where a contract 'is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its own personal notions of fairness and equity.'" (quoting *Glob. Reins. Corp. of Am. v. Century Indem. Co.*, 30 N.Y.3d 508, 519 (2017)) (citing Graydon S. Staring & Dean Hansell, *Law of Reinsurance* § 18:2, at 423 (2017) ("Early scholarship . . ., the best of modern scholarship, the judicial history of the subject . . . and the general law of contractual indemnity unite in confirming that there is no implied general obligation to follow settlements in the absence of an express clause to that purpose."))).

at the time the parties agreed to the Certificates, so 'fixed and invariable' in the reinsurance industry as to be part of the Certificates." (Dkt. No. 391, at 3). The Court explained,

> "[T]he burden of proving a trade usage has generally been placed on the party benefiting from its existence." *British Int'l Ins. Co. v. Seguros La Republica, S.A.*, 342 F.3d 78, 83 (2d Cir. 2003) (quoting *Putnam Rolling Ladder Co. v. Mfrs. Hanover Tr. Co.*, 74 N.Y.2d 340, 348 (1989)). "Under New York law . . . custom and usage evidence must establish that the omitted term is 'fixed and invariable' in the industry in question." *Hutner v. Greene*, 734 F.2d 896, 900 (2d Cir. 1984) (quoting *Belasco Theatre Corp., v. Jelin Prods., Inc.*, 270 A.D. 202, 205 (1st Dep't 1945)). "One who seeks to use trade usage to . . . annex a term to a contract must show either that the other party to the contract is actually aware of the usage, or that the existence of the usage in the business to which the transaction relates is so notorious that a person of ordinary prudence in the exercise of reasonable care would be aware of it." *Reuters Ltd. v. Dow Jones Telerate, Inc.*, 231 A.D.2d 337, 343 (1st Dep't 1997). "The trade usage must be 'so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and that they contracted in reference thereto.'" *British International*, 342 F.3d at 84 (quoting *Reuters*, 231 A.D. 2d at 343–44).

(*Id.* at 5).

Utica argues that a follow-the-fortunes term should be implied into the Reinsurance Certificates based upon the custom and practice in the industry. The follow-the-fortunes doctrine

> "binds a reinsurer to accept the cedent's good faith decisions on all things concerning the underlying insurance terms and claims against the underlying insured: coverage, tactics, lawsuits, compromise, resistance or capitulation." This doctrine insulates a reinsured's liability determinations from challenge by a reinsurer unless they are fraudulent, in bad faith, or the payments are "clearly beyond the scope of the original policy" or "in excess of [the reinsurer's] agreed-to exposure." . . . It is well-established that a follow-the-fortunes doctrine applies to all outcomes, including settlements and judgments.

*N. River Ins. Co. v. Ace Am. Reins. Co.*, 361 F.3d 134, 139–40 (2d Cir. 2004) (alteration in original) (first quoting *British Int'l Ins. Co.*, 342 F.3d at 85; then quoting *Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*, 979 F.2d 268, 280 (2d Cir. 1992)). "'[F]ollow the

settlements doctrine . . . is the follow-the-fortunes doctrine in the settlement context." *Travelers Cas. & Sur. Co., v. Gerling Global Reins. Corp. of Am.*, 419 F.3d 181, 186 n.4 (2d Cir. 2005). "[T]he main rationale for the doctrine is to foster the 'goals of maximum coverage and settlement' and to prevent courts, through 'de novo review of [the cedent's] decision-making process,' from undermining 'the foundation of the cedent-reinsurer relationship.'" *N. River Ins. Co.*, 361 F.3d at 140–41 (alteration in original) (quoting *N. River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1206 (3d Cir. 1995)).

While Utica argues that the Court should imply a follow-the-fortunes provision into the 1973 Certificate, Munich argues that if anything, it should be a follow-the-settlements provision, and the experts generally discussed the two doctrines together. (Dkt. No. 431, at 17; Dkt. No. 430, at 29). The Court has therefore included a discussion and analysis of both concepts. Having considered all the evidence, the Court concludes that Utica has failed to prove that follow the fortunes or follow the settlements was so fixed and invariable at the time the parties agreed to the 1973 Certificate that it is implied in their agreement.

At trial, Utica presented expert testimony by Paul Feldsher, Debra Roberts, and Andrew Maneval, all of whom testified that follow the fortunes and follow the settlements were industry-wide concepts that did not need to be stated in reinsurance certificates to apply. (*See* T. 916 (Feldsher testifying that in the 1970s there was "an industry-wide belief that reinsurers would follow the claims handling decisions of their cedents" and would not "second-guess the underwriting process" or "how the claims would be resolved, as long as they were decisions that were reasonable in terms of determining whether the claim fell within the scope of the policy"); T. 1611 (Roberts opining that follow the fortunes and follow the settlements are "foundational concept[s] in the industry" and do not need "to be explicitly stated in the contracts for the

industry to follow this concept"); T. 1975–76 (Maneval testifying that, in his opinion, it was the universal view that reinsurance contracts entered into in the 1970s were governed by the follow-the-fortunes and follow-the-settlements concepts and that the "overall purpose" of these concepts "is to assure that the insurance and reinsurance industry can work effectively and commercially and prudently by requiring and expecting reinsurers to defer to reasonable good faith settlement decisions or payment decisions or interpretations of their own policies")). The Court finds this testimony credible to the extent that it shows that cedents and their reinsurers, in general, endeavor to work together and that reinsurers, whenever possible, will defer to reasonable determinations by cedents in interpreting policies and paying or settling claims.

The testimony by Miller and O'Kane, both Munich employees, in handling Utica's billing under the 1977 Certificate—paying the billing promptly, without requiring policy documents based on the representation by Utica employees—exemplifies this concept. Miller testified that, when he requested the authority to pay the 1977 billings, he did not have the terms and conditions of the 1977 Umbrella, but he nevertheless believed that the policy covered defense in addition to limits based on Martin's "explanation of coverage" and indicated that even though the defense expense allocation was "inconsistent with the settlement agreement . . . it was consistent with what [Martin] explained to [him] and how [Martin] explained the intent of the settlement agreement." (T. 1766–77). O'Kane, who approved the payment, stated that Munich paid the 1977 claim because it believed it "owed a loss and supplemental expense based on representations to us, or in this case Tom Miller in his management of the case." (T. 1944). O'Kane testified that, although there are no following provisions in the certificates, when Munich handles claims, it has "been supportive" of paying them when it finds that "the claim is covered" and "the settlement value was reasonable" and made in good faith. (T. 1940). While

this is conduct evidencing Munich's attempt, in this instance, to operate in good faith, implement the following concepts in handling the 1977 billings, and defer to Utica's explanations, it does not establish that Munich considered itself contractually bound to do so absent an express provision in the reinsurance certificate.[33] Indeed, Munich clearly believed that it was entitled to challenge Utica's coverage determinations. After Munich received the June 15, 2011 billings under the 1973 Certificate and noticed the treatment of expense as supplemental, it decided to request the defense endorsement rather that defer to Utica's representations, (Ex. P-280-11, at MRA73 02180; Ex. D-121, at R0072141), and upon review challenged Utica's coverage determination. (Ex. D-18, at MRA73 02391).

While Feldsher, Roberts, and Maneval credibly testified that reinsurers generally operated under the concepts of follow the settlements and follow the fortunes in their relationships with the insured, both Feldsher and Maneval acknowledged that not all reinsurers included these provisions in their reinsurance certificates. Feldsher testified that in the 1970s the number of reinsurers that included following provisions in their certificates "varied;" "most" did not include following provisions in the 1970s, but reinsurers "more explicitly did as time went on through the '80s." (T. 1001). Maneval also opined that there may be reasons a reinsurance company might not want a follow-the-fortunes or follow-the-settlements provision in its certificate, including the concern "that the clause itself would create some direct privity of the reinsurer to the underlying insured" or that the provision might require it to reinsure "some kind of ex gratia or business risk kind of payment." (T. 2112, 2114). Munich's certificates never contained a follow-the-fortunes or follow-the-settlements provision. (T. 1930). Munich has cited language in the 1973 Certificate that appears to be inconsistent with a follow-the settlements

---

[33] Like the 1973 Certificate, the 1977 Certificate contained no following provisions.

provision. (*See* Ex. P-125, ¶ 1 (agreeing to indemnify Utica for losses or damages that Utica "*is legally obligated to pay* under the policy reinsured")).

As the Second Circuit recognized in *Clearwater Insurance*, in declining to imply follow the settlements into the facultative reinsurance certificates at issue, New York courts have repeatedly emphasized that a court "should not imply so significant a term into a contract negotiated between sophisticated parties." 906 F.3d at 24–25; *see Glob. Reins. Corp. of Am.*, 30 N.Y.3d at 518–19 ("[W]here an agreement is 'negotiated between sophisticated, counseled business people negotiating at arm's length, . . . courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.'" (quoting *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004))). The Court therefore concludes that Utica has failed to prove that follow the fortunes or follow the settlements were so "fixed and invariable" in the facultative reinsurance industry as to warrant importing them into the 1973 Certificate as binding terms. Thus, the Court declines to imply a follow-the-fortunes or follow-the-settlements obligation into the 1973 Certificate.

Because the Court concludes that follow the settlements and follow the fortunes were not implied into the 1973 Certificate, Munich "must indemnify Utica according to Utica's proven liability on the umbrella policies." *Clearwater Ins. Co.*, 906 F.3d at 25 (citing Staring & Hansell, *supra*, § 20:6, at 534 ("In the absence of a following settlements clause, . . . the reinsured has the burden of proving that the loss was specifically caused by a risk covered in the reinsurance contract.")). Accordingly, the Court considers whether Utica has proved that it was liable for the defense expenses under the 1973 Umbrella.

## C.    "Occurrence Not Covered By"

Utica contends that Munich breached the 1973 Certificate by failing to pay its share of

the defense expenses ($2,760,533.96)[34] that Utica incurred in connection with the asbestos

bodily injury claims it paid under the 1973 Umbrella and that it calculated as expense-

supplemental in accordance with the 1973 defense endorsement. (Dkt. No. 430, at 11).[35] Munich

argues that Utica had no obligation under the 1973 defense endorsement to provide supplemental

defense expenses.

At the summary judgment stage, the Court found the "occurrence not covered by

language" in the defense endorsement ambiguous and allowed the parties to introduce extrinsic

evidence at trial. *Utica Mut. Ins. Co.*, 2018 WL 1797623, at *23–25, 2018 U.S. Dist. LEXIS

107997, at 70–76. During closing arguments, the Court advised the parties that it was

reconsidering its ambiguity finding.[36] Indeed, having considered the meaning of the phrase

"occurrence not covered by" "when viewed objectively by a reasonably intelligent person who

has examined the context of the entire integrated agreement and who is cognizant of the customs,

---

[34] Utica's argument for reimbursement of declaratory judgment expense is based upon the 1973 Certificate and is discussed *infra* Section III.D.2.

[35] The Court has assumed, for the purpose of this decision, that Utica provided the 1973 defense endorsement to Munich when issued. There was no direct evidence of this. The endorsement was not in Munich's underwriting file, but its file was not complete, (Ex. P-460), and Utica provided some evidence of a practice of providing endorsements to reinsurers upon issuance, (*see* T. 364–83).

[36] Under Federal Rule of Civil Procedure 54, "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). "A district court . . . possesses the inherent authority to *sua sponte* reconsider its own interlocutory orders before they become final." *Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail Riggin g, LLC*, No. 11-cv-3238, 2015 WL 545565, at *2, 2015 U.S. Dist. LEXIS 15909, at *7 (S.D.N.Y. Feb. 9, 2015). "*Sua sponte* reconsideration is appropriate where there is a need to correct a clear error or prevent manifest injustice, there is an intervening change in the applicable law, or new evidence is available." *Id.* (quoting *Benavidez v. Piramides Mayas Inc.*, No. 09-cv-9574, 2013 WL 2357527, at *3, 2013 U.S. Dist. LEXIS, at *7–8 (S.D.N.Y. May 24, 2013)). "Whether such revision is appropriate in any given case is within the sound discretion of the trial judge." *Acha v. Beame*, 570 F.2d 57, 63 (2d Cir. 1978). Here, having closely examined the trial evidence and given greater consideration to the meaning of the term "covered" and to this provision in the context of the whole umbrella policy, including the retained limit provisions, and in light of the strength of the caselaw supporting Munich's position, the Court finds reconsideration warranted to correct a clearly erroneous finding of ambiguity.

practices, usages and terminology as generally understood in the particular trade or business," *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)), the Court finds that it is unambiguous and that it does not include exhaustion of the 1973 Primary here.

"An insurance agreement is subject to the principles of contract interpretation." *Universal Am. Corp. v. Nat. Union Fire Ins. Co. of Pittsburgh, Pa.*, 25 N.Y. 3d 675, 680 (2015). Under New York law, "agreements are construed in accord with the parties' intent," and the "best evidence of that intent is the parties' writing." *Marin v. Constitution Realty, LLC*, 28 N.Y.3d 666, 673 (2017) (quoting *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002)). "Where . . . the contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence." *Rainbow v. Swisher*, 72 N.Y.2d 106, 109 (1988).

"The determination of whether a contract term is ambiguous is a threshold question of law for the court." *Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987). "If the court finds that the terms, or the inferences readily drawn from the terms, are ambiguous, then the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Alexander,* 136 F.3d at 86. "Parties may offer evidence of custom or practice [of the reinsurance industry] to interpret the meaning of a term used in a contract." *Travelers Indem. Co. v. Scor Reins. Co.*, 62 F.3d 74, 78 (2d Cir. 1995) (citing *Gelb v. Auto. Ins. Co.*, 168 F.2d 774, 775 (2d Cir. 1948)).

The 1973 defense endorsement states: "With respect to any occurrence[37] not covered by the underlying policy(ies) of insurance described in the schedule of underlying insurance or any other underlying insurance collectible by the insured, but covered by terms and conditions of this policy except for the amount of retained limit,"[38] Utica "shall," among other things, "defend any suit against the insured" and "pay all expenses incurred by the company." (P-100, at R-0000164). It further states: "and the amounts so incurred, except settlements of claims and suits, are payable by the company in addition to the applicable limit of liability of this policy." (P-100, at R-0000164).

In this litigation, Munich has maintained that the "occurrence not covered by" language means an occurrence that is "not within the scope of coverage provided by underlying policies of insurance." (Dkt. No. 300-5, at 8). Utica reads the "occurrence not covered by" language more broadly as including occurrences that are "not covered" by the primary policy because that policy has been exhausted. (Dkt. No. 310, at 11).

The Court of Appeals of New York has described "coverage" as "the net total of policy inclusions minus exclusions." *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 323 (1995); *see also In re Joint E. & S. Dist. Asbestos Litig.*, 993 F.2d 313, 314 (2d Cir. 1993) ("The 'coverage' furnished by AEGIS is the amount and extent of the risk it contractually assumed, as specified in the insuring clause and exclusions."); *Pergament Distribs., Inc. v. Old Republic Ins. Co.*, 128 A.D.2d 760, 761 (2d Dep't 1987) (rejecting argument that an umbrella insurer had to "drop

[37] "Occurrence" is defined in the 1973 Umbrella as "an accident during the policy period or . . . continuous or repeated exposure to conditions during or prior to the policy period, if the bodily injury or property damage occurs during the policy period and is neither expected nor intended by the insured." (Ex. P-100, at R-0000152).

[38] "Retained limit" is defined in the 1973 Umbrella as "the amount, stated as such in the declarations, of ultimate net loss resulting from any one occurrence if the insurance afforded by the underlying insurance is inapplicable to such occurrence." (Ex. P-100, at R-0000152). "Ultimate Net Loss" is defined in the 1973 defense endorsement as "the sum actually paid in cash in the settlement or satisfaction of losses for which the insured is liable . . . but excludes all loss expenses and legal expenses (including attorneys' fees, court costs and interest on any judgment or award) . . . ." (Ex. P-100, at R-0000165).

down" and provide primary coverage after the primary insurer was declared insolvent; "the terms 'covered' and 'not covered' [in an ultimate loss provision] refer to whether the policy insures against a certain risk, not whether the insured can collect on an underlying policy"). There is no basis in law, or in the terms of the Umbrella, for inferring that "occurrence not covered" means anything other than the type of risk—bodily injury—Utica assumed under primary policies. The primary policies covered and paid (until the exhaustion of aggregate limits) the asbestos bodily injury claims filed and asserted against Goulds.[39] (Dkt. No. 449-1, ¶ 37). Further, these bodily injury claims arose from occurrences during the relevant policy periods: exposure to asbestos. (Ex. D-598, at D-0014154; Ex. P-11, at A0000007 (1973 Primary defining occurrence to include "exposure to conditions"); Ex. P-100, at R-0000152 (1973 Umbrella defining occurrence as "continuous or repeated exposure to conditions" and stating that "[a]ll such bodily injury . . . caused by continuous or repeated exposure to substantially the same general condition shall be deemed to be the result of one occurrence")).

---

[39] The 1973 Primary provides,

> COVERAGE A—BODILY INJURY LIABILITY
> COVERAGE B—PROPERTY DAMAGE LIABILITY
>
> The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> A. bodily injury or
> B. property damage
>
> to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claims or suits as it deems expedient, but the company shall not be obligated to pay any claim or judgment or defend any suit after the applicable limit of the company's liability has been exhausted by payments of judgment or settlements.

(Ex. P-11, at A0000009). The 1973 Primary states that "occurrence" "means an accident, including injuries or exposure to conditions, which results during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." (Ex. P-11, at A0000007).

Further, reading the 1973 Umbrella as a whole shows that it functions in two ways—providing coverage in excess of the 1973 Primary and providing "drop down" coverage for risks the 1973 Primary does not cover—and that it responds differently depending on whether it is functioning as an excess or primary coverage provider. *See, e.g.*, *Clearwater Ins. Co.*, 906 F.3d at 15 ("Umbrella policies blend primary and excess coverage by providing last-resort excess coverage as well as gap-filling primary coverage on claims not otherwise insured by primary policies."). For example, in section "III. Underlying Limit—Retained Limit," the 1973 Umbrella provides that Utica

> shall be liable only for the ultimate net loss resulting from any one occurrence in excess of either
>
> (a)    the amounts of the applicable limits of liability of the underlying insurance as stated in the Schedule of Underlying Insurance Policies less the amount, if any, by which any aggregate limit of such insurance has been reduced by payment of loss, hereinafter called the underlying limit, or
>
> (b)    if the insurance afforded by such underlying insurance is inapplicable to the occurrence, the amount stated in the declarations as the retained limit.

(Ex. P-100, at R-0000152). Read plainly, section III(a) provides that Utica assumes liability for loss resulting from an occurrence in excess of the underlying limits of liability of the primary policy, i.e., after the limits are exhausted, and section III(b) provides "drop down" or "primary" insurance where "underlying insurance is inapplicable" to the occurrence.[40]

The 1973 Umbrella's use of "inapplicable" in its definition of "retained limit"—"the amount, stated as such in the declarations, of ultimate net loss resulting from any one occurrence

---

[40] Here, for example, the 1973 Umbrella provided coverage for types of risk that were not covered by the 1973 Primary. The 1973 Umbrella provided coverage for "personal injury," which included "mental injury . . . false arrest . . . [and] libel." (Ex P-100, at R0000152). The 1973 Primary, in contrast, covered only "bodily injury" or "property damage." (Ex. P-11, at A0000006, A0000009).

if the insurance afforded by the underlying insurance is *inapplicable* to such occurrence"—is consistent with its use of "inapplicable" in section III(b)("[I]f the insurance afforded by such underlying insurance is inapplicable to the occurrence . . . "), and both refer to the same concept as "not covered by." (Ex. P-100, at R-0000152). If "inapplicable to the occurrence" means inapplicable because of exhaustion, the drop down provision, section III(b), would have required Goulds to pay a retained limit (identified in the declarations as $10,000), (Ex. P-100, at R-0000155), to access the coverage provided by the 1973 Umbrella. (*See* T. 930 (Testimony of Utica's expert Feldsher)). Such an interpretation would lead to an absurd result, contrary to the reasonable expectations of parties contracting for excess umbrella coverage.[41] *Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 415 (1st Dep't 2010) (explaining that under New York law, "a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties"). The Court, therefore, rejects it. Thus, the Court finds that Utica's reading of "occurrence not covered by" as including exhaustion is untenable.

Further, the majority of courts addressing the "not covered" or "occurrence not covered by" language have found it unambiguous and that it refers to the type of risk, not exhaustion or collectability. *See Am. Special Risk Ins. Co. v. A-Best Prod., Inc.*, 975 F. Supp. 1019, 1026 (N.D. Ohio 1997) ("[T]he phrase 'not covered' in the Defense Coverage Endorsement refers to situations of horizontal coverage where Stonewall acts as a primary carrier, and not to situations of vertical coverage where Stonewall provides excess insurance after the exhaustion of the underlying primary insurance."); *Pergament Distribs., Inc.*, 128 A.D.2d at 761 ("At bar, there is

---

[41] There is no evidence that Utica required or contemplated requiring Goulds to pay a retained limit before providing a response under the 1973 Umbrella.

only one reasonable interpretation of the preceding terms. When used in this context, the terms 'covered' and 'not covered' refer to whether the policy insures against a certain risk not whether the insured can collect on an underlying policy."); *R.T. Vanderbilt Co., Inc. v. Hartford Accident & Indem. Co.*, 171 Conn. App. 61, 283 (2017) ("Because Continental's reading of the policy language is equally plausible on its face and best comports with other specific provisions of the policy, the overall policy structure, and the conclusions reached by our sister courts, we conclude that the trial court properly determined that Coverage B unambiguously does not require the insurer to defend claims that would have been covered by underlying insurance but for its exhaustion."); *Nooter Corp. v. Allianz Underwriters Ins. Co.*, 536 S.W.3d 251, 282 (Mo. Ct. App. 2017) (finding that "occurrence not covered by" language "obligates these excess insurers to defend Nooter only if the terms of these excess policies cover an occurrence and the terms of the underlying insurance does not"); *but see In re Viking Pump, Inc.*, 148 A.3d 633, 662 (Del. 2016) (finding that "personal injury . . . covered under this policy . . . but not covered under any underlying policy" includes not covered because of exhaustion); *Hopeman Bros., Inc. v. Cont'l Cas. Co.*, 307 F. Supp. 3d 433, 465 (E.D. Va. 2018) (following *Viking Pump* in interpreting a defense provision that applies to specified "injury or damage covered under this policy . . . but not covered under any underlying policy")).[42]

---

[42] The Court's research reveals no legal support for Utica's interpretation of the "occurrence not covered by" language in its umbrella policies at the time it extended coverage for defense expenses to Goulds in 2003. (Ex. P-8, at A-0003510). *Viking Pump* appears to be the first court to find that "not covered" included a loss not covered by reason of exhaustion. *Viking Pump, Inc. v. Century Indem. Co.*, No. CV10C06141, 2013 WL 7098824, at *24, 2013 Del. Super. LEXIS 615, at *77 (Del. Super. Ct. Oct. 31, 2013) ("Liberty's policies are clear that 'covered' and 'not covered' refer to payments, or money available."); *cf. Pergament Distribs.*, 128 A.D.2d at 761 (finding in 1987 that "covered" and "not covered" refer to risk not collectibility); *Mission Nat. Ins. Co. v. Duke Transp. Co.*, 792 F.2d 550, 553 (5th Cir. 1986) ("When an excess insurer uses the term 'collectible' or 'recoverable' it is agreeing to drop down in the event the primary coverage becomes uncollectible or unrecoverable; on the other hand, when an excess insurer uses the term 'covered' or 'not covered,' it is agreeing to drop down only in the event that the terms of the underlying policy do not provide coverage for the occurrence or occurrences in question."); *Am. Special Risk Ins. Co.*, 975 F. Supp. at 1026 (finding in 1997 that "the phrase 'not covered' in this policy refers to a situation different from the exhaustion of primary insurance").

The policy language in *Viking Pump* is materially different than the policy language here. The defense provision at issue in *Viking Pump* does not contain the language "occurrence not covered by"; instead the provision there applied to "*personal injury* . . . covered under this policy . . . but not covered under any underlying policy." 148 A.3d at 660 (emphasis added). The Supreme Court of Delaware, applying New York law, and reviewing the policy as a whole, including a different definition of "retained limit" than the definition here, found that the "plain language . . . suggests that the policies were intended to provide coverage 'if any underlying policy . . . [was] inapplicable by reason of exhaustion.'" 148 A.3d at 662. The court concluded that "[a] reading of 'covered' to refer to whether the primary policy provides coverage, and not whether it is collectible, distorts the actual purpose of the . . . umbrella policies." *Viking Pump*, 148 A.D.3d at 662. Unlike the 1973 Umbrella here, the policy in *Viking Pump* associated "the term 'cover' both with risks assumed by the insurer and with payment obligations maintained by the insured." *Viking Pump*, 148 A.3d at 662 n.127. Given all of these differences in the policy language, the Court does not find *Viking Pump* persuasive in interpreting the 1973 Umbrella and, in any event, is persuaded by the other caselaw cited in this decision.

The Court concludes that, because the asbestos claims were covered by the 1973 Primary, the 1973 Umbrella (with the 1973 defense endorsement) did not obligate Utica to pay supplemental defense expenses upon exhaustion of the 1973 Primary. Accordingly, the Court turns to Utica's argument that, even if the 1973 Umbrella did not obligate Munich to pay expenses supplemental to losses, the 1973 Certificate imposes an independent obligation on Munich to pay the defense and declaratory judgment expenses billed.

### D. Independent Obligation Under the Certificate to Pay Expense[43]

Utica argues that the "allocated loss expense" provision in the 1973 Certificate imposes on Munich an independent obligation to pay Utica's expenses even if the 1973 Umbrella did not "legally obligate" Utica to pay expenses on Goulds' behalf. (Dkt. No. 431, at 10). Utica asserts that this provision also obligates Munich to pay a portion of its declaratory judgment expenses. (Dkt. No. 431, at 10–14). Munich responds that the 1973 Certificate covers only what is covered under the reinsured policy and that Utica's argument "is clever, but without legal precedent or support in the reinsurance industry." (Dkt. No. 430, at 20–23, 43–45).

At the summary judgment stage, the Court found that the "allocated loss expense" provisions in the Certificates was ambiguous:

> Munich argues that the [allocated loss expense] provisions [in Paragraph 3] cannot be read without reference to Paragraph 1, which specifies that Munich's obligation to indemnify Utica for "losses or damages" is for those "losses or damages" that Utica is "legally obligated to pay" under the reinsured policy; in other words, Munich argues that the expenses must have been those Utica was "legally obligated to pay" under the Umbrellas. But the fact that "losses or damages" are explicitly subject to the requirement that Utica be legally obligated to pay them under the terms of the Umbrellas reasonably implies, as Utica argues, that "allocated loss expenses" which are not explicitly subject to the same requirement, are not tied to the Umbrellas. This implication is not strong enough in the context of the Certificates as a whole to show that such expenses are not tied to the underlying Umbrella policies; however, it is

---

[43] Munich previously argued that the 1973 Certificate's $5 million limitation of liability capped its reinsurance liability on the 1973 Certificate. This Court found that "the Certificate's limit of liability unambiguously applies to expenses" and granted Munich's motion for summary judgment. *See Utica Mut. Ins. Co. v. Munich Reins. Am., Inc.*, 976 F. Supp 2d 254, 268 (N.D.N.Y. 2013). The Second Circuit, however, disagreed. The Second Circuit noted that, while Paragraph one expressly made Munich's obligation to indemnify Utica for "losses or damages" "subject to" the Certificate's limit of liability, the omission of this language from Paragraph three, which describes Munich's liability for expenses, rendered the Certificate ambiguous. *Utica Mut. Ins. Co. v. Munich Reins. Am., Inc.*, 594 F. App'x 700, 703 (2d Cir. 2014). There is no presumption of expense-inclusiveness, and "a party is bound by the terms to which it has agreed." *Id.* at 704. The Second Circuit thus held that "interpreting the Certificate requires consideration of extrinsic evidence" and remanded. *Id.* at 704–05. Munich, however, subsequently withdrew its assertion that its liability for loss and expense combined was capped at the limit of reinsurance accepted. (Dkt. No. 180, at 6).

"sufficient to render the Certificate ambiguous." *Utica Mut. Ins. Co. v. Munich Reins. Am., Inc.*, 594 F. App'x 700, 703 (2d Cir. 2014).

*Utica Mut. Ins. Co.*, 2018 WL 1737623, at *20, 2018 U.S. Dist. LEXIS, at 60–61. As the parties had not fully briefed this issue, the Court proceeded no further and denied the parties' motions for summary judgment on this issue. *Id.* Now, having considered the 1973 Certificate as a whole and the parties' arguments, the Court finds that the 1973 Certificate does not contain an independent requirement obligating Munich to pay defense or the declaratory judgment expenses billed in this case.

"Reinsurance contracts are governed by the same principles that govern contracts generally." *Glob. Reins. e Corp. of Am.*, 30 N.Y.3d at 518. "Reinsurance, like any other contract, depends upon the intention of the parties, to be gathered from the words used, taking into account, when the meaning is doubtful, the surrounding circumstances" *Id.* (quoting *London Assur. Corp. v. Thompson*, 170 N.Y. 94, 99 (1902)). Thus, a reinsurance certificate "should be 'read as whole, and every part will be interpreted with reference to the whole.'" *Id.* (quoting *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324–25 (2007)). "[S]ingle clauses cannot be construed by taking them out of their context and giving them an interpretation apart from the contract of which they are a part." *Analisa Salon, Ltd. v. Elide Properties, LLC*, 30 A.D.3d 448, 448–491 (2d Dep't 2006). A reinsurance certificate, "while serving as written confirmation of a contract, might not in and of itself constitute the fully integrated agreement"; the underlying reinsured policy is not extrinsic evidence. *Glob. Reins. Corp. of Am.*, 30 N.Y.3d at 519.

The declarations page of the 1973 Certificate states: "In consideration of the payment of the net premium and subject to the general conditions set forth on the reverse side hereof *the reinsurer does hereby reinsure*." (Ex. P-4, at MRA 10181). The declarations page identifies the 1973 Umbrella that is the subject of reinsurance. (Ex. P-4, at MRA 10181). Munich argues that,

by the very nature of a facultative reinsurance contract, it only agreed to reinsure what Utica agreed in the first instance to insure. *See, e.g.*, *Glob. Reins. Corp. of Am.*, 30 N.Y.3d at 513 ("[I]n facultative reinsurance, the reinsurer agrees to indemnify the cedent for all or a portion of the cedent's risk under a single policy in the event of a loss.").[44] Utica, on the other hand, relies on the conditions on the back of the Certificate, arguing that Munich agreed to reinsure "subject to" those conditions. (Ex. P-4, at MRA 10181); *see, e.g., Clearwater Ins. Co.*, 906 F.3d at 18 (noting that a reinsurer's obligations hinge on the terms and conditions on the certificate when it agreed to reinsure "subject to" those terms and conditions).

### 1.  Loss Expenses

Paragraph 3 of the 1973 Certificate states, in relevant part:

> The Reinsurer shall be liable for its proportion of allocated loss expenses incurred by the Company in the same ratio that the Reinsurer's share of the settlement or judgment bears to the total amount of such settlement or judgment under the policy reinsured. The term "allocated loss expense" means all expenses incurred in the investigation, adjustment and litigation of claims or suits, but excluding the office expenses of the Company and the salaries and expenses of all employees of the Company.

(Ex. P-125). Paragraph 4 further provides: "The Company has the obligation to investigate and defend claims or suits affecting this reinsurance and to pursue such claims or suits to final determination." (Ex. P-125).[45]

---

[44] Maneval, Utica's own expert, agreed at trial that the "reinsurer reinsures what the policy insures." (T. 2187–88). Further, Martin, who was extensively involved in the litigation with Goulds and Utica's reinsurance billings and is, at present, Utica's chief operating officer, (T. 397), was asked at trial whether "[f]acultative reinsurance is concurrent in nature and [if] facultative reinsurers only reinsurer [sic] what is covered under your policies?" (T. 583–84). She responded: "Yes. They will cover what was covered under the terms and conditions of our policies." (*Id.*). Munich's employee, Spivey, similarly testified that she understood the 1973 and 1977 Certificates to "provide[] the coverage that the policy provides" and that there was not "any independent coverage or expansive coverage beyond what is in the policy itself." (T. 241–42).

[45] Utica now cites Paragraph 4 in support of its argument that Munich is liable for loss expenses outside the scope of the policy insured. Paragraph 4, by its terms, does not impose any obligation on Munich. Under Paragraph 4, Utica is required to give Munich notice of claims and subsequent developments that may involve the reinsurance, and "has the obligation to investigate and defend claims or suits affecting" the reinsurance. The Court notes that Utica did not

While Paragraph 1 obligates Munich to indemnify Utica "against losses or damages" that Utica is "legally obligated to pay," Paragraph 3 obligates Munich to pay its proportion of allocated loss expenses *incurred*" by Utica. Under New York law, to "incur" has been defined for insurance purposes to mean "to become liable or subject to." *Metz v. U.S. Life Ins. Co. in City of N.Y.*, 662 F.3d 600, 602 (2d Cir. 2011). Further, "[t]o incur a charge under New York law, an insured must at some point be legally liable to pay that charge, even if liability is later extinguished prior to payment by the insured." *Metz*, 662 F.3d at 602 (quoting *Rubin v. Empire Mut. Ins. Co.*, 25 N.Y.2d 426, 429 (1969)). Utica would not be "legally liable to pay" Goulds' defense expenses unless the Umbrella policy required it.

The parties' conduct further supports this conclusion. "Only when a contract is ambiguous can the interpretation placed upon it by the parties, as shown by their conduct, be considered in determining their intent, and even then, the parties' practices are 'merely an interpretive tool and cannot be used to create a contractual right independent of some express source in the underlying agreement.'" *Adamo v. City of Albany*, 156 A.D.3d 1017, 1018 (3d Dep't 2017) (quoting *Karol v. Polsinello*, 127 A.D.3d 1401, 1404 (3d Dep't 2015)). Here, at all relevant times, Utica's conduct indicates that it paid expenses and billed them to Munich based on its contemporaneous interpretation of the terms of the underlying umbrella policies, rather than a belief that the reinsurance certificates required Munich to pay defense expenses in all contexts. (Ex D-154, at MRA73 03448–49; Ex. D-157, at MRA73 00065, T. 406, 508-09).

While Utica cites *Employers Insurance Co. of Wausau v. American Reinsurance Co.*, 256 F Supp. 2d 923 (W.D. Wis. 2003), that case considered a reinsurer's liability for declaratory

___

rely on or cite Paragraph 4 in its discussions with Munich before bringing this action, (Ex. P-111), or in its opposition to Munich's motion for summary judgment on defense costs, (Dkt. 310), and, in light of the Court's analysis of the language in Paragraph 3, the Court declines to read an obligation to pay expenses beyond the policy based on Paragraph 4.

judgment expenses incurred in litigating coverage of the underlying policy, not defense costs outside the scope of coverage of that policy.[46] Here, interpreting the language of the Certificate with reference to the nature of facultative insurance—to reinsure a cedent's risk—and considering New York's interpretation of "incurred" in other types of insurance policies to mean "liable for or subject to," as well as Utica's course of conduct, the Court does not find Utica's interpretation, which would require Munich to pay for defense expenses beyond the scope of the coverage under the umbrella policy, to be a reasonable interpretation of the reinsurance contract. Accordingly, because the 1973 Umbrella did not require Utica to pay Goulds' defense expenses as the asbestos claims were occurrences covered by the 1973 Primary, Munich did not breach the 1973 Certificate by refusing to pay expense-supplemental defense costs.

## 2. Declaratory Judgment Expenses

Even assuming that Utica was "legally obligated" to pay declaratory judgment expenses within the meaning of the Certificates, the Court finds that the definition of "allocated loss expense" is unambiguous and does not include the declaratory judgment expenses here. The 1973 Certificate defines this phrase as "all expenses incurred in the investigation, adjustment and litigation of claims or suits, but excluding the office expenses of the Company and the salaries and expenses of all employees of the Company." (Ex. P-125). Munich argues that word "allocated" means that the expense is "linked or 'allocated' to a particular claimant" and that declaratory judgment expenses cannot be "allocated" because they "are Utica's own expenses,

---

[46] The other case on which Utica relies, *Penn Re, Inc. v. Aetna Cas. & Sur. Co.*, No. 85-cv-385, 1987 WL 909519, 1987 U.S. Dist. LEXIS 15252 (E.D.N.C. June 30, 1987), applied North Carolina law, interpreted different contractual language, and, in any event, has not been followed. *See Bellefonte Reins. Co. v. Aetna Cas. & Sur. Co.*, 903 F.2d 910, 914 (2d Cir. 1990) (declining to follow the reasoning of *Penn Re*); *see also Utica Mut. Ins. Co. v. Munich Reins. Am., Inc.*, 976 F. Supp. 2d 254, 268 n.15 (N.D.N.Y. 2013); *Pac. Emp'rs Ins. Co. v. Global Reins. Corp. of Am.*, No. 09-cv-6055, 2010 WL 1659760 at *5 n.5, 2010 U.S. Dist. LEXIS 40605, at *16 n.5 (E.D. Penn. Apr. 23, 2010).

not expenses paid on behalf of its policyholder." (Dkt. No. 430, at 21). Indeed, in its internal records, Utica labeled declaratory judgment expenses as "unallocated" expense. (Dkt. No. 449-1, ¶ 137; Exs. D-521, D-520, D-1; T. 134–35). Relying on Maneval's testimony, Utica argues that the phrase is broad in nature and the use of "claims or suits" in the definition indicates that the Certificates intended to cover declaratory judgment expenses. (Dkt. No. 431, at 52).

While the Court found ambiguity in the 1973 Certificate as to the larger question of whether Paragraph 3, which addresses "allocated loss expense," was a standalone provision requiring Munich to pay its share of expenses regardless of the underlying 1973 Umbrella, the Court did not squarely address the meaning of the phrase itself. The Court begins with the modifiers "allocated loss." While "loss" is not defined, the term is also used in Paragraph 1, obligating Munich to indemnify Utica against "losses . . . resulting from occurrences" under the 1973 Umbrella. And Paragraph 3 defines "allocated loss expenses" as "all expenses incurred in the investigation, adjustment and litigation of claims or suits." Thus, to be an "allocated loss expense," an expense must be allocable to a loss claim that Utica was obligated to pay as a result of an occurrence under the 1973 Umbrella, i.e., in connection with a particular asbestos claim or suit. *See, e.g.*, *Federal Ins. Co. v. Zurich Am. Ins. Co.*, 445 F. App'x 405, 408–09 (2d Cir. 2011) (finding that term "allocated loss expense," according to the parties' definitions "broadly include costs that are related to the insurer's investigation litigation, or settlement of a claim" and that "[t]hese definitions . . . reveal that the modifier 'allocated' refers to a particular claim or loss, as opposed to, for example, and insurer's general office expenses or overhead"). There is no evidence that Utica incurred declaratory judgment expenses in connection with the investigation, adjustment, and litigation of an asbestos claim or suit under the 1973 Umbrella—indeed, the declaratory judgment actions primarily involved issues concerning the primary policies, orphan

shares, and control of the defense: such expenses could not be allocated to the payment of a loss under the 1973 Umbrella. Moreover, Utica itself deemed its declaratory judgment expenses "*unallocated* loss expenses" prior to allocating them across the policy years. (Dkt. No. 449-1, ¶ 137; Exs. D-521, D-520, D-1; T. 134–35).

Utica argues that limiting expense in the 1973 Certificate "to expense that the reinsured policy covered, then excluding certain Utica employee salaries and office expenses . . . is superfluous since an insurance policy issued to Goulds does not cover Utica employee salaries and office expenses." (Dkt. No. 431, at 12). The Court disagrees. There is no question that Utica's employees spent time handling claims made under the 1973 Umbrella; to the extent Utica allocated the time and resources its employees spent handling each claim to the loss it paid on such a claim, this provision makes it clear that such expenses are not recoverable under the 1973 Certificate.[47]

Utica relies on *Employers Insurance* in support of its argument that 1973 Certificate requires Munich to pay declaratory judgment expenses. (Dkt. No. 431, at 4, 14). Although *Employers Insurance* involved nearly identical reinsurance language, the declaratory judgment expenses at issue there were incurred "in regard to a claim alleged to be within the policy provision, namely the claim the policy covered environmental liability." 256 F. Supp. 2d at 925. Here, Utica incurred the declaratory judgment expenses at issue litigating, among other things, issues concerning aggregate limits in primary policies, orphan shares, and control of defense, and

---

[47] To the extent Utica argues that Paragraph 4 implicitly obligates Munich to pay declaratory judgment expenses because Utica must "investigate and defend claims or suits affecting this reinsurance and []pursue such claims or suits to final determination," the Court notes that Munich only expressly assumed liability for "allocated loss expenses incurred." (*See supra* note 45). Moreover, Paragraph 4 also obligates Utica to advise Munich "promptly of any claim and subsequent developments," which "may involve the reinsurance." Utica notified Munich of the orphan share issue because it could have "material impact on billings," but did not notify Munich about the significant aggregate limit issue. (T. 530, 541).

does not contend it incurred the expenses litigating an alleged liability within the provisions of the 1973 Umbrella. Thus, *Employers Insurance* does not aid Utica in this case.[48]

*Fireman's Fund Insurance Co. v. General Reinsurance Corp.*, No. 03-cv-4406, 2005 WL 1865424, 2005 U.S. Dist. LEXIS 43650 (N.D. Ca. Aug. 5, 2005), and *Affiliated FM Insurance Co. v. Constitution Reinsurance Corp.*, 416 Mass. 839 (1994), both of which addressed reinsurer liability for a share of the cedent's declaratory judgment expenses, do not aid Utica either. In *Affiliated FM Insurance*, the court addressed whether the reinsurance certificate, which required the reinsurer to pay its share of "expenses [other than office expenses and payments to any salaried employee] incurred by the Company in the investigation and settlement of claims or suits," included "legal expenses incurred in defending a declaratory judgment brought by the insured." 416 Mass. at 842. The court found the word "expenses" to be ambiguous, explaining:

> Expenses is a word of broad import. It has no fixed definition. It is of varying signification and is dependent for its precise meaning upon its connection and the purpose to be accomplished by its use. It is comprehensive enough to include a wide range of disbursements. Standing alone, it is ambiguous.

*Id.* at 844 (quoting *Pittsfield & N. Adams R.R. v. Boston & Albany R.R.*, 260 Mass. 390, 397 (1927)). It therefore remanded for consideration of evidence of custom and trade practice to determine the meaning of the agreement. *Id.* at 846.

---

[48] Utica asks this Court to revisit its in limine ruling declining to find that Munich is collaterally estopped by *Employers Insurance*. (Dkt. No. 431, at 14). Utica argues that there are cogent and compelling reasons not to apply the law of the case doctrine because the Court erroneously applied New York collateral estoppel law instead of federal collateral estoppel law. In fact, upon further research, it appears that the preclusive effect of this federal diversity decision from Wisconsin would not be determined by reference to federal substantive law but rather the state law of Wisconsin. *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001). Neither Utica nor Munich has briefed the applicability of collateral estoppel under Wisconsin law; the Court declines to address that issue without any briefing and therefore denies Utica's request. Nevertheless, the Court notes, in passing, that collateral estoppel would be unwarranted because the declaratory judgment expenses incurred in *Employers Insurance*, unlike here, were expended litigating coverage of a coverage claim under the reinsured policy. *See Employers Insurance*, 256 F. Supp. 2d at 924; *see also DeGuelle v. Camilli*, 724 F.3d 933, 937–38 (7th Cir. 2013).

In *Fireman's Fund*, the court, citing *Affiliated FM Insurance*, also found that the word "expenses" in the certificates at issue was ambiguous. 2005 WL 1865424, at *11, 2005 U.S. Dist. LEXIS 43650, at *31. There, the certificates bound the reinsurer to pay "its proportion of expenses, other than Company [Fireman's Fund] salaries and office expenses incurred by the Company [Fireman's Fund] in the investigation and settlement of claims or suits." 2005 WL 1865424, at *4, 11, 2005 U.S. Dist. LEXIS 43650, at *15–16. Relying on expert testimony concerning "the custom and practice in the industry at the time the Certificates were issued," the court concluded that "there was a widespread custom and practice among reinsurers, including Gen Re, of paying DJ expenses under facultative reinsurance certificates containing language similar to or the same as the language at issue here" and that "the disputed language covers the DJ expenses sought by Fireman's Fund in this case." *Id.* at *12, 2005 U.S. Dist. LEXIS 43650, at *33.

Here, the word "expenses" does not stand alone but is preceded by the modifiers "allocated loss," which expressly tie the expenses for which Munich is responsible to those Utica incurred in the investigation, litigation, and settlement of—in this case, asbestos—claims and suits under the Umbrellas. Thus, *Affiliated FM Insurance* and *Fireman's Fund*, which addressed certificate language obligating reinsurers to pay "expenses," are inapposite. The Court concludes that Munich is not obligated under the Certificates to pay the declaratory judgment expenses at issue in this case.[49]

---

[49] Having found that the 1973 Certificate does not obligate Munich to pay "allocated loss expense" unless the 1973 Umbrella does, and that the term "allocated loss expense" is unambiguous and does not include the declaratory judgment expenses at issue in this case, the Court need not consider the expert testimony of Andrew Maneval on the custom and practice of declaratory judgment expenses in the reinsurance industry. At trial, Maneval, who testified as an expert witness for Utica, testified that in his opinion, the Certificates obligated the "reinsurer . . . to pay declaratory judgment expenses." (T. 2004). Maneval explained that in the 1970s there were "different types of clauses" and those that contained "broader kinds of terms" that referred to "defending claims and suits" "tend to support the reinsurer's obligation to pay [declaratory judgment expenses] as an element of defense expense." (T. 2005–05). Maneval states that he did not believe there was a "general practice that all fact certs . . . cover

52

In any event, the Court finds that Utica has failed to prove what, if any of the declaratory judgment expenses that it allocated to the 1973 Umbrella, $367,372.52, (T. 92–93; Dkt. No. 450-1, ¶ 70), and the share of those expenses that it assigned to Munich, could be attributed to the reinsured umbrella policy. The evidence at trial showed that the California and New York declaratory judgment actions concerned, among other things, the absence of aggregate limits in the primary policies. (Ex. D-279, at D-0014772; Ex. P-238, at UN-00004–5). Utica, however, assigned no declaratory judgment expenses to the primary policies, but shifted them to the umbrella policies. (T. 1555–56). Thus, Utica failed to prove that Munich breached the 1973 Certificate by refusing to pay a share of declaratory judgment expenses.

### E.    *Utica II*: 1977 Certificate – Reimbursement

In *Utica II*, Munich contends that because it had no obligation to pay supplemental expenses under the 1977 Umbrella Policy, Utica breached the 1977 Certificate by billing Munich for these expenses; Munich seeks an award of damages against Utica in the amount of its alleged overpayment—$789,813.47. (Dkt. No. 430, at 53).[50] Utica argues that the 1977 Certificate contains no right of reimbursement and has raised a number of affirmative defenses, including account stated, assumption of the risk, and voluntary payment. (Dkt. No. 442, at 32–35). Because Utica has proved by a preponderance of the evidence that Munich made a voluntary payment, the Court need not address Utica's remaining arguments.

---

[declaratory judgment] expense" but that, in his opinion, there "is a custom regarding the breadth or the narrowness of the . . . expense obligation that . . . determines how the industry responds." (T. 2157). Maneval identified "the operative words" in the 1973 and 1977 Certificates as "claims and suits" and explained that when a certificate refers "to any kinds of claims or suits, [his] understanding is the normal practice is to cover declaratory judgment expenses." (T. 2158). Maneval did not, however, address the impact or meaning of "allocated loss expense."

[50] The Court assumes, without deciding, that the 1977 Umbrella, which also contains the "occurrence not covered by" language, did not require to Utica to provide a defense to Goulds. (Ex. P-92, at R-0007676). The Court likewise assumes that the 1977 Certificate, (Ex. P-113), did not independently obligate Munich to pay defense expenses.

The voluntary payment doctrine "precludes a plaintiff from recovering payments 'made with full knowledge of the facts' and with a 'lack of diligence' in determining his contractual rights and obligations." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 72 (2d Cir. 2009) (quoting *Dillon v. U–A Columbia Cablevision of Westchester, Inc.*, 292 A.D.2d 25, 27 (2d Dep't 2002), and *Gimbel Bros. v. Brook Shopping Ctrs., Inc.*, 118 A.D.2d 532, 536 (2d Dep't 1986)). "The doctrine does not apply, however, when a plaintiff made payments under a mistake of fact or law regarding the plaintiff's contractual duty to pay." *Spagnola*, 574 F.3d at 72 (citing *Dillon*, 292 A.D.2d at 27). As this is an affirmative defense, *see Wurtz v. Rawlings Co., LLC*, No. 12-cv-01182, 2014 WL 4961422, at *6, 2014 U.S. Dist. LEXIS 141869, at *15 (E.D.N.Y. Oct. 3, 2014), Utica bears the burden of proof, *see Barton Grp., Inc. v. NCR Corp.*, 796 F. Supp. 2d 473, 498 (S.D.N.Y. 2011).

In November 2007, Munich received its first bill from Utica under the 1977 Certificate, for the $1 million liability limit for loss and $731,368.21 in expense. (Ex. D-154, at MRA73 03450). Although he had not seen any policy documentation, Miller, Munich's claims handler, had the impression from Utica's "statements" and "claim analysis" that "some of the umbrella policies," including the 1977 Umbrella Policy, "had expense in addition to limits." (T. 1744–45). On December 6, 2007, prior to paying the bill, Miller spoke with Martin, then a Utica associate claims attorney, who explained that Utica was allocating loss and expense to "all triggered policies pursuant to the terms of their policies." (Ex. D-157, at MRA73 00065). They discussed the discrepancy between this expense-supplemental billing to Munich and the settlement's expense-inclusive treatment of the 1977 Umbrella policy. (Ex. D-157, at MRA73 00065). Miller requested that Martin send "available policy documentation." (Ex. D-157, at MRA73 00065).[51]

---

[51] Munich argues that Miller did not request further documentation on the 1977 Umbrella Policy or how Utica determined it was expense-supplemental because he believed that Utica had already sent all available policy

Martin knew that Miller wanted the 1977 Umbrella policy and knew that Utica had reconstructed that policy, including the provisions governing defense expenses and the "not covered by language." (T. 560; Ex. P-92). Because those files were in a "unit where" she "no longer worked," however, Martin instead sent Miller what she had "on her hard drive," none of which included any pertinent policy language. (T. 560, Ex. D-488). Miller understood that Utica was claiming that the 1977 Umbrella was expense-supplemental and billing Munich accordingly, and that none of the documentation Utica had sent revealed any language indicating that the 1977 Umbrella was expense-supplemental; yet he recommended, and his supervisors approved, payment of the $1,731,368.21 bill. In November 2012, approximately five years later, Munich's attorneys obtained the 1977 Umbrella policy and saw the defense expense provisions ("occurrence not covered by" language) for the first time. (Ex. D-110, at MRA77 1308).

Based on these facts, the Court concludes that Munich was fully aware that Utica was billing on an expense-supplemental basis. Munich claims mistake of fact and contends that it was misled by Utica because it did not know until after payment that the 1977 Umbrella did not cover defense expenses. Munich, however, was fully aware at the time of payment that none of the policy documentation Utica had provided showed that the 1977 Umbrella was expense-supplemental, and that Utica's settlement treatment reflected the 1977 Umbrella policy as

---

documentation in response to his December 6, 2007 request, which concerned both the 1973 and 1977 Umbrellas, and relied on Utica's "misrepresentations" in recommending payment. (Dkt. No. 430, at 55–56; D-157, at MRA73 00065; T. 1752–53). However, the Court does not find Miller's testimony that he believed Utica had sent all available policy documentation credible because, shortly after receiving that documentation, Miller continued to press Utica for additional documentation regarding the 1973 Umbrella, including "specimen copies of the umbrella coverage form that Utica would have been using at the time the 1973 was issued," and asked for an "explanation of how it was determined that the 1973 policy treated expense as part of loss." (Ex. P-162, at R-0074003). Indeed, Miller requested and received authority to pay the bill under the 1977 Certificate on December 14, 2007, the same day he requested specimen copies of the 1973 Umbrella. (Ex. P-162, at R-0074003; Ex. P-91, at MRA77 277). The Court therefore finds Munich's failure to press Utica for additional documentation, knowing that Utica was billing Munich in a manner for which there was no documentary support, to be attributable to a lack of diligence—not to being misled.

expense-inclusive. Munich paid the reinsurance bill anyway, without obtaining even the specimen form or further pressing Utica to explain the basis for its determination that the 1977 Umbrella was expense-supplemental. Under these facts, the Court finds that Munich lacked knowledge of the terms of the policy not because it was misled but because of its lack of diligence. *See, e.g.*, *Spagnola*, 574 F.3d at 73 (distinguishing lack of knowledge due to being misled, which is not barred by the voluntary payment doctrine, from a lack of knowledge due to a lack of diligence). And under New York law, "the voluntary payment doctrine precludes a party from recovering voluntary payments 'made with full knowledge of the facts' if the party's ignorance of its contractual rights and obligations resulted from a 'lack of diligence.'" *United States ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 657 (S.D.N.Y. 2011) (quoting *Spagnola*, 574 F.3d at 72); *see Gimbel Bros.*, 118 A.D.2d 532, 535–36 (2d Dep't 1986) (holding that tenant was not entitled to recover improper "Sunday charges" that it voluntarily made for almost a year and a half before questioning them, and that, having "displayed a marked lack of diligence in determining what its contractual rights were, [it] is therefore not entitled to the equitable relief of restitution").

Having full knowledge that it was being billed for expenses on an expense-supplemental basis and that the documentation Utica had provided did not support its expense-supplemental position, Munich paid the bill without protest or further inquiry. The Court does not condone Martin's failure to send the 1977 Umbrella Policy in response to Miller's request for policy documentation. But given the parties' course of dealing and Miller's continued requests for additional information regarding the 1973 Umbrella Policy after Martin's incomplete response, the Court finds that Miller accepted the uncertainty surrounding the basis for the expense-supplemental billing and made a calculated decision to pay it rather than request more

information. *See Chris Albritton Const. Co. v. Pitney Bowes Inc.*, 304 F.3d 527, 531–32 (5th Cir. 2002) ("Regarding mistake or accident, '[u]ncertainty about the facts, irrespective of the reason for such uncertainty, is not the equivalent of a mistake of fact.'" (quoting *Mobile Telecomm. Techs. Corp. v. Aetna Cas. & Sur. Co.*, 962 F. Supp. 952, 956 (S.D. Miss. 1997))). As O'Kane, who approved Miller's request to pay Utica's billing under the 1977 Certificate, has acknowledged: "Munich's decision to reimburse Utica for expenses in excess of the limit of liability of the 1977 certificate was a business decision rather than a reflection of contract language and depended upon a consideration of a number of variables, including: The nature of the relationship, commercial considerations, the nature of the billed expense, and the benefit to Munich resulting from Utica having incurred those expenses." (T. 1948).

Munich therefore cannot rely on receipt of the actual terms of the 1977 Umbrella almost five years later to defeat the voluntary payment doctrine. *See Dillon*, 292 A.D.2d at 27–28 ("Having full knowledge of the late fee and the circumstances under which it would be imposed, the plaintiff cannot rely on her misconception of the actual costs associated with late payments to defeat application of the voluntary payment doctrine."); *Gimbel Bros*, 118 A.D.2d at 536 ("When a party intends to resort to litigation in order to resist paying an unjust demand, that party should take its position at the time of the demand, and litigate the issue before, rather than after, payment is made."). The Court concludes that Utica has proved by a preponderance of the evidence that the voluntary payment doctrine bars Munich's breach of contract claim.

## IV.   CONCLUSION

For these reasons, it is

**ORDERED** that Utica's request for entry of declaratory judgment is **DENIED** and that the Clerk is directed to enter judgment in favor of Munich in *Utica I*, 6:12-cv-196; and it is further

**ORDERED** that Munich's request for entry of declaratory judgment is **DENIED** and that the Clerk is directed to enter judgment in favor of Utica in *Utica II*, 6:13-cv-743; and it is further

**ORDERED** that the Clerk is directed to close these cases.

**IT IS SO ORDERED.**

Dated:  March 29, 2019
         Syracuse, New York

Brenda K. Sannes
U.S. District Judge